## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| CLOUD PEAK ENERGY INC., *et al.*, | ) | Case No. 19 – 11047 (KG) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re:  Docket Nos. 31, 106, 117, & 368** |

### FINAL ORDER (I) AUTHORIZING
### THE DEBTORS TO (A) OBTAIN POSTPETITION
### FINANCING SECURED BY SENIOR PRIMING LIENS AND (B) USE CASH
### COLLATERAL, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
### ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION,
### (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

Upon the Motion[2] filed by the above-referenced debtors and debtors in possession (collectively, the "***Debtors***") for entry of a final order (this "***Final Order***") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), *inter alia*:

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Antelope Coal LLC (8952); Arrowhead I LLC (3024); Arrowhead II LLC (2098); Arrowhead III LLC (9696); Big Metal Coal Co. LLC (0200); Caballo Rojo LLC (9409); Caballo Rojo Holdings LLC (4824); Cloud Peak Energy Finance Corp. (4674); Cloud Peak Energy Inc. (8162); Cloud Peak Energy Logistics LLC (7973); Cloud Peak Energy Logistics I LLC (3370); Cloud Peak Energy Resources LLC (3917); Cloud Peak Energy Services Company (9797); Cordero Mining LLC (6991); Cordero Mining Holdings LLC (4837); Cordero Oil and Gas LLC (5726); Kennecott Coal Sales LLC (0466); NERCO LLC (3907); NERCO Coal LLC (7859); NERCO Coal Sales LLC (7134); Prospect Land and Development LLC (6404); Resource Development LLC (7027); Sequatchie Valley Coal Corporation (9113); Spring Creek Coal LLC (8948); Western Minerals LLC (3201); Youngs Creek Holdings I LLC (3481); Youngs Creek Holdings II LLC (9722); Youngs Creek Mining Company, LLC (5734).  The location of the Debtors' service address is:  385 Interlocken Crescent, Suite 400, Broomfield, Colorado 80021.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Motion.

i.  authorizing the Debtors to obtain senior secured priming and superpriority postpetition financing to be funded by certain of the Prepetition Secured Noteholders (as defined below, in their capacity as lenders under the DIP Facility, the "***DIP Lenders***") under a secured term loan (the "***DIP Facility***") consisting of (A) (1) new money term loans (the "***DIP Term Loans***") in an aggregate principal amount of up to $35 million of initial secured term loans (the "***Initial DIP Term Loans***"), including $10 million of "Initial Borrowing" (as defined in the DIP Credit Agreement (as defined below), the "***Initial Borrowing***") and up to an additional $25 million being available on or after entry of the Final Order in one or two additional draws, and (2) an option to draw up to an additional $10 million of Incremental Loans (as defined in the DIP Credit Agreement, the "***Incremental Facility***"), and (B) roll-up term loans (the "***DIP Roll-Up Loans***" and, together with the DIP Term Loans, the "***DIP Loans***"), which shall be subject and subordinate to the DIP Term Loans, to refinance $0.80 of the Secured Notes Debt (as defined below) held by the DIP Lenders for every dollar of DIP Term Loans, in the aggregate amount of up to $28 million, plus an additional aggregate amount of up to $8 million in the event of the incurrence of debt under the Incremental Facility;

ii. confirming the Court's grant of authority to the Debtors, as Borrowers (as defined in the DIP Credit Agreement, in such capacity, the "***DIP Loan Parties***") under the Interim Order (as defined below) to execute, enter into, and perform under that certain *Superpriority Senior Secured Debtor-in-Possession Credit Agreement* dated as of May 15, 2019, by and among the DIP Loan Parties, the DIP Lenders, and Ankura Trust Company, LLC, as administrative and collateral agent (collectively, solely in such capacities, the "***DIP Agent***" and, together with the DIP Lenders, the "***DIP Secured Parties***"), substantially in the form attached as Exhibit A to the Interim Order, and authorizing the DIP Loan Parties to execute, enter into, and perform under that certain *Superpriority Senior Secured  Debtor-in-Possession Credit Agreement* (as amended), by and among the DIP Loan Parties and the DIP Secured Parties substantially in the form attached hereto as **<u>Exhibit A</u>** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "***DIP Credit Agreement***") on a final basis, and any other related documentation, including security agreements, pledge agreements, mortgages, guaranties, promissory notes, certificates, instruments, and such other documentation that may be reasonably necessary, desirable or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agent, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "***DIP Facility Documents***"), each of which shall be in form and substance reasonably satisfactory to the DIP Secured Parties and the DIP Loan Parties; and to perform such other acts as may be reasonably necessary, desirable, or appropriate in connection with the DIP Facility Documents;

iii.    granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties (a) DIP Liens (as defined below) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which DIP Liens shall be senior to all liens, security interests, and pledges on the DIP Collateral, except that such DIP Liens shall be junior, subordinate, and subject in all respects solely to (i) the Carve-Out (as defined below), (ii) the valid, perfected, and non-avoidable liens of the Purchasers (as defined below) under the Debtors' accounts receivable securitization facility (the "*Securitization Facility*") in the equity interests of non-debtor Cloud Peak Energy Receivables LLC pursuant to the Amended Purchase Agreements,[3] (iii) valid, non-avoidable liens perfected in the Debtors' property subsequent to the Petition Date (as defined below) as permitted by section 546(b) of the Bankruptcy Code, and (iv) other valid, perfected, and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and identified as such on a schedule to the DIP Credit Agreement; (b) valid, perfected second liens on other collateral as described herein and in the DIP Credit Agreement; and (c) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim, subject and subordinate to the Carve-Out;

iv.    authorizing and directing the Debtors to pay all principal, interest, fees, costs, expenses, and other amounts payable under the DIP Facility Documents as such become due and payable, as provided and in accordance therewith;

v.    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility Documents, the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 106] (the "*Interim Order*"), and this Final Order;

vi.    authorizing the Debtors to continue to use Cash Collateral (as defined below) and all other Secured Notes Collateral (as defined below), and the

---

[3]    The "*Amended Purchase Agreements*", together with all related amendments, instruments and agreements, are: (i) that certain *Amended and Restated Purchase and Sale Agreement* among the various Originators from time to time party thereto, Cloud Peak Energy Resources LLC as Servicer, and Cloud Peak Energy Receivables LLC as Buyer; and (ii) that certain *Second Amended and Restated Receivables Purchase Agreement* (the "*RPA*") among Cloud Peak Energy Receivables LLC as Seller, Cloud Peak Energy Resources LLC as initial Servicer, certain Purchasers, PNC Bank as Administrator and LC Bank, and PNC Capital Markets LLC as Structuring Agent, each of (i) and (ii) as may be amended, amended and restated, and/or modified from time to time, as the case may be, approved by the Court, and entered into by the respective parties thereto after the Petition Date.

US 6474966

granting of adequate protection to the Prepetition Secured Noteholders as provided in the Interim Order and this Final Order;

vii.    authorizing (A) the DIP Loan Parties upon entry of the Interim Order, to incur in a single draw on the Effective Date (as defined in the DIP Credit Agreement) the Initial Borrowing in an aggregate principal amount of $10 million (the incurrence of such Initial Borrowing upon entry of the Interim Order, the "***Interim Financing***") with $10 million of such Interim Financing to be deposited into the Segregated Account (as defined in the DIP Credit Agreement) and request funds in respect of such Interim Financing from the Segregated Account, (B) upon entry of this Final Order, and subject to the terms of the DIP Credit Agreement, (x) the funding into the Segregated Account in one or two additional draws of up to an additional $25 million as may become available upon entry of the Final Order (the "***Final Financing***"), and (y) the DIP Loan Parties to request funds from the Segregated Account in an aggregate principal amount of up to such amount so approved to be funded (pursuant to one or more withdrawals subject to the terms and conditions of the DIP Credit Agreement), including for purposes of funding the Carve-Out Reserve (as defined below) in accordance with the terms hereof, and (C) the incurrence of debt under the Incremental Facility (the "***Incremental Financing***", and together with the Interim Financing and the Final Financing, the "***DIP Financing***"), in each case subject to the terms and conditions set forth in the DIP Facility Documents (including, among others, satisfaction or waiver of the Specified Tax Condition (as defined in the DIP Credit Agreement), to the extent applicable), the Interim Order, and this Final Order; and

viii.    authorizing the Debtors (A) upon entry of this Final Order, to use the DIP Roll-Up Loans to refinance and discharge $0.80 of Secured Notes Debt held by the DIP Lenders for every dollar of DIP Term Loans in the aggregate amount of up to $28 million, and (B) in the event of the incurrence of debt under the Incremental Facility, to also use DIP Roll-Up Loans to refinance and discharge $0.80 of Secured Notes Debt held by the DIP Lenders for every dollar of Incremental Loans in the aggregate amount equal to the total debt funded under the Incremental Facility in the aggregate amount of up to an additional $8 million (collectively, the "***Secured Notes Refinancing***");

all as more fully set forth in the Motion, the First Day Declaration and the Puntus Declaration in support thereof, and the *Supplement to Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and*

US 6474966

*(V) Granting Related Relief]* [Docket No. 368] (the "**Supplement**"); and the Court having

jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware*, dated February 29, 2012; and the Court having found that this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article

III of the United States Constitution; and the Court having found that venue of this proceeding and

the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

considered the Motion, the First Day Declaration and the Puntus Declaration in support thereof, the

Supplement, the DIP Facility Documents, and the pleadings submitted and arguments made by the

Debtors at the interim hearing held on May 14, 2019 (the "**Interim Hearing**") and final hearing held

on July 18, 2019 (the "**Final Hearing**"); and the Court having entered the Interim Order approving

the relief requested in the Motion on an interim basis; and the Court having found that the relief

requested in the Motion is in the best interests of the Debtors and their respective estates, creditors,

and other parties in interest; and the Court having found that proper and adequate notice of the

Motion, the Supplement, and the Final Hearing has been given under the circumstances and that no

other or further notice is necessary for the relief requested in the Motion (as supplemented by the

Supplement); and the Court having found that good and sufficient cause exists for the granting of

the relief requested in the Motion (as supplemented by the Supplement) after having given due

deliberation upon the Motion, the Supplement, and all of the proceedings had before the Court in

connection with the Motion and the Supplement, THE COURT HEREBY MAKES THE

FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[4]:

---

[4] Where appropriate in this Final Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

US 6474966

A.    *Petition Date*.  On May 10, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), commencing these chapter 11 cases.

B.    *Debtors in Possession*.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

C.    *Joint Administration*.  These chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Waiving the Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(b)* [Docket No. 89], entered by the Court on May 14, 2019 in each of these chapter 11 cases.

D.    *Interim Order*.  On May 15, 2019, the Court entered the Interim Order.

E.    *Jurisdiction and Venue*.  This Court has jurisdiction over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

F.    *Committee Formation*.  The Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**") in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code on May 22, 2019.

US 6474966

G.    *Findings Regarding Postpetition Financing and the Use of Cash Collateral*.

(i)    Request for Postpetition Financing.  The Debtors seek final authority to enter into the DIP Facility on the terms described herein and in the DIP Facility Documents to administer their chapter 11 cases and fund their operations.

(ii)    Priming of the Prepetition Liens.  The priming of liens to the extent provided herein under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Loans under the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors.  The Notes Secured Parties (as defined below) have consented to such priming of liens and the Debtors' use of Cash Collateral subject to the terms and conditions of this Final Order.

(iii)    Need for Postpetition Financing.  The Debtors have a need to obtain postpetition financing pursuant to the DIP Facility and to use the Secured Notes Collateral (including cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "***Cash Collateral***")) in order to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships, to make capital expenditures, to satisfy other working capital and operational needs, and to conduct an orderly and value-maximizing process for the sale of the Debtors' assets as a going concern for the benefit of the Debtors' stakeholders.  The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  The Debtors do not have sufficient available sources of working capital and financing to preserve the value of their businesses without the ability to borrow under the DIP Facility and access the Cash Collateral.

US 6474966

(iv)    <u>No Credit Available on More Favorable Terms</u>.  As set forth in the Motion, the First Day Declaration and the Puntus Declaration in support thereof, and the Supplement, and the record presented to the Court at the Interim Hearing and the Final Hearing, the DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders: (a) perfected security interests in and DIP Liens on (each as provided herein) the Debtors' existing and after-acquired assets with the priorities (but subject to the exclusions) as set forth herein, (b) superpriority claims with the priorities set forth herein, (c) the refinancing of a portion of the Secured Notes Debt with the DIP Roll-Up Loans, and (d) the other protections set forth in this Final Order.

(v)    <u>Use of Proceeds of the DIP Facility and Use of Cash Collateral</u>.  As a condition to the Debtors' entry into the DIP Facility Documents and the extension of credit under the DIP Facility, the DIP Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used solely in a manner consistent with the terms and conditions of this Final Order and the DIP Facility Documents.  As a condition to their consent to the use of Cash Collateral,

8

the Prepetition Secured Noteholders also require, and the Debtors herein agree, that the Cash Collateral shall be used solely in a manner consistent with the terms and conditions of this Final Order.

(vi)    <u>Use of the DIP Roll-Up Loans</u>.  Use of the DIP Roll-Up Loans to refinance and discharge the DIP Lenders' Secured Notes (in an amount equal to 80% the DIP Term Loans provided by such DIP Lenders under the DIP Facility) reflects the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties.

(vii)    <u>Notes Secured Parties' Entitlement to Adequate Protection</u>.  The Notes Secured Parties are entitled to the adequate protection provided in the Interim Order and this Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the Motion, the First Day Declaration and the Puntus Declaration in support thereof, and the Supplement, and on the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the proposed adequate protection arrangements and of the use of the Secured Notes Collateral are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of the Secured Notes Collateral; *provided* that nothing in the Interim Order, this Final Order or the DIP Facility Documents shall (i) be construed as the affirmative consent by any of the Notes Secured Parties for the use of Cash Collateral other than on the terms set forth in this Final Order and in the context of the DIP Facility authorized by this Final Order, or (ii) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Secured Notes Collateral (whether senior or junior thereto), or (iii) prejudice, limit, or otherwise impair the rights of any of the Notes Secured Parties to seek new, different, or additional adequate protection for any diminution in value from and after the Petition Date of their interests in any Secured Notes Collateral (*provided,*

US 6474966

*however*, that any such additional adequate protection granted, if any, shall be junior to the Carve-Out, the DIP Liens, the DIP Superpriority Claim, the lien on the Securitization Facility Collateral (as defined below), and the Securitization Superpriority Claim (as defined below), as applicable), or assert the interests of any of the Notes Secured Parties to the extent not inconsistent with that certain *Amended and Restated Sale and Plan Support Agreement* dated as of May 9, 2019 (the "**Support Agreement**") among Cloud Peak Energy Inc., Cloud Peak Energy Resources LLC, Cloud Peak Energy Finance Corp., and the other direct and indirect subsidiaries of Cloud Peak Energy Inc. that are or become a party thereto, together with the Prepetition Secured Noteholders that are party thereto and each holder of 2024 Notes Claims (as defined in the Support Agreement) that are or become a party thereto, to the extent the same is still in effect, and the rights of any other party in interest (including, without limitation, the Debtors) to object to such relief are hereby preserved.

H.      *Section 506(c)*.  In light of the DIP Secured Parties' agreement to extend credit to the Debtors on the terms described herein and the Notes Secured Parties' consent to the Debtors' use of the Secured Notes Collateral, including Cash Collateral, upon entry of the Final Order, each of the DIP Secured Parties and the Notes Secured Parties is entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code, subject to the Carve-Out.

I.      *Good Faith*.

(i)      <u>Willingness to Provide Financing</u>.   The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) for the Initial Borrowing, entry of the Interim Order and, for the subsequent borrowing of DIP Loans, this Final Order; (b) Court approval of the terms and conditions of the DIP Facility and the DIP Facility Documents; (c) satisfaction or waiver of the closing conditions set forth in the DIP Facility Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Secured Parties are

extending credit to the Debtors pursuant to the DIP Facility Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to the Interim Order, this Final Order and the DIP Facility Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)     <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  The terms and conditions of the DIP Facility, the DIP Facility Documents, and the fees paid and to be paid thereunder to the DIP Secured Parties, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured postpetition financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Entry of this Final Order is in the best interests of the Debtors and their estates, creditors, and equity holders. The terms and conditions of the DIP Facility were negotiated in good faith and at arms' length among the Debtors and the DIP Secured Parties, with the assistance and counsel of their respective advisors. Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties, within the meaning of section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Final Order or any other order.

J.     <u>*Debtors' Stipulations*</u>.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of a Committee or any other party in interest (subject to the limitations thereon contained in Paragraphs 29 and 31 below), the Debtors acknowledge, admit, stipulate and agree that:

    i.    <u>Prepetition Secured Notes</u>.  Pursuant to that certain Indenture dated as of October 17, 2016 (as amended, supplemented or otherwise modified prior to the date hereof, the "***Secured Notes Indenture***", and collectively with any other agreements and documents executed or delivered in connection therewith, each as may be

amended, restated, amended and restated, supplemented, waived, and/or otherwise modified from time to time, the "**Secured Notes Documents**"), by and among, *inter alia*, Cloud Peak Energy Inc., Cloud Peak Energy Resources LLC, Cloud Peak Energy Finance Corp. (together with Cloud Peak Energy Resources LLC, the "**Secured Notes Issuers**"), the other subsidiaries of Cloud Peak Energy Inc. party thereto (collectively, the "**Secured Notes Loan Parties**") and Wilmington Trust, National Association, in its capacity as trustee and collateral agent (in such capacity, together with its successors in such capacity, the "**Secured Notes Trustee**" and, together with the Holders (as defined in the Secured 2021 Notes Indenture, the "**Prepetition Secured Noteholders**"), the "**Notes Secured Parties**"), the Secured Notes Issuers incurred indebtedness to the Prepetition Secured Noteholders consisting of 12.00% Second Lien Senior Secured Notes due 2021 (collectively, the "**Secured Notes**").

ii.    Secured Notes Debt.  As of the Petition Date, each of the Debtors was justly and lawfully indebted and liable to the Notes Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the Secured Notes in the aggregate principal amount of $290,366,000 (collectively, such indebtedness together with accrued and unpaid interest thereon and fees, expenses, charges, indemnities, and other obligations incurred in connection therewith as provided in the Secured Notes Documents, the "**Secured Notes Debt**").

iii.    Validity of Secured Notes.  (a) The Secured Notes Debt constitutes legal, valid, binding, unreleased and non-avoidable obligations of each of the Debtors and (b) no portion of the Secured Notes Debt or any payments made to the Notes Secured Parties or applied to or paid on account of the obligations owing under the Secured Notes Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law.

iv.    Prepetition Liens.  The liens granted to the Notes Secured Parties by each of the Debtors (the "**Secured Notes Liens**") are (a) valid, binding, perfected, enforceable, unreleased liens and security interests in the Collateral (as defined in the Secured Notes Indenture) (such Collateral, the "**Secured Notes Collateral**"), (b) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law, and (c) as of the Petition Date, subject only to Permitted Liens (as defined in the Secured Notes Indenture).

v.    Cash Collateral.  All of the Debtors' cash in deposit accounts (other than in the Segregated Account or in an Excluded Account (as defined in the DIP Credit Agreement)) constitutes Cash Collateral of the Notes Secured Parties.

vi.    No Control.  None of the Notes Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue

US 6474966

of any of the actions taken with respect to, in connection with, related to, or arising from the Secured Notes Documents.

vii.    <u>No Claims or Causes of Action</u>.  No claims, counterclaims or causes of action of any kind or nature exist against, or with respect to, the Notes Secured Parties under any agreements by and among the Debtors and any such party that is in existence as of the Petition Date, whether related to the Secured Notes Documents, any other agreement, the Debtors or otherwise.

K.    Based on the Motion, the First Day Declaration and the Puntus Declaration in support thereof, the Supplement, and the record presented to the Court at the Interim Hearing and the Final Hearing, and the Court having entered the Interim Order, approving the relief requested in the Motion on an interim basis, the terms of the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

L.    _Secured Notes Collateral_.  After consultation with its attorneys and financial advisors, the Committee (as defined below) acknowledges, admits, stipulates and agrees that:

US 6474966

(i)     Notwithstanding anything to the contrary herein, including Paragraph 31, the liens granted to the Notes Secured Parties by Cloud Peak Energy, Inc. and the Secured Notes Issuers (the "*Parent-Issuer Liens*") are (a) valid, binding, perfected, enforceable, unreleased liens and security interests in the Secured Notes Collateral, (b) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law, and (c) as of the Petition Date, subject only to Permitted Liens (as defined in the Secured Notes Indenture), except solely with respect to those assets of Cloud Peak Energy, Inc. and the Secured Notes Issuers set forth on Schedule I hereto (the "*Reserved Challenge Assets*").

(ii)    Upon the Entry of this Final Order, the Committee agrees that it will not accrue or incur any additional professional fees in connection with the investigation of the Parent-Issuer Liens, including, but not limited to, professional fees incurred in connection with the production or review of documents, depositions, interrogatories, examinations or other discovery or in connection with the analysis of claims or causes of action, except solely with respect to the Reserved Challenge Assets.

M.     *Notice*. Notice of the Interim Hearing and the Final Hearing has been provided by delivery to:  (a) the United States Trustee; (b) Nixon Peabody LLP, as counsel to the Secured Notes Trustee; (c) counsel to the ad hoc group of Prepetition Secured Noteholders (the "*Ad Hoc Group*"), the DIP Agent, and the DIP Lenders, (d) the indenture trustee under the Debtors' unsecured notes; (e) the Debtors' 50 largest unsecured creditors (on a consolidated basis); (f) those parties entitled to notice pursuant to Local Rule 9013-1(m); (g) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002; (h) the Securities and Exchange Commission; (i) the Internal Revenue Service; (j) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules; (k) counsel to PNC Bank; (l) the United States Environmental Protection Agency; and (m) the United States Department of the Interior.  A copy of the Motion, the Interim Order, and the Supplement were also served on the Campbell County, Wyoming Assessor, the Converse County, Wyoming Assessor, and the Wyoming Attorney General's Office.  Proper, timely, adequate and sufficient notice of the Motion and the Supplement has been provided in accordance with the Bankruptcy Code, the Bankruptcy

14

Rules and the Local Rules, and no other or further notice of the Motion or the Supplement or the entry of the Interim Order or this Final Order shall be required.

N.    As of the date hereof, the amount of the Borrowing Base (as defined in the DIP Credit Agreement) is $35,155,925.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    <u>Financing Approved</u>.  The Motion is **GRANTED** on a final basis as set forth herein.

2.    <u>Objections Overruled</u>.  Any objections to the Motion not resolved or otherwise withdrawn are **OVERRULED**.

3.    [Reserved]

4.    <u>Authorization of the DIP Facility</u>.  The DIP Facility, and the borrowing of the DIP Financing, is hereby approved.  The Debtors were authorized by the Interim Order, and are hereby expressly and immediately authorized and empowered on a final basis to execute and deliver the DIP Facility Documents, and to incur and to perform the DIP Obligations (as defined below) in accordance with, and subject to, the terms of this Final Order and the DIP Facility Documents, including to deliver all DIP Facility Documents which may be reasonably required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Final Order and the DIP Facility Documents.  The Debtors are hereby authorized and directed to pay, in accordance with the DIP Facility Documents and this Final Order, the principal, interest, fees, expenses, and other amounts described in the DIP Facility Documents as such become due and payable and without need to obtain further Court approval, including, without limitation, the DIP Agent's fees, the reasonable and documented fees,

US 6474966

costs, disbursements and expenses of the DIP  Secured Parties in accordance with the DIP Facility

Documents (including the reasonable and documented fees and expenses of Davis Polk and one local

counsel in each material jurisdiction ), whether or not such fees arose before or after the Petition

Date (the "***DIP Professional Fees***"), all to the extent provided in this Final Order or the DIP Facility

Documents, including without limitation delivery of invoices to the Fee Notice Parties (as defined

below) as provided for in Paragraph 27 herein.   Upon execution and delivery, the DIP Facility

Documents shall represent valid and binding obligations of the Debtors, enforceable against each of

the Debtors and their estates in accordance with their terms.   For the purposes hereof, the term "***DIP***

***Obligations***" means all "Obligations" or "DIP Obligations" as defined in the DIP Credit Agreement,

and shall include, without limitation, principal, interest, all loans, advances, extensions of credit,

financial accommodations, reimbursement obligations, fees and any administrative agent fees, costs,

expenses and other liabilities, all other obligations (including indemnities and similar obligations,

whether contingent or absolute) and all other amounts due or payable under the DIP Facility

Documents, but shall exclude Contingent Roll-Up Loans (as defined below) unless and until such

Contingent Roll-Up Loans are converted into DIP Roll-Up Loans.

US 6474966

5.       Authorization of the DIP Financing and the Use of the Prepetition Collateral.

(a)       From the entry of this Final Order through and including the earliest to occur of (i) entry of the Final Order, or (ii) the Termination Declaration (as defined below), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Facility Documents and this Final Order, the Debtors are hereby authorized, on a final basis, to borrow all amounts available under the DIP Facility incurred pursuant to, and in accordance with, this Final Order and the DIP Facility Documents.

(b)       The full principal amount of the DIP Financing shall be deemed the aggregate principal amount of such DIP Loans and shall be deemed outstanding upon the drawing of such DIP Loans.

(c)       The Debtors' use of advances of credit under the DIP Facility and the Secured Notes Collateral (including Cash Collateral) is hereby approved in accordance with the budget attached hereto as **Exhibit B** (as modified from time to time in accordance with Paragraph 17, the "***Budget***") and subject to the other terms and conditions of this Final Order and the DIP Facility Documents.

(d)       Cash constituting Cash Collateral of the Notes Secured Parties shall be deemed to have been used first by the Debtors, and all such Cash Collateral shall be used and deemed to be used prior to the Debtors' use of any of the Interim Financing, the Final Financing, or any postpetition cash or postpetition proceeds of the DIP Collateral.

6.       Secured Notes Refinancing.

(a)       The Debtors shall use the DIP Roll-Up Loans to: (A) concurrently with the Second Borrowing (as defined in the DIP Credit Agreement), which shall occur within 10 business days following the entry of this Final DIP Order (unless such requirement is waived by the Required

US 6474966

Lenders (as defined in the DIP Credit Agreement) (but only to the extent that the applicable conditions to the Second Borrowing as set forth in DIP Credit Agreement are otherwise satisfied or waived by the Required Lenders at such time), (i) refinance and discharge Secured Notes Debt held by the DIP Lenders in an amount equal to 80% of the Initial Borrowing (as defined in the DIP Credit Agreement, the "*Initial Roll-Up Loans*"); (ii) refinance and discharge Secured Notes Debt held by the DIP Lenders in an amount equal to 80% of the Second Borrowing, and (iii) refinance and discharge Secured Notes Debt held by the DIP Lenders in an amount equal to 80% of the amount of any remaining unused commitments, if any, under the DIP Credit Agreement at the time of the Second Borrowing (the "*Contingent Roll-Up Loans*"); and (B) concurrently with the incurrence of debt under the Incremental Facility, refinance and discharge Secured Notes Debt of the Incremental Term Lenders (as defined in the DIP Credit Agreement) in an amount equal to 80% of the Incremental Financing, in each case subject to the terms and conditions set forth in the DIP Facility Documents and the reservation of rights of parties in interest in Paragraph 31 below.

(b)     Notwithstanding anything to the contrary herein, upon the entry of this Final Order, an amount of the Secured Notes Debt claims held by the DIP Lenders, such amount to equal 80% of the Initial Borrowing, shall be granted superpriority administrative expense priority under section 364(c)(1) of the Bankruptcy Code (the "*Initial Roll-Up Superpriority Claims*").

(c)     Notwithstanding anything to the contrary herein, (x) upon the occurrence of the Third Borrowing, without any application, motion or notice to, hearing before, or order from the Court, or any further action by any party, the Contingent Roll-Up Loans shall, simultaneously with the occurrence of the Third Borrowing, automatically convert into DIP Roll-Up Loans under the DIP Credit Agreement on a dollar-for-dollar basis and (y) unless and until the incurrence of the Third Borrowing, the Contingent Roll-Up Loans: (i) shall have identical substantive rights (including with

US 6474966

respect to economic rights, guarantees, collateral and lien priorities) to those of, and recover on a *pro rata* and *pari passu* basis with, the Secured Notes and (ii) may be classified together with the Secured Notes in any chapter 11 plan and receive the same voting rights and distributions as the Secured Notes under any chapter 11 plan.

(d)     Upon expiration of the Challenge Period without a successful Challenge having been brought with respect thereto, the DIP Roll-Up Loans issued under this Paragraph 6 shall be deemed indefeasible and that portion of the Secured Notes Debt so refinanced thereby shall be discharged.  To the extent that a Challenge is successful, the roll-up of the Secured Notes Debt into DIP Roll-Up Loans shall not in any way impact such Challenge, and the rights of the party that mounted such successful Challenge are reserved to seek an appropriate remedy.

(e)     Notwithstanding anything to the contrary herein, the claims and liens in respect of the DIP Roll-Up Loans and the Contingent Roll-Up Loans, if any, shall be subject and subordinate to the claims and liens in respect of the DIP Term Loans in all respects; *provided* that any proceeds allocated on account of the DIP Roll-Up Loans and the Secured Notes Debt shall be applied first to the repayment of the DIP Roll-Up Loans (excluding the Contingent Roll-Up Loans, if any) before (i) any Secured Notes Debt that is not subject to the Secured Notes Refinancing and (ii) any Contingent Roll-Up Loans.  For the avoidance of doubt and notwithstanding anything to the contrary contained in this Final Order, so long as the Termination Date (as defined in the Support Agreement) has not occurred under the Support Agreement, the DIP Roll-Up Loans shall be paid in accordance with the distribution protocol set forth in Section 4(c) of the Support Agreement.

7.     <u>DIP Obligations</u>.  The DIP Facility Documents and this Final Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without

US 6474966

limitation, any trustee appointed in these chapter 11 cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "*Successor Cases*").  Upon entry of this Final Order, the DIP Obligations will include all loans, obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by any of the Debtors to the DIP Secured Parties under the DIP Facility Documents or this Final Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Facility Documents.  The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable on the DIP Termination Date (as defined below).  No obligation, payment, transfer, or grant of collateral security hereunder to any of the DIP Secured Parties or under the DIP Facility Documents (including any DIP Obligation or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

8.    <u>DIP Liens</u>.

(a)    To secure the DIP Obligations, upon entry of this Final Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens

US 6474966

(collectively, the "***DIP Liens***") on all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations.

(b)     The term "***DIP Collateral***" shall mean all prepetition and postpetition assets and properties (real and personal) of the DIP Loan Parties, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the DIP Loan Parties (including under any trade names, styles, or derivations thereof), whether owned or consigned by or to, or leased from or to, the DIP Loan Parties, and wherever located including, without limitation, all cash and cash equivalents of the DIP Loan Parties wherever located, including in any segregated deposit account subject to a control agreement in favor of the DIP Agent, money, inventory, accounts and accounts receivable, other rights to payment, deposit accounts, franchise rights, contracts, contract rights, instruments, documents and chattel paper, all securities (whether or not marketable), documents of title, letters of credit, letter of credit rights, goods, machinery, equipment, inventory, fixtures, real and leasehold property interests, plants, general intangibles, payment intangibles, patents, copyrights, trademarks, trade names and all other intellectual property, membership interests and capital stock owned by the DIP Loan Parties, investment property, intercompany loans or claims, all books and records, commercial tort claims, tax and other refunds, insurance proceeds, and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing; *provided, however*, that, notwithstanding the foregoing, the DIP Collateral shall not include any Excluded Accounts, the Securitization Facility Collateral,[5] or any other assets or

---

[5]     "***Securitization Facility Collateral***" shall mean all Pool Assets (as defined in the Amended Purchase Agreements) sold or otherwise transferred from any of the Debtors to Cloud Peak Energy Receivables LLC; *provided* that any

US 6474966

property expressly excluded from DIP Collateral under the DIP Credit Agreement; *provided further, however*, that DIP Collateral shall include all proceeds and products of such excluded assets or property (other than the proceeds or products of the Securitization Facility Collateral) to the extent not constituting excluded assets in their own right received by the Debtors (including the proceeds of all claims and causes of action arising under chapter 5 of the Bankruptcy Code (the "***Avoidance Proceeds***");  *provided, however, that* the Notes Secured Parties, DIP Agent and the DIP Lenders shall use commercially reasonable efforts to first use all DIP Collateral or Secured Notes Collateral other than any Avoidance Proceeds to repay the DIP Superpriority Claims or the Adequate Protection Superpriority Claims, as applicable.

(c)     To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof to the extent comprising DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Facility Documents and this Final Order.

---

such assets that are not acquired from (or otherwise transferred, assigned, or pledged (to the extent of any recharacterization as other than a sale)) or reconveyed (or released from any lien) to, the DIP Loan Parties, shall not be Securitization Facility Collateral.  No party, other than the Administrator (for the benefit of the Purchasers), shall have a security interest in or lien on the Securitization Facility Collateral.

US 6474966

9.    <u>DIP Lien Priority</u>.

(a)    The DIP Liens securing the DIP Obligations are valid, automatically and properly perfected, non-avoidable, liens on all DIP Collateral (subject to the exclusions therefrom set forth herein and in the DIP Credit Agreement), and shall have the following priorities:

(i)    subject and subordinate to the Carve-Out, the DIP Permitted Prior Liens (as defined below), and the first-priority perfected continuing security interests and liens of the Administrator (as defined in the RPA) (for the benefit of the other purchasers under the Securitization Facility (collectively, the "***Purchasers***")) in the equity interests of non-debtor Cloud Peak Energy Receivables LLC (the "***Securitization SPV Equity Collateral***"), pursuant to section 364(d)(1) of the Bankruptcy Code, a first-priority perfected senior priming lien on, and security interest in, the Secured Notes Collateral to the extent comprising DIP Collateral that may be subject to the Secured Notes Liens or other prepetition liens, which shall all be primed by and made subject and subordinate to the perfected, first-priority senior priming liens and security interests to be granted to the DIP Agent for the benefit of the DIP Lenders, which senior priming liens and security interests in favor of the DIP Agent, for the benefit of the DIP Lenders, shall also be senior to the Adequate Protection Liens (as defined below) granted to the Notes Secured Parties; *provided, however*, that the DIP Secured Parties' DIP Liens in cash held in accounts as adequate assurance of future performance for the Debtors' utility providers shall be subject to the rights of such utilities providers in accordance with any order of the Court governing such accounts;

(ii)    subject and subordinate to the Carve-Out, utilities providers as provided in (i) above, and the liens of the Administrator (for the benefit of the Purchasers) in the Securitization SPV Equity Collateral, pursuant to section 364(c)(2) of the Bankruptcy Code, a first-

US 6474966

priority perfected lien on, and security interest in, all DIP Collateral that is not subject to a lien or security interest on the Petition Date;

(iii)    subject and subordinate to the Carve-Out and utilities providers as provided in (i) above, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in all DIP Collateral, with such junior lien and security interest being subject and subordinate to (A) any valid, perfected, and non-avoidable liens in the Debtors' property solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (B) any other valid, perfected, and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and identified as such on a schedule to the DIP Credit Agreement (including, for the avoidance of doubt, the Comerica Lien[6]) (all such liens described in (A) and (B), collectively, the "***DIP Permitted Prior Liens***"), and (C) the liens of the Administrator (for the benefit of the Purchasers) in the Securitization SPV Equity Collateral.

(b)    Neither (x) Campbell County, Wyoming nor (y) Converse County, Wyoming ((x) and (y) together, the "***Counties***") holds any lien, interest or claim on and in respect of *ad valorem* taxes, gross proceeds taxes, or any other amounts owed by any of the Debtors to either of the Counties that constitutes a DIP Permitted Prior Lien.

(c)    The DIP Liens, the DIP Superpriority Claim (as defined below), the Adequate Protection Liens, and the Adequate Protection Claims (as defined below):  (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any postpetition lien or security interest hereinafter granted by order of the Court in any of the chapter 11

---

[6]    "**Comerica Lien**" shall mean that certain lien perfected by a UCC-1 financing statement filed with the Delaware Secretary of State (File No. 20140603928) on February 14, 2014, with Comerica Leasing, a Division of Comerica Bank, as secured party, as such financing statement has been amended and/or continued from time to time, which lien is listed as a Prior Permitted Lien on Schedule 1.01(B) to the DIP Credit Agreement.

24

cases or any Successor Cases, (y) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (z) any intercompany or affiliate liens of the Debtors, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the chapter 11 cases or any Successor Cases, and/or upon the dismissal of any of the chapter 11 cases.

(d)     If there exists a DIP Permitted Prior Lien that is junior in priority to the Secured Notes Liens, any recovery that the Notes Secured Parties would have received on account of a claim secured by such Secured Notes Lien shall be turned over to the DIP Agent for the benefit of the DIP Lenders until the DIP Obligations shall have been indefeasibly paid in full in cash.

(e)     Notwithstanding anything to the contrary herein, no liens granted hereby on any of the Debtors' Bank Accounts[7] shall take priority over the prepetition and postpetition service and other fees, costs, charges, and expenses to which the Banks are entitled under the terms of and in accordance with the respective contractual arrangements with the Debtors governing such Bank Accounts.

10.     <u>DIP Superpriority Claim</u>.  Upon entry of this Final Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, subject and subordinate to the Carve-Out, allowed superpriority administrative expense claims (collectively, the "***DIP Superpriority Claim***"), which shall rank *pari passu* to the allowed superpriority administrative expense claims granted to the Administrator (for the benefit of the Purchasers) pursuant to the Court's *Interim Order (I) Authorizing Certain Debtors to Continue Selling Receivables and Related*

---

[7]     Capitalized terms used in this Paragraph 9(d) but not otherwise defined herein shall have the meanings ascribed to them in the in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Checks and Business Forms, and (C) Continue Intercompany Arrangements, (II) Providing Administrative Expense Priority Status for Postpetition Intercompany Claims, and (III) Granting Related Relief.*

US 6474966

*Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "***Securitization Superpriority Claim***") in each of the chapter 11 cases and any Successor Cases for all DIP Obligations; *provided* that the DIP Superpriority Claims in respect of the DIP Roll-Up Loans shall be subject and subordinate to the DIP Superpriority Claims in respect of the DIP Term Loans and the Securitization Superpriority Claim: (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the chapter 11 cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) except as set forth herein, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, shall be payable from and have recourse to all DIP Collateral (including all Avoidance Proceeds), and shall be subject and subordinate to the Carve-Out.

11.     <u>Adequate Protection</u>.  The Notes Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Secured Notes Collateral, for and equal in amount to the aggregate diminution in the value as provided in the Bankruptcy Code, if any, as of the Petition Date, of the Notes Secured Parties' security interests in the Secured Notes Collateral from and after the Petition

26

Date, for any reason provided for under the Bankruptcy Code, including but not limited to, the Debtors' use, sale, or lease of Cash Collateral and other Secured Notes Collateral, the imposition of the automatic stay of section 362 of the Bankruptcy Code, and/or the Carve-Out.  In consideration of the foregoing, the Notes Secured Parties are hereby granted the following (collectively, the "***Adequate Protection Obligations***"):

(a)     *Adequate Protection Liens*.  Pursuant to sections 361, 363 and 364(d) of the Bankruptcy Code, and effective as of the Petition Date, the Secured Notes Trustee, for the benefit of the Prepetition Secured Noteholders, were granted pursuant to the Interim Order, and are hereby granted, continuing, valid, binding, enforceable and automatically perfected replacement liens and additional security interests (the "***Adequate Protection Liens***") on the DIP Collateral[8] junior to: (A) the Carve-Out, (B) the DIP Permitted Prior Liens and the liens of the Administrator (for the benefit of the Purchasers) in the SPV Equity Collateral, (C) the DIP Liens, and (D)  any valid, perfected, and non-avoidable liens that are permitted under the Secured Notes Indenture and are senior to the Secured Notes Liens.

(b)     *Priority of Liens*.  The priority of the DIP Liens, the Secured Notes Liens, any liens securing Contingent Roll-Up Loans, the liens of the Administrator (for the benefit of the Purchasers) in the SPV Equity Collateral, the Adequate Protection Liens, the DIP Permitted Prior Liens and the Carve-Out shall be as follows: (i) the Carve-Out, (ii) the DIP Permitted Prior Liens and the liens of the Administrator (for the benefit of the Purchasers) in the SPV Equity Collateral, (iv) the DIP Liens in respect of the DIP Term Loans, (v) the DIP Liens in respect of the DIP Roll-Up Loans (excluding any Contingent Roll-Up Loans), (vi) the Adequate Protection Liens granted

---

[8]     For the avoidance of doubt, the DIP Collateral excludes Securitization Facility Collateral.

US 6474966

to the Notes Secured Parties, (vii) the Secured Notes Liens and any liens securing Contingent Roll-Up Loans.

(c)     *Superpriority Claims of Notes Secured Parties*.   As further adequate protection of the interests of the Secured Notes Liens and the Notes Secured Parties, and effective as of the Petition Date, the Notes Secured Parties (including, if applicable, the holders of Contingent Roll-Up Loans) were granted pursuant to the Interim Order, and are hereby granted, subject and subordinate to the Carve-Out, the Securitization Superpriority Claim, and the DIP Superpriority Claim, allowed superpriority administrative expense claims against the Debtors' estates under sections 503(b) and 507(b) of the Bankruptcy Code (the "***Adequate Protection Superpriority Claims***") to the extent of any diminution in value of the Secured Notes Parties' respective interests in the Secured Notes Collateral, including as a result of the imposition of the automatic stay, the Debtors' use, sale or lease of the Secured Notes Collateral, and the subordination of the Secured Notes Liens to the Carve-Out.

(d)     *DIP Roll-Up Facility*.   The Debtors shall use the DIP Roll-Up Loans to (A) concurrently with the Second Borrowing: (i) refinance and discharge Secured Notes Debt held by the DIP Lenders in an amount equal to 80% of the Initial Borrowing, (ii) refinance and discharge Secured Notes Debt held by the DIP Lenders in an amount equal to 80% of the Second Borrowing, and (iii) except as provided in Paragraph 6(c), refinance and discharge Secured Notes Debt held by the DIP Lenders in an amount equal to 80% of the amount of any remaining unused commitments, if any, under the DIP Credit Agreement at the time of the Second Borrowing; and (B) concurrently with the incurrence of debt under the Incremental Facility, refinance and discharge Secured Notes Debt of the Incremental Term Lenders (as defined in the DIP Credit Agreement) in an amount equal

US 6474966

to 80% of the Incremental Financing, in each case subject to the terms and conditions set forth in the DIP Facility Documents and the reservation of rights of parties in interest in Paragraph 31 below.

(e)     *Initial Roll-Up Superpriority Claims.*  Effective as of the entry of this Final Order, the Initial Roll-Up Superpriority Claims shall be deemed granted.

(f)     *Notes Secured Parties' Fees and Expenses.*  The DIP Loan Parties shall make current cash payments of the reasonable and documented prepetition and postpetition fees and expenses incurred by certain of the Notes Secured Parties in accordance with Paragraph 27 of this Final Order, which payments shall be subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such).

12.     <u>Priority of Superpriority Claims</u>.  The priority of the DIP Superpriority Claim, the Securitization Superpriority Claim, the Adequate Protection Superpriority Claims, and the Carve-Out shall be as follows: (1) the Carve-Out, (2) the DIP Superpriority Claim on account of the DIP Term Loans and the Securitization Superpriority Claim, (3) the DIP Superpriority Claim on account of the DIP Roll-Up Loans (excluding, prior to the incurrence of the Third Borrowing, the Contingent Roll-Up Loans) or the Initial Roll-Up Superpriority Claims, as applicable, and (4) the Adequate Protection Superpriority Claims on account of the Secured Notes (including, prior to the incurrence of the Third Borrowing, the Contingent Roll-Up Loans).

13.     <u>Financial Reporting</u>.  The Debtors shall provide counsel to the Secured Notes Trustee, counsel to the Ad Hoc Group and counsel to the Committee with financial and all other reporting substantially in compliance with the reports and notices provided for in the DIP Facility Documents, in each case when and as required under the DIP Facility Documents; *provided however*, that such

reporting to counsel to the Ad Hoc Group, counsel to the Secured Notes Trustee, and counsel to the Committee shall continue after repayment in full in cash of the DIP Obligations.

14.     <u>No Obligation to Extend Credit</u>.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Facility Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Facility Documents and this Final Order have been satisfied in full or waived by the DIP Agent, as applicable, and in accordance with the terms of the DIP Credit Agreement.

15.     <u>Use of Proceeds of DIP Facility, Budget, Variance Reports</u>.

(a)     From and after the Petition Date, the Debtors shall use advances of credit and cash collateral under the DIP Facility and Cash Collateral of the Notes Secured Parties only for the purposes specifically set forth in this Final Order and, as applicable, the DIP Facility Documents, and in compliance with the terms and conditions in this Final Order and the DIP Facility Documents, and in accordance with the Budget, subject to any variances thereto permitted under the terms and conditions of the DIP Facility Documents and this Final Order (the "***Permitted Use***").

16.     <u>Amendment of the DIP Facility Documents</u>.  The DIP Facility Documents may from time to time be amended, modified or supplemented by the parties thereto without further order of the Court if: (a) the amendment, modification, or supplement is in accordance with the DIP Facility Documents; (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification or supplement is provided to counsel to the Ad Hoc Group, counsel to PNC Bank, counsel to the Secured Notes Trustee, counsel to the Committee, and the U.S. Trustee (together, the "***Notice Parties***"); and (c) the amendment, modification or supplement is filed with the Court; *provided, however*, that neither consent of the Required Consenting Noteholders or the Notice Parties, nor approval of the Court, will be necessary to effectuate any non-material

US 6474966

amendment, modification or supplement and *provided furthe*r that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard.

17.     Budget Modification.  The Budget and any modification to, or amendment or update of, the Budget shall be as set forth in the DIP Facility Documents.  Subject to the written consent of the Debtors and the DIP Agent, the DIP Lenders and the Debtors are hereby authorized to modify, amend, or update the Budget from time to time without further notice or order of the Court, *provided* that the Notice Parties shall receive notice of such modification, amendment or update.  Upon repayment in full and in cash of all DIP Obligations, the Budget shall continue to be updated in accordance with the terms and conditions of the DIP Facility Documents, except that the consent of the holders of a majority in principal amount of the Secured Notes Debt shall be substituted for the consent of the DIP Agent and/or the DIP Lenders.

18.     Modification of Automatic Stay.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claim; (b) permit the Debtors to perform such acts as the DIP Agent or the DIP Lenders each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties under the DIP Facility Documents, the DIP Facility and this Final Order; and (d) authorize the Debtors to pay, and the DIP Secured Parties to retain and apply, payments made in accordance with the terms of this Final Order.

19.     Automatic Perfection of DIP Liens and Adequate Protection Liens.  This Final Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any

US 6474966

financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, filing of Uniform Commercial Code financing statements, mortgages, assignments, notices of lien and similar documents, and entering into any deposit account control agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Adequate Protection Liens, or to entitle the DIP Secured Parties and other secured parties to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent and the Secured Notes Trustee, as applicable, are authorized to file, as it in their sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens or the Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The Debtors are authorized to execute and deliver promptly upon demand to the DIP Agent and the Secured Notes Trustee all such financing statements, mortgages, notices and other documents as the DIP Agent may reasonably request.  The DIP Agent and/or the Secured Notes Trustee, in their sole respective discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

20.    Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these chapter 11 cases or any

US 6474966

Successor Cases shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Facility Documents at any time prior to the indefeasible repayment in full and in cash of all DIP Obligations and the termination of the DIP Secured Parties' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or indebtedness shall immediately be turned over to the DIP Agent to be applied in accordance with this Final Order and the DIP Facility Documents.

21.   <u>Maintenance of DIP Collateral</u>.  Until the indefeasible repayment in full and in cash of all DIP Obligations and the termination of the DIP Secured Parties' obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Facility Documents; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court which has first been agreed to by the DIP Agent (such agreement not to be unreasonably withheld), or as otherwise required by the DIP Facility Documents.

22.   <u>DIP Termination Events</u>.  Each of the following occurrences or events, unless waived by the DIP Agent in writing and in accordance with the terms of the DIP Credit Agreement, shall constitute a termination event under this Final Order (each, a "***DIP Termination Event***", and the date upon which such DIP Termination Event occurs, the "***DIP Termination Date***"), notice of which will promptly be provided to counsel to the Debtors, the Ad Hoc Group, counsel to the Secured Notes Trustee, the Committee, and the U.S. Trustee: (i) the occurrence of the DIP Facility becoming due on February 15, 2020; (ii) the date of the conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code without the consent of the Required Lenders (as defined in

US 6474966

the DIP Credit Agreement), (iii) the date of dismissal of any of these chapter 11 cases without the consent of the Required Lenders, (iv) the appointment in any of these chapter 11 cases of a trustee, (v) the appointment of an examiner with expanded powers, (vi) the consummation of a sale of all or substantially all of the Debtors' assets, whether under section 363 of the Bankruptcy Code or otherwise without the consent of the Required Lenders, (vii) the effective date of any chapter 11 plan, or (viii) the occurrence of an "Event of Default" as defined in and under the DIP Credit Agreement.

23.    <u>Rights and Remedies Upon a DIP Termination Event</u>.  Subject to the limitations set forth herein, immediately upon the occurrence and during the continuation of a DIP Termination Event, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Final Order and the Support Agreement, the DIP Agent may declare (any such declaration shall be referred to herein as a "*Termination Declaration*"): (1) all DIP Obligations owing under the respective DIP Facility Documents to be immediately due and payable, (2) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (3) termination of the DIP Facility and the respective DIP Facility Documents as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations.  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee, counsel to the Secured Notes Trustee, and the U.S. Trustee.  The automatic stay in the chapter 11 cases otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (such period, the "*Remedies Notice Period*"): the DIP Secured Parties shall be entitled to exercise their rights and

34

remedies, in accordance with the respective DIP Facility Documents and this Final Order (subject to the funding in full of the Carve-Out Reserve), including without limitation, exercising rights of setoff or foreclosing on all or a portion of the DIP Collateral, occupying the Debtors' premises, or a sale or disposition of the DIP Collateral, and shall be permitted to satisfy the relevant DIP Obligations, DIP Superpriority Claim, and DIP Liens.  During the Remedies Notice Period, the only basis on which the Debtors and/or the Committee shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court shall be to contest whether a DIP Termination Event has occurred and/or is continuing and the DIP Secured Parties shall consent to such emergency hearing.  Unless during the Remedies Notice Period, the Court determines that a DIP Termination Event has not occurred, or the Debtors cure the DIP Termination Event (to the extent curable under the DIP Facility Documents) that was the basis for the delivery of a Termination Declaration in accordance with the terms and conditions of the DIP Facility Documents, automatic stay imposed under section 105 or 362(a) of the Bankruptcy Code or otherwise, as to the DIP Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Secured Parties shall be permitted to exercise all remedies set forth herein, in the DIP Facility Documents, and as otherwise available at law without further order of or application or motion to the Court.  The Debtors shall reasonably cooperate with the DIP Agent in its exercise of rights and remedies against the DIP Collateral. Notwithstanding the foregoing or anything contained in any DIP Facility Document, no party (including, without limitation, the DIP Agent, any DIP Lender, the Secured Notes Trustee, and any Prepetition Secured Noteholder, but excluding, however, the Administrator or any Purchaser) shall exercise any rights or remedies (or take any enforcement action with respect to) the Securitization SPV Equity Collateral, until such time as the obligations under the Securitization Facility have been

indefeasibly paid in full in cash. For the avoidance of doubt, the remedies set forth in this Paragraph 23 shall be cumulative and non-exclusive.

24.    <u>Cash Collateral Termination Events</u>.  Unless otherwise ordered by the Court or waived or otherwise agreed to in writing by the holders of a majority in principal amount of Secured Notes Debt, the Debtors' authority to use Cash Collateral shall terminate without further order of the Court upon the occurrence of the "***Cash Collateral Termination Date***", which shall also constitute a DIP Termination Event (notice of which shall automatically constitute a Termination Declaration, and shall promptly be provided to the Debtors, counsel to the Debtors, counsel to the DIP Agent, the U.S. Trustee, and the Committee), which Cash Collateral Termination Date shall occur five (5) business days following written notice (including via email) from the Required Consenting Noteholders to the Debtors and the Secured Notes Trustee of the occurrence of any of the following events, *provided* that the Cash Collateral Termination Date shall occur immediately upon the occurrence of any event set forth in subsections 24(a), 24(i), 24(j), 24(k), 24(m), or 24(n) below, and notice of termination of the Support Agreement in accordance with the terms thereof shall be sufficient notice of the occurrence of the event set forth in subsection 24(b) hereof (collectively, the "***Cash Collateral Termination Events***"):

(a)    the occurrence of any DIP Termination Event, unless waived in accordance with the DIP Facility Documents;

(b)    the Support Agreement (as may be hereafter modified or amended in accordance with the terms thereof) shall have terminated as to all parties thereto in accordance with its terms;

(c)    the failure of the Debtors to distribute the Net Sale Proceeds (as defined in the Support Agreement) of any asset sale to the Secured Notes Trustee in accordance with the Support Agreement, irrespective of whether such Support Agreement has been assumed by the Debtors or has been terminated;

(d)    any Debtor files or publicly announces that it will file (or fails to timely object to) or joins in or supports any plan (or disclosure statement related thereto) in these chapter 11 cases that is inconsistent with the Support Agreement;

36

(e)      any Debtor seeks approval or publicly announces that it will seek approval of any sale in these chapter 11 cases that is inconsistent with the Support Agreement;

(f)      any Debtor shall grant, create, incur or suffer to exist any post-petition liens or security interests other than (i) those granted pursuant to the Interim Order or this Final Order, (ii) carriers' mechanics', operator's, warehousemen's, repairmen's or other similar liens arising in the ordinary course of business, (iii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation arising in the ordinary course of business, and (iv) deposits to secure the performance of any post-petition statutory obligations and other obligations of a like nature incurred in the ordinary course of business, *provided* that the Debtors shall have 10 business days from receipt of notice thereof to cure any of the foregoing which were involuntarily imposed or created;

(g)      any Debtor shall create, incur, or suffer to exist any other claim that is *pari passu* with or senior to the Adequate Protection Superpriority Claims, except as provided in the Interim Order or this Final Order;

(h)      the failure of the Debtors to make any payment provided for under this Final Order to the Prepetition Secured Noteholders within five (5) business days after the date such payment is due;

(i)      this Final Order ceases, for any reason (other than with the express written agreement of the Required Consenting Noteholders in their sole discretion), to be in full force and effect in any material respect, or any Debtor so asserts in writing, or the Adequate Protection Liens or Adequate Protection Superpriority Claims created by this Final Order cease in any material respect to be enforceable and of the same effect and priority purported to be created hereby or any Debtor so asserts in writing;

(j)      the Court shall have entered an order amending, supplementing, or otherwise modifying this Final Order that materially and adversely affects the adequate protection provided to the Notes Secured Parties or is otherwise materially and directly adverse to the Notes Secured Parties, without the consent of the holders of a majority in principal amount of Secured Notes Debt;

(k)      any Debtor supports or takes any steps in furtherance of any Challenge (as defined below) or any other action commenced by any other person against any of the Notes Secured Parties, with respect to any of the Secured Notes Documents or the Court shall have ruled in favor of the plaintiff or moving party in any such Challenge or other action; *provided* that compliance with discovery requests by the Debtors brought by third parties in connection with any of the foregoing shall not constitute a Cash Collateral Termination Event under this Paragraph 24;

(l)     the Court shall have entered an order disallowing or subordinating any claim, lien, or interest held by any Notes Secured Party;

(m)     the Court shall have entered an order appointing a chapter 11 trustee, responsible officer or any examiner with enlarged powers relating to the operation of the businesses in these chapter 11 cases; and

(n)     an order shall have been entered dismissing any of these chapter 11 cases or converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code.

25.     <u>Rights and Remedies Upon a Cash Collateral Termination Event</u>.   Upon the occurrence of the Cash Collateral Termination Date, (a) consensual use of Cash Collateral shall terminate immediately; (b) Adequate Protection Superpriority Claims, if any, shall become due and payable; and (c) following the funding in full of the Carve-Out Reserve and subsequently the repayment in full and in cash of the DIP Obligations, the Secured Notes Trustee may, upon five (5) business days' written notice to counsel to the Debtors, the U.S. Trustee and the Committee, (i) set off amounts in any account of the Debtors with respect to which the Secured Notes Trustee exercises control pursuant to a deposit account control agreement to the extent necessary for payment of the Adequate Protection Obligations due to the Notes Secured Parties, and/or (ii) exercise any other rights and remedies available under the Secured Notes Documents, this Final Order or applicable law.   The remedies set forth in this Paragraph 25 shall be cumulative and non-exclusive.   The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit such actions upon the occurrence of the Cash Collateral Termination Date and pursuant to the terms set forth herein.   Notwithstanding anything to the contrary herein or the occurrence of the Cash Collateral Termination Date, all of the rights, remedies, benefits and protections provided to the Secured Notes Trustee and/or the Notes Secured Parties under this Final Order shall survive the occurrence of the Cash Collateral Termination Date.   The Debtors and all parties in interest shall be entitled to seek an emergency hearing before this Court to contest whether

the Cash Collateral Termination Date has occurred under Paragraph 24 of this Final Order and at which hearing the Debtors shall reserve the right to seek Court approval of a new order approving the use of Cash Collateral, *provided* that pending such hearing, the Debtors may only use Cash Collateral to make necessary ordinary course operating expenditures.

26.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order</u>.  The DIP Secured Parties have acted in good faith in connection with this Final Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Final Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

27.     <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees, costs, disbursements and expenses of the DIP Secured Parties in connection with the DIP Facility and the chapter 11 cases, as provided in the DIP Facility Documents, whether or not the transactions contemplated hereby are consummated, as set forth herein, in each case, including, without limitation, the DIP Professional Fees, and all reasonable and documented prepetition and postpetition fees and expenses incurred by the Notes Secured Parties in connection with the chapter 11 cases (the "***Notes Secured Parties' Fees***") (without duplication of the DIP Professional fees and limited, in the case of the advisors to the Prepetition Secured Noteholders, to Houlihan Lokey, Inc., Davis Polk, and one local counsel in each

material jurisdiction, and limited, in the case of the advisors to the Secured Notes Trustee, to Nixon Peabody LLP and Cross & Simon, LLC, as local counsel). Payment of the DIP Professional Fees and the Notes Secured Parties' Fees shall not be subject to the Budget and shall not be subject to allowance by the Court. Professionals for the DIP Secured Parties and the Notes Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines and no attorney or advisor to the DIP Agent, the DIP Lenders, or the Notes Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Notwithstanding the foregoing, the professionals for the DIP Secured Parties and the Notes Secured Parties shall deliver reasonably detailed statements (redacted if necessary for privileged, confidential, or otherwise sensitive information, as to those statements provided to any party other than the U.S. Trustee) for fees and expenses incurred after entry of the Interim Order to the U.S. Trustee, the Committee, and the Debtors and their respective counsel (the "***Fee Notice Parties***"), *provided* that any such invoice shall not be required to contain time entry detail. If no objection is raised by any of the Fee Notice Parties with respect to such summaries within ten (10) days of the receipt thereof (the "***Professional Fee Objection Period***") then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors. If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Professional Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agent, the DIP Lenders, or the Notes Secured Parties in connection with or with respect to the DIP Facility or the chapter 11 cases, as applicable, are hereby approved in full.

Notwithstanding the foregoing, the Debtors are authorized and directed to pay upon the Initial Borrowing, all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Secured Parties incurred on or prior to such date to the extent payable in accordance with the terms of the DIP Facility Documents.

28. <u>Indemnification</u>. The Debtors shall indemnify and hold harmless the DIP Secured Parties in accordance with the terms and conditions of the DIP Credit Agreement.

29. <u>Limitations on Use of DIP Proceeds, Secured Notes Collateral, and Carve-Out</u>. No DIP Collateral, DIP Loans, Secured Notes Collateral (including, for the avoidance of doubt in all instances, Cash Collateral) or the proceeds of the foregoing or any portion of the Carve-Out may be used directly or indirectly by any of the Debtors, the Committee, or any trustee or other estate representative appointed in the chapter 11 cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with: (a) preventing, hindering, or delaying (i) the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral, or (ii) the Secured Notes Trustee's enforcement upon the Secured Notes Collateral; (b) using or selling or otherwise disposing of (i) the DIP Collateral without the consent of the DIP Agent (other than pursuant to an Acceptable 363 Sale (as defined in the DIP Credit Agreement)), or (ii) the Secured Notes Collateral without the consent of the Secured Notes Trustee (other than pursuant to the Debtors' sale process as presented to the Court); (c) using or seeking to use any insurance proceeds (i) constituting DIP Collateral without the consent of the DIP Agent and the DIP Lenders except to the extent permitted under the DIP Credit Agreement, or (ii) constituting Secured Notes Collateral except to the extent permitted under the Secured Notes Indenture and consistent with the Support Agreement; (d) incurring indebtedness without the prior consent of the DIP Agent, the DIP Lenders, and the holders of a

41

majority in principal amount of Secured Notes Debt, except to the extent permitted under the DIP Credit Agreement; (e) seeking authorization to obtain liens or security interests that are senior to, or on a parity with, the Carve-Out, the DIP Liens, the DIP Superpriority Claim, the Secured Notes Liens, the Adequate Protection Liens, or the Adequate Protection Superpriority Claims (except as otherwise provided herein); (f) seeking to amend or modify any of the rights granted to (i) the DIP Agent or the DIP Lenders, including seeking to use DIP Collateral on a contested basis, or (ii) the Secured Notes Trustee or the Prepetition Secured Noteholders or seeking to use the Secured Notes Collateral on a contested basis; (g) objecting to or challenging in any way (i) the DIP Liens, the DIP Obligations, and/or the DIP Collateral, or any other claims or liens, held by or on behalf of any of the DIP Agent or the DIP Lenders, or (ii) the Secured Notes Liens, Adequate Protection Obligations, and/or Secured Notes Collateral or any other claims or liens, held by or on behalf of any of the Secured Notes Trustee or the Prepetition Secured Noteholders; (h) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against the DIP Agent, the DIP Lenders, the Secured Notes Trustee, or the Prepetition Secured Noteholders, with respect to any of the foregoing, any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (i) litigating, objecting to, challenging, investigating (including by way of examination or discovery), contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of (i) the DIP Obligations, DIP Liens, or any other rights or interests of the DIP Agent, or the DIP Lenders or (ii) the Secured Notes, Secured Notes Debt, Adequate Protection Obligations, or any other rights and interests of the Secured Notes Trustee or the Prepetition Secured Noteholders; (j) seeking to subordinate, recharacterize, disallow or avoid (i) the DIP Liens or the

42

DIP Obligations or (ii) the Secured Notes Liens or Adequate Protection Obligations; or (k) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of the Court (including, without limitation, hereunder); *provided* that notwithstanding anything to the contrary herein, the Committee may use the proceeds of the DIP Facility and Cash Collateral, to investigate (but not prosecute or initiate the prosecution of, including the preparation of any complaint, objection, or motion on account of), (y) the claims and liens of the Notes Secured Parties, and (z) potential claims, counterclaims, causes of action, or defenses against the Notes Secured Parties; *provided further*, that no more than an aggregate of $150,000 of the proceeds of the DIP Facility and Cash Collateral may be used by the Committee in respect of the investigations set forth in the preceding proviso (the "***Investigation Budget***"); *provided further*, that to the extent the Committee incurs fees and expenses in an amount in excess of the Investigation Budget, the Debtors, the Notes Secured Parties and the DIP Lenders agree that the Committee may seek payment of such fees as an administrative expense as part of its professionals' fee applications.

30.    <u>Carve-Out</u>.

(a)    As used in this Final Order, and notwithstanding anything to the contrary contained in this Final Order, the Interim Order, the DIP Facility Documents, the Secured Notes Indenture, or any other documents or instruments evidencing indebtedness of or claims against the Debtors, the "***Carve-Out***" shall mean a carve-out from the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, all administrative expense claims granted under this Final Order including the DIP Superpriority Claim, the Adequate Protection Superpriority Claim, any and all other forms of adequate protection granted hereunder, the applicable Debtors' obligations under the Securitization Facility, and any other obligations of the Debtors, including any postpetition intercompany claims among the Debtors, in an amount equal to the sum of: (i) all fees required to

be paid to the Clerk of the Court and all statutory fees payable to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses in an aggregate amount not to exceed $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise, all unpaid fees, costs, and expenses (the "*Allowed Professional Fees*") of persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "*Debtor Professionals*") and the Committee (the "*Committee Professionals*" and, together with the Debtor Professionals, the "*Professional Persons*") appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code incurred at any time on or before the first business day following delivery by the DIP Agent (or, following the repayment in full of the DIP Obligations, the Required Consenting Noteholders) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after such date (the amounts set forth in clauses (i)-(iii) being the "*Pre-Carve-Out Trigger Notice Cap*"); and (iv) Allowed Professional Fees of the Debtor Professionals (including all success, incentive, or similar fees or bonuses not earned prior to the Carve-Out Trigger Date (as defined below)) and Committee Professionals in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv) being the "*Post-Carve-Out Trigger Notice Cap*").

(b)     For purposes of the foregoing, "*Carve-Out Trigger Notice*" means a written notice delivered by email (or other electronic means) by the DIP Agent (or, following the repayment in full and in cash of the DIP Obligations, the Required Consenting Noteholders) to the Debtors,

Vinson & Elkins LLP as lead restructuring counsel to the Debtors, counsel to the Committee, the Secured Notes Trustee, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of a Termination Event under the Final Order or the DIP Credit Agreement, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered, the Debtors shall be permitted to pay and/or reimburse, as applicable, Allowed Professional Fees that are allowed by the Court and payable under sections 328, 330, and 331 of the Bankruptcy Code and compensation procedures approved by the Court, and the payment and/or reimbursement of same shall not reduce the Carve-Out.

(c)    On the date of delivery by the DIP Agent of a Carve-Out Trigger Notice in accordance with the terms of this Final Order (the "*Carve-Out Trigger Date*"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors as of such date to fund, in accordance with the other terms hereof, a reserve from all cash on hand (including Cash Collateral and cash in the Segregated Account) as of such date and any available cash thereafter held by any Debtors in an amount equal to the sum of: (i) the Pre-Carve-Out Trigger Notice Cap (including all then-unpaid Allowed Professional Fees incurred through the first business day following the Carve-Out Trigger Date, whether allowed by the Court prior to or after the Carve-Out Trigger Date), and (ii) the Post-Carve-Out Trigger Notice Cap.  The Carve-Out Reserve (as defined below) shall be funded (i) first, from cash on hand as of the Carve-Out Trigger Date other than cash in the Segregated Account; and (ii) second, proceeds of DIP Collateral other than cash in the Segregated Account; and (iii) only to the extent such other cash is insufficient to fund the Carve-Out Reserve in full, from cash in the Segregated Account until the Carve-Out Reserve is fully funded in the amount set forth herein.  The

US 6474966

Debtors shall deposit and hold all such amounts in a segregated account in trust to pay the amounts set forth in the preceding sentence (the "***Carve-Out Reserve***").

(d)        The Debtors shall deposit the amounts in the Carve-Out Reserve in full prior to the payment of any DIP Collateral to the DIP Secured Parties, the disbursement of any proceeds held in the Segregated Account, or the payment of any amount to any DIP Secured Party or any Notes Secured Party, and no DIP Secured Party or Notes Secured Party shall sweep or foreclose on cash or Cash Collateral (including (i) cash received as a result of the disposition of any assets or property of the estate or the DIP Collateral, and (ii) cash held in the Segregated Account) of the Debtors' estates until the Carve-Out Reserve has been fully funded.

(e)        The Carve-Out Reserve shall be held for the benefit of the U.S. Trustee, the Chapter 7 Trustee (if any), and the Professional Persons to pay the Allowed Professional Fees benefiting from the Carve-Out Reserve, and shall be available only to satisfy such obligations until paid in full.  The failure of the Carve-Out Reserve to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and none of the Carve-Out, the Post-Carve-Out Trigger Notice Cap, the Carve-Out Reserve, the Budget, nor any of the foregoing shall be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.

31.    Effect of Stipulations on Third Parties.

(a)        The Debtors' stipulations, admissions, agreements and releases contained in this Final Order shall be binding upon (i) the Debtors and their estates, in all circumstances and for all purposes and (ii) all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the chapter 11 cases (including the Committee) and any other person or entity acting or seeking to act on behalf of the Debtors' estates including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances

and for all purposes unless (1) such committee or any other party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with standing granted by the Court, has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this Paragraph 31 and Paragraph 29) (x) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Secured Notes Debt or the Secured Notes Liens or (y otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, a "***Challenge***") against the Notes Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and their respective successors and assigns thereof, in each case in their respective capacity as such (each, a "***Representative***" and, collectively, the "***Representatives***") in connection with matters related to any claims of the Debtors against the Notes Secured Parties, the Secured Notes Documents, the Secured Notes Debt, the Secured Notes Collateral, or otherwise, provided that all pleadings filed in connection with a Challenge shall set forth the basis for such challenge or claim, (2) such Challenge has been filed prior to the latest of (a) (Y) with respect to parties in interest with standing (other than the Committee), Monday, July 29, 2019 and (Z) with respect to the Committee, the date that is the earlier of (i) the effective date of a chapter 11 plan that is consistent with the Support Agreement or (ii) fourteen (14) days following termination of the Support Agreement in accordance with its terms, (b) any such later date as has been agreed to in writing by the holders of a majority in principal amount of Secured Notes Debt, and (c) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable time period set forth in this Paragraph 31 (the

time period established by the foregoing clauses (1) through (2), the "***Initial Challenge Period***"),
and (3) there is a final non-appealable order sustaining such Challenge in favor of the plaintiff in
such timely filed adversary proceeding or contested matter; *provided* that nothing in this Paragraph
31 shall limit (or be deemed to limit) any of the Debtors' or any other party in interest's rights to
seek recharacterization of adequate protection as being applied to principal, as applicable.  If during
the Initial Challenge Period, the Committee or other third party files a motion for standing with a
draft complaint identifying and describing all Challenges such party seeks leave to assert, the Initial
Challenge Period will be tolled for the Committee or other third party solely with respect to the
matter(s) asserted in the draft complaint until three (3) business days from the entry of an order
granting the motion for standing to prosecute such Challenges described in the draft complaint and
permitted by the Court (the "***Extended Challenge Period***", together with the Initial Challenge
Period, the "***Challenge Period***").  If standing is denied by the Court, the Challenge Period shall be
deemed to have expired.  Any Challenge that is not timely commenced prior to the expiration of the
Challenge Period shall be deemed forever, waived, released, and barred.  For the avoidance of doubt,
any trustee appointed or elected in these chapter 11 cases shall, until the expiration of the period
provided herein for asserting a Challenge, and thereafter for the duration of any adversary proceeding
or contested matter commenced pursuant to this Paragraph 31 (whether commenced by such trustee
or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a
party other than the Debtors and shall not, for purposes of such adversary proceeding or contested
matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors
in this Final Order.  For the avoidance of any doubt, the Committee shall not be permitted to bring
a Challenge with respect to the Parent-Issuer Liens except solely with respect to the Reserved
Challenge Assets.

US 6474966

(b)     Notwithstanding anything herein to the contrary, following entry of an order authorizing the Debtors to assume the Support Agreement and approving the settlement contained in Section 9 thereof pursuant to Bankruptcy Rule 9019, no Challenge may be brought by any party, including, without limitation the Committee, that would contravene or if successful have the effect of undoing such settlement in whole or in part.

32.     If no such Challenge is filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding, then (i) the Debtors' stipulations, admissions, agreements, and releases contained in this Final Order shall be binding on all parties in interest, including, without limitation, the Committee, (ii) the obligations of the Secured Notes Loan Parties under the Secured Notes Documents, including the Secured Notes Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset, or avoidance, for all purposes in the chapter 11 cases, and any subsequent chapter 7 case(s), (iii) the Secured Notes Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense, (iv) the Secured Notes Debt and the Secured Notes Liens shall not be subject to any other or further claim or challenge by the Committee, any non-statutory committees appointed or formed in the chapter 11 cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates including any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for any of the Debtors) and (v) any defenses, claims, causes of action, counterclaims, and offsets by the Committee, any non-statutory committees appointed or formed in the chapter 11 cases, or any other party acting or seeking to act on behalf of the Debtors' estates, whether arising under the Bankruptcy Code or otherwise, against any of the Notes Secured Parties and their Representatives arising out of or relating to the any claims of the Debtors against the Notes

US 6474966

Secured Parties, the Secured Notes Documents or otherwise shall be deemed forever waived, released, and barred.  If any such Challenge is filed during the Challenge Period, the stipulations, admissions, agreements, and releases contained in this Final Order shall nonetheless remain binding and preclusive (as provided in this Paragraph 32 on the Committee and on any other person or entity, except to the extent that such stipulations, admissions, agreements, and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee or any non-statutory committees appointed or formed in the chapter 11 cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Secured Notes Documents, the Secured Notes Debt or the Secured Notes Liens, or claims, counterclaims or causes of action of the Debtors against any Notes Secured Parties.

33.    _Payment of Professional Fees_.  Nothing contained herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Persons or shall affect the rights of the DIP Secured Parties or the Notes Secured Parties to object to the allowance and payment of such fees and expenses.  Neither the DIP Secured Parties nor the Notes Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the chapter 11 cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Secured Parties or the Notes Secured Parties in any way to pay compensation to or to reimburse expenses of any Professional Persons or to guarantee that the Debtors have sufficient funds to pay compensation or to so reimburse.

34.    _Financial Information and Reporting Requests_.

(a)      In addition to the provisions of the DIP Facility Documents, and the Secured Notes Documents, the Debtors shall allow the DIP Agent, the Ad Hoc Group, the Committee, and the Secured Notes Trustee, respectively, to visit and inspect any of the properties of Debtors and their subsidiaries to, at the Debtors' expense, (i) conduct field examinations of any or all of the DIP Collateral, (ii) conduct evaluations, environmental assessments, environmental audits and ongoing maintenance and monitoring of the assets and properties of the Borrowers and the Subsidiaries, and (iii) inspect, copy and take extracts from its and their respective financial and accounting records; *provided, however*, that, so long as no DIP Termination Event  or Cash Collateral Termination Date has occurred and is continuing, not more than two each of any such examinations, evaluations, assessments and audits may be conducted at the Debtors' expense in each fiscal year.  The Debtors shall furnish to the DIP Agent, the Ad Hoc Group, the Secured Notes Trustee and the Committee, respectively, such financial and other information as the DIP Agent, the Ad Hoc Group, and the Secured Notes Trustee and the Committee, respectively, shall reasonably request.

(b)      The Debtors, as and when required under the DIP Facility Documents, shall furnish to the DIP Agent, the Ad Hoc Group, the Committee, and the Secured Notes Trustee, respectively, each of the financial reports provided for under the DIP Facility Documents; *provided* that such reporting to the Ad Hoc Group, the Secured Notes Trustee, and the Committee shall continue after repayment in full and in cash of the DIP Obligations.

35.      <u>Disposition of DIP Collateral; Rights of Notes Secured Parties</u>.  Unless otherwise authorized by the Court, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent and the holders of a majority in principal amount of Secured Notes Debt (and no such consent shall be implied, from any other action, inaction or acquiescence by the

US 6474966

DIP Agent, DIP Lenders, or the holders of a majority in principal amount of Secured Notes Debt), except as otherwise provided for in the DIP Facility Documents or this Final Order. Nothing provided herein shall limit the rights of the DIP Agent, the DIP Lenders, the Secured Notes Trustee, or the Prepetition Secured Noteholders to object to any proposed disposition of DIP Collateral, including, without limitation, pursuant to a sale under section 363 of the Bankruptcy Code, subject, however, in the case of the Consenting 2021 Notes Holders (as defined in the Support Agreement), to the terms of the Support Agreement.

36.     <u>Release</u>.  Subject to Paragraph 31 hereof, and as further set forth in the Support Agreement, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in these chapter 11 cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the chapter 11 cases) and any party acting by, through, or under any of the Debtors or any of their estates, hereby stipulate and agree that they forever and irrevocably (a) release, discharge, waive, and acquit the Notes Secured Parties, and each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, successors, assigns and predecessors in interest (collectively, "***Released Parties***"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description,

US 6474966

arising out of, in connection with, or relating to the Secured Notes Documents, or the transactions and relationships contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code (including, without limitation, claims and causes of action arising under chapter 5 of the Bankruptcy Code), and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the Notes Secured Parties; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the Secured Notes Debt, the Secured Notes Liens, the Adequate Protection Superpriority Claims, the Adequate Protection Liens, and any adequate protection payment obligations pursuant to this Final Order.  For the avoidance of doubt, the foregoing release shall not constitute a release of any rights or obligations arising under the Secured Notes Documents or any rights or obligations of the Released Parties under the Support Agreement, the DIP Facility Documents, the Interim Order, or this Final Order.  Notwithstanding the releases and covenants contained above in this Paragraph 36, such releases and covenants in favor of the Released Parties shall be deemed acknowledged and reaffirmed by the Debtors each time there is a use of Cash Collateral under this Final Order.

37.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

38.    <u>Section 506(c) Claims</u>.  Save and except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the chapter 11 cases at any time shall be charged against the DIP Secured Parties or the Notes Secured Parties, or the DIP Collateral or the

US 6474966

Secured Notes Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of each of the DIP Secured Parties and the holders of a majority in principal amount of Secured Notes Debt, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agent, trustee, or lenders.

39.  <u>No Marshaling/Applications of Proceeds</u>.  Neither the DIP Secured Parties nor the Notes Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Secured Notes Collateral.

40.  <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly (but subject in all respects to the Support Agreement with respect to the Consenting 2021 Notes Holders): (a) the DIP Secured Parties' or the Notes Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Secured Parties or the Notes Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the chapter 11 cases or any Successor Case, conversion of the chapter 11 cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans.  Other than as expressly set forth in this Final Order, and, with respect to the Consenting 2021 Notes Holders, as provided in the Support Agreement, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties and the Notes Secured Parties are preserved.

41.  <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Secured Parties or the Notes Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final

US 6474966

Order, the DIP Facility Documents, the Secured Notes Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of such parties.

42.    <u>Binding Effect of Final Order</u>.    Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Notes Secured Parties, all other creditors of the Debtors, the Committee or any other court appointed committee appointed in the chapter 11 cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the chapter 11 cases, any Successor Case, or upon dismissal of the chapter 11 cases or any Successor Case.

43.    <u>No Modification of Final Order</u>.  Except as otherwise ordered by the Court, until and unless the DIP Obligations have been indefeasibly paid in full in cash in accordance with the terms thereof (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Secured Parties (and to the extent that it directly, materially, and adversely affects the adequate protection provided herein to the Notes Secured Parties or is otherwise directly and materially adverse to the Notes Secured Parties, the prior written consent of the holders of a majority in principal amount of Secured Notes Debt): (i) any modification, stay, vacatur or amendment to this Final Order; or (ii) save and except for the Carve-Out, a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever,

US 6474966

including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the chapter 11 cases or any Successor Case, equal or superior to the DIP Superpriority Claim or the Adequate Protection Superpriority Claims; or (b) without the prior written consent of the DIP Agent or the Secured Notes Trustee, save and except for the Carve-Out, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens or the Adequate Protection Liens.  Unless otherwise ordered by the Court, the Debtors irrevocably waive any right to seek any material amendment, modification, or extension of this Final Order without the prior written consent, as provided in the foregoing, of the DIP Agent (and to the extent that it directly, materially, and adversely affects the adequate protection provided herein to the Notes Secured Parties or is otherwise directly and materially adverse to the Notes Secured Parties, the prior written consent of the holders of a majority in principal amount of Secured Notes Debt) and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent, the Secured Notes Trustee, or any other party.

44.   <u>Access to Secured Notes Collateral and DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, exercisable on behalf of the DIP Lenders contained in this Final Order, the DIP Facility Documents, or otherwise available at law or in equity, subject to the Remedies Notice Period, upon written notice to the landlord of any leased premises that a DIP Termination Event or the DIP Termination Date has occurred and is continuing, the DIP Agent may, subject to the applicable notice provisions, if any, in this Final Order and any separate applicable agreement by and between such landlord and the DIP Agent, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords

US 6474966

thereunder, *provided* that the DIP Agent shall be obligated only to pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent calculated on a daily per diem basis.  Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded in this Paragraph 44.  For the avoidance of doubt, subject to (and without waiver of) the rights of the DIP Secured Parties under applicable nonbankruptcy law, the DIP Secured Parties can only enter upon a leased premises after a DIP Termination Event or the DIP Termination Date, and in any case subject to the Remedies Notice Period, in accordance with (i) a separate agreement with the landlord at the applicable leased premises, or (ii) upon entry of an order of this Court obtained by motion of any of the DIP Secured Parties on such notice to the landlord as shall be required by this Court.  Upon repayment in full and in cash of all DIP Obligations, the Secured Notes Trustee shall replace the DIP Agent with respect to the rights described above in this Paragraph 44.

45.    <u>Limits on Lender Liability</u>.  Nothing in this Final Order or in any of the DIP Facility Documents, the Secured Notes Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Secured Notes Trustee, or the Prepetition Secured Noteholders of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these chapter 11 cases.  The DIP Agent, the DIP Lenders, and the Notes Secured Parties shall not be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this Final Order or the DIP Facility Documents

US 6474966

or in the Secured Notes Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Secured Notes Trustee, or the Prepetition Secured Noteholders of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

46.     <u>Insurance Proceeds and Policies</u>.  Upon entry of this Final Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insured on each liability insurance policy and loss payee on each property coverage insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

47.     <u>Joint and Several Liability</u>.  Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates or a substantive consolidation with any non-Debtor guarantor, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Facility Documents.

48.     <u>Non-Debtor Subsidiaries</u>.  Any direct or indirect subsidiary of the Debtors that hereafter becomes a debtor in a case under chapter 11 of the Bankruptcy Code in the Court and is or is required to be a Borrower (as defined in the DIP Credit Agreement) under the DIP Credit Agreement automatically and immediately, upon the filing of a petition for relief for such subsidiary, shall be deemed to be one of the "Debtors" hereunder in all respects, and all the terms and provisions of this Final Order and the Final Order, including, those provisions granting security interests in, and liens on, the DIP Collateral, DIP Superpriority Claim,  the Secured Notes Collateral, and the Adequate Protection Superpriority Claim in each of the chapter 11 cases, shall, to the extent not already, immediately be applicable in all respects to such subsidiary and its chapter 11 estate, subject

US 6474966

to the terms and conditions of this Final Order.  Within two (2) Business Days of the filing of a

petition for relief for any such Subsidiary, the Debtors shall file a notice with the Court indicating

that the subsidiary is a Borrower under the DIP Credit Agreement.

49.     <u>Waiver of Requirement to File Proofs of Claim</u>.  Neither the DIP Secured Parties nor

the Notes Secured Parties will be required to file proofs of claim in any of the chapter 11 cases or

Successor Cases for any claim allowed herein.  Notwithstanding any order entered by the Court in

relation to the establishment of a bar date in any of the chapter 11 cases or Successor Cases to the

contrary, the DIP Agent on behalf of itself and the DIP Lenders, and the Secured Notes Trustee, on

behalf of itself and the Prepetition Secured Noteholders, is hereby authorized and entitled, in its sole

discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim

and/or aggregate proofs of claim in each of the chapter 11 cases or Successor Cases for any claim

allowed herein.  Any proof of claim filed by the DIP Agent or the Secured Notes Trustee shall be

deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of

the DIP Lenders or the Prepetition Secured Noteholders, respectively.  Any order entered by the

Court in relation to the establishment of a bar date in any of the chapter 11 cases or Successor Cases

shall not apply to any claim of the DIP Agent, the DIP Lenders, the Secured Notes Trustee, or the

Prepetition Secured Noteholders.

50.     <u>Credit Bidding</u>.  Subject to Section 4 of the Support Agreement, and the Carve-Out,

and the Committee's right to seek entry of an order for cause pursuant to section 363(k) of the

Bankruptcy Code, the DIP Secured Parties and the Notes Secured Parties shall have the right to

credit bid for the assets and property of the Debtors up to the full amount of the DIP Obligations

(including for the avoidance of doubt the DIP Roll-Up Loans (excluding, prior to the incurrence of

the Third Borrowing, any Contingent Roll-Up Loans)) and the outstanding Secured Notes Debt,

respectively, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

51.     <u>Authorization for Phillips 66 Deposit</u>.  Notwithstanding anything in this Final Order to the contrary, including, without limitation, anything in Paragraph 24 hereof, the Debtors are authorized to provide a postpetition reserve deposit to Phillips 66, consistent with the practices between the Debtors and Phillips 66 prior to the Petition Date.

52.     <u>Surety Collateral</u>.  Notwithstanding any provision herein to the contrary, nothing in this Final Order or in any amendment thereto shall affect the rights of the sureties in any cash, letter of credit, letter of credit rights, or other collateral delivered to, in possession of, or controlled by any surety as of the Petition Date or the proceeds thereof (collectively, "***Surety Collateral***"), and nothing herein shall be deemed to alter, limit, modify or impair any rights of any surety in any Surety Collateral, and the definition of "DIP Collateral" shall not include any Surety Collateral.  To the extent any Surety Collateral is deemed to be subject to the Motion, such Surety Collateral shall be deemed to be included in the DIP Permitted Prior Liens.

53.     <u>Zurich Credit Support</u>.  For the avoidance of doubt (i) the DIP Secured Parties shall not have a security interest or lien on (x) that certain trust account with Wilmington Trust, National Association for the benefit of Zurich American Insurance Company (together with its affiliates and successors, "***Zurich***") and (y) that certain letter of credit number 18128983-00-000 in the amount of $125,000.00 issued by PNC Bank, National Association (together, and with any proceeds thereof, the "***Zurich Credit Support***"), (ii) the Debtors may not grant liens and/or security interests in the

US 6474966

Zurich Credit Support to any party other than Zurich, and (iii) this Final Order does not grant the Debtors any right to use the Zurich Credit Support.

54.    <u>Environmental and Related Matters</u>.

(a)    Notwithstanding anything to the contrary in the Interim Order, this Final Order or the DIP Facility Documents, nothing in the Interim Order, this Final Order, or the DIP Facility Documents shall limit, expand, or otherwise modify any of the Debtors' obligations under 28 U.S.C. § 959(b).

(b)    Notwithstanding anything to the contrary in the Interim Order, this Final Order or the DIP Facility Documents, nothing in the Interim Order, this Final Order or the DIP Facility Documents shall, as to the United States of America or any state, or any of the foregoing's respective agencies, departments or agents, impair, adversely affect or expand any valid right, claim, or defense of setoff or recoupment that any such entity may have.

(c)    Paragraphs H(vi) and 45 of the Interim Order, and Paragraphs K(vi) and 45 of this Final Order, shall apply to environmental liabilities to governmental units only so long as (i) the actions of the DIP Agent, the DIP Lenders, the Secured Notes Trustee, or the Prepetition Secured Noteholders have not constituted and do not constitute, within the meaning of 42 U.S.C. § 601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by the Debtors, and (ii) the DIP Agent, the DIP Lenders, the Secured Notes Trustee or the Prepetition Secured Noteholders are not otherwise liable under applicable law as a "controlling person," "responsible person," or "owner" or "operator" with respect to a facility owned or operated by the Debtors.

(d)    Notwithstanding anything to the contrary in the Interim Order, this Final Order, or the DIP Documents, nothing in the Interim Order, this Final Order, or the DIP Facility

Documents shall: (i) impair, adversely affect or expand any right under applicable law of any governmental unit with respect to any financial assurance, letter of credit, trust, surety bond, or insurance proceeds; (ii) waive, impair, adversely affect or expand the United States' rights (if any), states' rights (if any), or the rights of an Indian tribe (if any), under applicable law, to refuse to provide its consent to the proposed assumption and/or assignment of any lease or executory contract to which it is a party; or (iii) limit any governmental unit in the exercise of its police powers in accordance with 11 U.S.C. § 362(b)(4).

55.    <u>Final Order Controls</u>.    In the event of any inconsistency between the terms and conditions of the Interim Order, the DIP Facility Documents and/or this Final Order, the provisions of this Final Order shall govern and control.

56.    <u>Discharge</u>.    Subject to the terms of the Support Agreement, unless paid in full and in cash, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or approving a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code in any of the chapter 11 cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless (i) such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization or the closing of any sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (ii) each of the DIP Secured Parties has otherwise agreed in writing. Subject to the terms of the Support Agreement, none of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the obligations on account of the DIP Term Loans or, without the written consent of Required Lenders, any other DIP Obligation, in full in cash within a commercially reasonable period of time (and in no event later than the effective date

US 6474966

of such plan of reorganization or sale) or is otherwise reasonably acceptable to the DIP Lenders (a "***Prohibited Plan or Sale***"), without the written consent of the Supermajority Lenders (as defined in the DIP Credit Agreement).  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute a DIP Termination Event hereunder and under the DIP Facility Documents.

57.    <u>Big Horn County</u>.  Notwithstanding any other provisions included in the Interim Order or this Final Order, or any agreement of any Debtor expressly approved hereby, any statutory liens of Big Horn County with respect to unpaid ad valorem taxes or gross proceeds (such liens, collectively, the "***Tax Liens***") shall not be primed nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are Permitted Prior Liens; provided that all parties in interests' rights to object to and contest the priority, validity, amount and extent of the claims and liens asserted by any of Big Horn County are fully preserved.

58.    <u>Survival</u>.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization or liquidation in the chapter 11 cases; (b) converting the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing the chapter 11 cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the chapter 11 cases or any Successor Case, provided however that the various superpriority claims or other administrative expenses shall survive only to the extent permitted by applicable law.  The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties pursuant to this Final Order or the DIP Facility Documents, notwithstanding the entry of any such order, shall continue in the chapter 11 cases, in any Successor Case, or following dismissal of the chapter 11

US 6474966

cases or any Successor Case, and shall maintain their priority as provided by this Final Order until all DIP Obligations have been paid in full.

59.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

60.    Bankruptcy Rule 6003(b) has been satisfied.

61.    The requirements of Bankruptcy Rule 6004(a) are waived.

62.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon entry of this Final Order.

63.    The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

**Dated: July 18th, 2019**
**Wilmington, Delaware**

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**