**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| CLOUD PEAK ENERGY INC., *et al.*, | ) | Case No. 19 – 11047 (KG) |
| Debtors.[1] | ) | (Jointly Administered) |

**[PROPOSED] DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF CLOUD PEAK ENERGY INC. AND CERTAIN OF ITS DEBTOR AFFILIATES**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THIS [PROPOSED] DISCLOSURE STATEMENT IS BEING SUBMITTED FOR CONDITIONAL APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

Daniel J. DeFranceschi (No. 2732)
John H. Knight (No. 3848)
One Rodney Square
920 North King Street
Wilmington, DE 19801

**RICHARDS, LAYTON & FINGER, P.A.**
**COUNSEL FOR THE DEBTORS**

David S. Meyer (admitted *pro hac vice*)
Jessica C. Peet (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040

- and -

Paul E. Heath (admitted *pro hac vice*)
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, TX 75201

**VINSON & ELKINS LLP**
**COUNSEL FOR THE DEBTORS**

**Dated: October 4, 2019**

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Antelope Coal LLC (8952); Arrowhead I LLC (3024); Arrowhead II LLC (2098); Arrowhead III LLC (9696); Big Metal Coal Co. LLC (0200); Caballo Rojo LLC (9409); Caballo Rojo Holdings LLC (4824); Cloud Peak Energy Finance Corp. (4674); Cloud Peak Energy Inc. (8162); Cloud Peak Energy Logistics LLC (7973); Cloud Peak Energy Logistics I LLC (3370); Cloud Peak Energy Resources LLC (3917); Cloud Peak Energy Services Company (9797); Cordero Mining LLC (6991); Cordero Mining Holdings LLC (4837); Cordero Oil and Gas LLC (5726); Kennecott Coal Sales LLC (0466); NERCO LLC (3907); NERCO Coal LLC (7859); NERCO Coal Sales LLC (7134); Prospect Land and Development LLC (6404); Resource Development LLC (7027); Sequatchie Valley Coal Corporation (9113); Spring Creek Coal LLC (8948); Western Minerals LLC (3201); Youngs Creek Holdings I LLC (3481); Youngs Creek Holdings II LLC (9722); Youngs Creek Mining Company, LLC (5734). The location of the Debtors' service address is: 385 Interlocken Crescent, Suite 400, Broomfield, Colorado 80021.

**Important Information for You to Read**[2]

| SUPPORT FOR THE PLAN |
|---|
| **The Debtors, the Prepetition Secured Noteholder Group, and the Committee support the Plan and strongly urge Holders of Claims whose votes are being solicited to accept the Plan.** |
| **PLAN VOTING DEADLINE** |
| **The deadline to vote on the Plan is [●], 2019, at 5:00 p.m. prevailing Eastern Time unless extended by the Debtors. For your vote to be counted, your Ballot must be actually received by Prime Clerk before the Voting Deadline in accordance with the instructions provided herein.**<br><br>**The Debtors are providing you with the information in this Disclosure Statement (as may be amended, altered, modified, revised, or supplemented from time to time, the "*Disclosure Statement*") for the Plan because you may be a creditor entitled to vote on the Plan. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose.** |
| **SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS** |
| **The Plan has not been approved (or disapproved) by the Securities and Exchange Commission ("*SEC*") or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is unlawful.**<br><br>**This Disclosure Statement contains forward-looking statements that involve substantial risks and uncertainties. You can identify these statements by forward-looking words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "should," "will," "would," or similar words. You should read statements that contain these words carefully because they discuss the Company's and its expectations concerning its business, financial condition, valuation, the Plan and other similar matters. While the Company believes that these forward-looking statements are reasonable as and when made, there may be events in the future that the Company is not able to predict accurately or control, and there can be no assurance that future developments will be those that the Company anticipates. The factors listed under "Risk Factors" in the reports incorporated by reference herein as well as any cautionary language in this Disclosure Statement, describe the known material risks, uncertainties, and events that may cause actual events or results to differ materially and adversely from the expectations the Company describes in its forward-looking statements. Additional factors or events that may emerge from time to time, or those that the Company currently deem to be immaterial, could cause our actual events or results to differ, and it is not possible for the Company to predict all of them. You are cautioned not to place undue reliance on the forward-looking statements contained herein. The Company undertakes no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise, except as required by law.**<br><br>**The Liquidation Analysis set forth in <u>Exhibit E</u> and other information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot now be predicted.[3] Any analyses, estimates, or recovery projections may not turn out to be accurate. Such analyses were not prepared with a view toward public disclosure or** |

[2] Capitalized terms used but not immediately defined herein shall have the meanings ascribed to such terms later in the Disclosure Statement or in the *Joint Chapter 11 Plan of Cloud Peak Energy Inc. and Certain of its Debtor Affiliates* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "***Plan***"), as applicable; *provided*, that any capitalized term used but not defined herein or in the Plan that is defined in chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), or the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***") will have the meaning ascribed to such term in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, as applicable.

[3] The Liquidation Analysis shall be included in a revised Disclosure Statement to be filed shortly.

**compliance with the published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants regarding projections or forecasts, and does not purport to present the Company's financial condition in accordance with accounting principles generally accepted in the United States. The Company's independent accountants have not examined, compiled or otherwise applied procedures to any financial information included herein and, accordingly, do not express an opinion or any other form of assurance with respect to such financial information**.

**Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is, therefore, highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.**

**The Debtors cannot assure you that the Disclosure Statement, including any exhibits thereto, that is ultimately approved by the Court in the Chapter 11 Cases: (i) will contain any of the terms described in this Disclosure Statement; or (ii) will not contain different, additional, or material terms that do not appear in this Disclosure Statement. The Debtors urge each holder of a Claim or Interest: (i) to read and carefully consider this entire Disclosure Statement (including the Plan and the matters described under "Risk Factors" below); and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan. You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.**

**No independent auditor or accountant has reviewed or approved the Liquidation Analysis herein. The Debtors have not authorized any person to give any information or advice, or to make any representation in connection with the Plan or this Disclosure Statement. This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, file, and prosecute Claims or Causes of Action and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or Objections to Claims. Holders of Claims should not construe the contents of this Disclosure Statement as providing any legal, business, financial, securities, or tax advice and should consult with their own advisors before voting on the Plan.**

**If the Plan is confirmed by the Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors (including, without limitation, those Holders of Claims or Interests who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.**

**QUESTIONS AND ADDITIONAL INFORMATION**

**If you would like to obtain copies of this Disclosure Statement, the Plan, any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact Prime Clerk, LLC ("*Prime Clerk*"), the Debtors' Notice and Claims Agent, by either: (i) visiting its website at https://cases.primeclerk.com/cloudpeakenergy; or (ii) calling (844) 217-3067**

**TABLE OF CONTENTS**


I. EXECUTIVE SUMMARY ..... 1

- **A.** Introduction ..... 1
- **B.** Purpose of the Disclosure Statement ..... 2
- **C.** The Solicitation Package ..... 2
- **D.** The Plan ..... 2
- **E.** Voting Procedures and Requirements ..... 5

II. OVERVIEW OF THE DEBTORS' OPERATIONS ..... 7

- **A.** The Debtors' Business and History ..... 7
- **B.** The Debtors' Assets ..... 8
- **C.** The Debtors' Corporate Structure ..... 9
- **D.** The Debtors' Operations ..... 10
- **E.** The Debtors' Capital Structure ..... 12

III. KEY EVENTS LEADING TO CHAPTER 11 CASES ..... 15

- **A.** Thermal Coal Distress ..... 15
- **B.** Export Market Volatility ..... 15
- **C.** Weather Impacts on Operations ..... 16
- **D.** Deleveraging Strategies ..... 16
- **E.** Hiring Advisors and Engaging with the Prepetition Secured Noteholders ..... 18
- **F.** Negotiations with Potential Purchasers ..... 20

IV. DEVELOPMENTS DURING THE CHAPTER 11 CASES ..... 20

- **A.** First Day Pleadings ..... 20
- **B.** Other Administrative Motions and Retention Applications ..... 21
- **C.** Appointment of Official Committee ..... 22
- **D.** Debtor-in-Possession Financing and Tender Offer ..... 22
- **E.** Committee SAPSA Settlement ..... 23
- **F.** The Committee's Lien Investigation ..... 24
- **G.** Schedules of Assets and Liabilities and Statements of Financial Affairs ..... 25
- **H.** Claims Bar Date ..... 25
- **I.** Key Employee Retention Plan and Key Employee Incentive Program ..... 25
- **J.** Post-Effective Date Minimum Cash Amount ..... 26

V. THE CHAPTER 11 SALE PROCESS ..... 26

- **A.** Bidding Procedures ..... 26
- **B.** Bidding Process ..... 26
- **C.** Auction ..... 27
- **D.** The Sale Hearing ..... 28
- **E.** ONRR Settlement ..... 28
- **F.** Purchaser Overview ..... 29
- **G.** Sale Transaction ..... 29

VI. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS ..... 32

VII. SUMMARY OF THE PLAN ..... 32

- **A.** Administrative Claims, Professional Fee Claims, and Priority Claims ..... 32
- **B.** Classification and Treatment of Claims and Interests ..... 35
- **C.** Means for Implementation of the Plan ..... 38
- **D.** Treatment of Executory Contracts and Unexpired Leases ..... 44
- **E.** Provisions Governing Distributions ..... 46
- **F.** Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ..... 49
- **G.** Settlement, Release, Injunction, And Related Provisions ..... 50
- **H.** Provisions Regarding Governance of the Reorganized Debtors ..... 54

**I.** Conditions Precedent to Confirmation and Consummation of the Plan .......... 55
**J.** Modification, Revocation, or Withdrawal of the Plan .......... 57
**K.** Retention of Jurisdiction .......... 58
**L.** Miscellaneous Provisions .......... 59

VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 62

**A.** Introduction .......... 62
**B.** Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors .......... 63
**C.** U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Prepetition 2021 Notes Secured Claims .......... 65
**D.** Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims .......... 70
**E.** Information Reporting and Back-Up Withholding .......... 72

IX. CERTAIN RISK FACTORS TO BE CONSIDERED .......... 73

**A.** Certain Bankruptcy Law Considerations .......... 73
**B.** Additional Factors Affecting the Value of Claims .......... 75
**C.** Risks Relating to the Debtors' Business and Financial Condition .......... 75
**D.** Factors Relating to Securities to Be Issued Under the Plan .......... 76
**E.** Additional Factors .......... 77

X. CONFIRMATION OF THE PLAN .......... 78

**A.** Confirmation Hearing .......... 78
**B.** Objections To Confirmation .......... 78
**C.** Requirements for Confirmation of the Plan .......... 80
**D.** Best Interests Test/Liquidation Analysis .......... 80
**E.** Feasibility .......... 81
**F.** Acceptance by Impaired Classes .......... 81
**G.** Additional Requirements for Nonconsensual Confirmation .......... 82

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .......... 82

**A.** Alternative Plan .......... 82
**B.** Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law .......... 82

XII. CONCLUSION AND RECOMMENDATION .......... 84

**EXHIBITS**

EXHIBIT A Plan

EXHIBIT B Sale and Plan Support Agreement

EXHIBIT C Corporate Structure Chart

EXHIBIT D Conditional Disclosure Statement Order

EXHIBIT E Liquidation Analysis

# I. EXECUTIVE SUMMARY

This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan. This Executive Summary is qualified in its entirety by reference to the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan. The Debtors urge all parties to read this Executive Summary in conjunction with the entire Disclosure Statement and the Plan.

## A. Introduction

Cloud Peak Energy Inc. ("***Cloud Peak***") and its 27 debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***" or the "***Company***") submit this Disclosure Statement pursuant to section 1125 of title 11 of the Bankruptcy Code in connection with the solicitation of votes on the Plan, dated October 4, 2019, which is attached hereto as **Exhibit A**). The Plan constitutes a separate chapter 11 plan for Cloud Peak and each of the other Debtors. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs. The Debtors, the Prepetition Secured Noteholder Group, and the Committee support the Plan and strongly urge Holders of Claims whose votes are being solicited to accept the Plan.

Cloud Peak has historically been one of the largest coal producers in the United States—supplying coal for approximately 2% of the United States' electricity demand—and the only pure-play Powder River Basin coal company. Cloud Peak is widely recognized in the industry for its exemplary performance in its safety and environmental programs and continues to focus on such programs. Although general distress has affected the domestic U.S. thermal coal industry over the last several years, Cloud Peak has taken certain measures, including deleveraging and capital preservation measures, to maximize value for its stakeholders. Despite these efforts and in recognition of challenging market trends, Cloud Peak began considering additional strategic alternatives, including potential consolidation opportunities, to maximize value for stakeholders. Following a robust prepetition sale process, Cloud Peak and its advisors determined that chapter 11 was the appropriate forum to continue the sale process for substantially all of the Company's assets while preserving and strengthening the Company's liquidity position.

To achieve this goal, the Company engaged with certain Prepetition Secured Noteholders holding approximately 62% of the face value of the Prepetition 2021 Notes and the holder of approximately 54% of the Prepetition Unsecured Notes to negotiate a consensual sale and plan process and resolve a dispute regarding the release of certain liens and guarantee release as a result of the termination of the Prepetition First Lien Credit Agreement. After months of hard-fought, arm's-length negotiations, the Company and the Consenting Noteholders successfully reached agreement on the terms of a comprehensive sale and plan support process as memorialized in the SAPSA. The SAPSA contemplated, among other things, support for a chapter 11 plan process, a sale process designed to encourage a robust auction for substantially all of the Company's assets, debtor-in-possession financing provided by certain members of the Prepetition Secured Noteholder Group, consent to the Company's use of cash collateral, and an agreed-upon waterfall for distribution of net sale proceeds.

During the Chapter 11 Cases, the Debtors commenced the Tender Offer to allow Prepetition Secured Noteholders not included in the Prepetition Secured Noteholder Group to become DIP Lenders under the DIP Facility. As a result of the Tender Offer, Prepetition Secured Noteholders comprised of both Backstop Parties and non-Backstop Parties participate as DIP Lenders. Pursuant to the Final DIP Order, the Debtors have access to the full remaining amount of commitments under the DIP Facility. Further, as set forth in more detail in Section IV.E below, the Debtors engaged with the Committee and the Prepetition Secured Noteholder Group on certain modifications to the SAPSA, to provide for the Consenting Noteholders' agreement to allow the Debtors' cash on hand to pay, among other things, certain critical vendor claims, administrative expense claims, and cure costs. The Debtors sought to assume the SAPSA (as amended) on a consensual basis, and the Court approved such assumption and the settlement regarding the lien and guarantee dispute contained therein. Thus, the Debtors, the Prepetition Secured Noteholder Group, Nomura, and the Prepetition Secured Noteholders who later become signatories to the SAPSA as a result of their participation in the Tender Offer and the DIP Facility are signatories to and are bound by the terms of the SAPSA. As described further in Section IV.E, the Committee supported the Debtors' assumption of the SAPSA and the Committee SAPSA settlement contained therein.

The Plan embodies a global settlement that provides for the reinstatement of the Prepetition 2021 Notes in the aggregate principal amount of [•], as amended by the Amended Prepetition Notes Indenture, and distribution of the Purchaser Take-Back Notes, the New Parent Equity, and certain cash distributions to Allowed Holders of Prepetition 2021 Notes Secured Claims and Allowed General Unsecured Claims. The Plan and the related Sale

preserve the jobs of hundreds of employees, addresses potential environmental risks, maximizes value for all stakeholders, and ensures that the Debtors' assets remain operating as part of a going concern business. The Debtors believe that implementing the transactions under the Plan on the timeline proposed will maximize value for all stakeholders and provide for the best opportunity for success going forward.

**B. Purpose of the Disclosure Statement**

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the Bankruptcy Code in connection with the solicitation of votes on the Plan. Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims against the Debtors because the Debtors are asking such Holders of Claims to vote to accept the Plan.

**C. The Solicitation Package**

Only record Holders of Class 3- Prepetition 2021 Notes Secured Claims and Class 4- General Unsecured Claims as of [●, 2019] (the "***Voting Record Date***") are entitled to vote on the Plan. Holders of Class 3- Prepetition 2021 Notes Secured Claims and Class 4- General Unsecured Claims will receive a solicitation package consisting of the following materials:

- a Combined Hearing Notice;
- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments thereto;
- a form ballot (the "***Ballot***"), which will include the voting instructions;
- any other documents authorized by the Court;[4] and
- a pre-addressed, return envelope.

**D. The Plan**

1. **Purpose and Effect of the Plan**

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth how a debtor will treat claims and interests. A bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by such bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' estates. Instead, the Plan, although proposed jointly, will constitute a separate plan for each of the 28 Debtors in the Chapter 11 Cases. Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class. Among other things, subject to certain limited exceptions and except as otherwise provided in the Plan or a confirmation order with respect to the Plan (the "***Confirmation Order***"), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and Interests of prepetition equity holders and substitute the obligations set forth in the Plan for those prepetition Claims and Interests. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

2. **Feasibility of the Plan**

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to make the distributions contemplated under the Plan, and payment of the Debtors' obligations in the ordinary course of business. As discussed

---

[4] Such documents may include a letter from the Prepetition Secured Noteholder Group to Holders of Class 3- Prepetition 2021 Notes Claims and the Committee to Holders of Class 4- General Unsecured Claims.

below, the Plan provides for the payment in full of Other Priority Claims and Other Secured Claims, a Post-Effective Date Minimum Cash Amount, and mechanisms for the Administrative and Priority Claims Reserve Account to provide for distributions on account of, of among other things, Administrative Claims, Cure Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims. Thus, the Debtors believe that, following consummation of the Plan, no liquidation or further reorganization will be necessary unless otherwise contemplated by the Plan.

3. **Analysis of Recoveries to Holders of Claims and Interests under the Plan**

The Plan reflects the reality that, based upon projected tax obligations, market constraints, operating performance, and cashflow projections, the Debtors' enterprise value is significantly less than the amount of Secured Debt under the Prepetition 2021 Notes Indenture. The treatment of Class 3- Prepetition 2021 Notes Secured Claims and Class 4- General Unsecured Claims is the product of extensive negotiations between the Debtors, the Purchaser, and the Prepetition Secured Noteholder Group. Importantly, the Plan provides for the reinstatement of the Prepetition 2021 Notes in the aggregate principal amount of [•], as amended by the Amended Prepetition Notes Indenture, and distribution of the Purchaser Take-Back Notes, the New Parent Equity, and certain cash distributions to Allowed Holders of Prepetition 2021 Notes Secured Claims and Allowed General Unsecured Claims.

In developing the Plan, the Debtors gave due consideration to various other restructuring alternatives. After a careful review of their current operations, prospects as an ongoing business, and estimated recoveries to creditors in a forced sale scenario given current market conditions, the Debtors concluded that the Debtors will maximize recoveries to their stakeholders by closing the Sale to the Purchaser and completing the transactions as contemplated by the Plan. The Debtors believe that any alternative to Confirmation of the Plan, such as a standalone reorganization, an alternative plan, or a partial sale of assets, would result in materially lower recoveries for stakeholders, significant delays, protracted litigation, and greater costs. For these reasons, the Debtors believe that their business and assets have significant value that would not be realized in a forced sale or a liquidation, either in whole or in substantial part.

As set forth more fully in Section V.B of this Disclosure Statement, the Debtors believe that the Plan provides the best recoveries possible for the Debtors' stakeholders and recommend that, if you are entitled to vote, you vote to accept the Plan.

**THE DEBTORS, THE PREPETITION SECURED NOTEHOLDER GROUP, AND THE COMMITTEE BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTORS URGE ALL PARTIES ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

4. **Treatment and Classification**

The Plan organizes the Debtors' creditors and equity holders into groups called "Classes." For each Class, the Plan describes: (i) the Claims or Interests comprising such Class; (ii) the recovery available to the Holders of Allowed Claims or Interests in that Class under the Plan; (iii) whether the Class is "Impaired" under the Plan, meaning that the Holders in such Class will receive less than full value on account of their Claims or Interest, or that the legal or equitable rights of such Holders will be altered in some other form; and (iv) the form of recovery, if any, that such Holders will receive on account of their respective Claims or Interests.

The table below summarizes the classification, treatment, and estimated recoveries of Claims and Interests under the Plan. A more detailed description of the classification and treatment of Claims and Interests is set forth in Section VII of this Disclosure Statement. As demonstrated in the liquidation analysis (the "***Liquidation Analysis***," attached hereto as **Exhibit E**), recoveries of each Class of Claims and Interests are equal to or greater under the Plan than through a hypothetical chapter 7 liquidation. The Debtors believe that their businesses and assets have significant value that would not be realized in a chapter 7 liquidation, either in whole or in substantial part. The information in the table below is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan. Because each Debtor's Plan contemplates distributions to Holders of Claims in the amount of the estimated percentage recoveries set forth below, the estimated aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Voting Rights | Approx. % Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim from the Administrative and Priority Administrative and Priority Claims Reserve Account or such other treatment as may be agreed to by such Holder and the Debtors | Unimpaired | Presumed to Accept | 100% |
| 2 | Other Secured Claims | Payment in full in Cash equal to the full Allowed amount of its Claim from the Administrative and Priority Claims Reserve Account, the return or abandonment of the collateral securing its Claim, or such other treatment as may be agreed to by such Holder and the Debtors | Unimpaired | Presumed to Accept | 100% |
| 3 | Prepetition 2021 Notes Secured Claims | (i) reinstatement of the Prepetition 2021 Notes in the aggregate principal amount of [•], as amended by the Amended Prepetition Notes Indenture and its (ii) Pro Rata Share, based on the allowed amount of its Prepetition 2021 Notes Secured Claim, of the following: the Purchaser Take-Back Notes; the New Parent Equity; and the Prepetition 2021 Notes Secured Claim Cash Distribution | Impaired | Entitled to Vote | [•]% |
| 4 | General Unsecured Claims | Receipt of its Pro Rata Share of the General Unsecured Claims Cash Distribution Amount *less* GUC Administrator Expenses. Holders of Prepetition 2021 Notes Deficiency Claims will waive, or will be deemed to have waived, any recovery or distribution on account of any Prepetition 2021 Notes Deficiency Claim; provided, however, for the avoidance of doubt, in addition to being permitted to vote in Class 3, Holders of Prepetition 2021 Notes Deficiency Claims shall be entitled to vote in Class 4 on account of such Claims | Impaired | Entitled to Vote | [•]% |
| 5 | Intercompany Claims | Discharged | Impaired | Deemed to Reject | 0% |
| 6 | Intercompany Interests | Reinstated or extinguished at the option of the Debtors or the Reorganized Debtors, as applicable, with the consent | Impaired | Deemed to Reject | 0% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Voting Rights | Approx. % Recovery |
|---|---|---|---|---|---|
| | | of the Required Consenting Noteholders | | | |
| 7 | Parent Interests | Extinguished; *provided* that all New Parent Equity shall be issued to Holders of Prepetition 2021 Notes Secured Claims | Impaired | Deemed to Reject | 0% |

5. **Where to Find Additional Information**

Cloud Peak files annual, quarterly and current reports, proxy statements, and other information with the SEC. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Filings" link. The information included in the following filings incorporated by reference herein is deemed to be part of this Disclosure Statement, except for any information superseded or modified by information contained expressly in this Disclosure Statement. You should not assume that the information in this Disclosure Statement is current as of any date other than the date on the first page of the Disclosure Statement. Any information Cloud Peak files under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1933, as amended, that updates information in the filings incorporated by reference will update and supersede that information:

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed on March 15, 2019;
- Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2019 and June 30, 2019, filed on May 10, 2019 and September 20, 2019, respectively;
- Current Reports on Form 8-K filed January 14, 2019, January 29, 2019, March 27, 2019, April 15, 2019, May 1, 2019, May 8, 2019, May 10, 2019, May 17, 2019, June 25, 2019, July 19, 2019, August 14, 2019, August 20, 2019, August 23, 2019, August 29, 2019, September 5, 2019, September 11, 2019, September 19, 2019, September 26, 2019, and October 1, 2019.

6. **Releases and Exculpations**

As set forth more fully in Section VII of this Disclosure Statement and Article VIII of the Plan, the Plan provides certain releases and exculpations to the Released Parties. Each of the Released Parties made substantial and valuable contributions to the Sale Process and efforts to negotiate and implement the Plan. The Debtors intend to present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Specifically, as set forth in Section III of this Disclosure Statement, each of the Released Parties participated, *inter alia*, in the months-long negotiations which ultimately led to the SAPSA, the Sale Process and closing of the Sale Transaction, and the settlement with the Committee. Furthermore, as set forth more fully in Section V of this Disclosure Statement, the Prepetition Secured Noteholder Group agreed to support the consummation of the Sale to the Purchaser in exchange for, among other things, Cash, the Purchaser Take-Back Notes, the Royalty Interest, and the assumption of certain taxes, royalties, and post-petition accounts payable. Class 3- Prepetition 2021 Notes Secured Claims and Class 4- General Unsecured Claims are the only Classes entitled to vote on the Plan, and the Debtors cannot implement the transactions contemplated by the SAPSA (as amended) without the support of Class 3- Prepetition 2021 Notes Secured Claims. Accordingly, the Debtors believe that the releases and exculpation provisions are an integral part of the Plan which will maximize the value of the Debtors for the benefit of all stakeholders.

**E. Voting Procedures and Requirements**

1. **Parties Entitled to Vote**

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest,

the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

Only Claims in Class 3- Prepetition 2021 Notes Secured Claims and Class 4- General Unsecured Claims (the "***Voting Classes***") are entitled to vote to accept or reject the Plan:

The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

2. **Voting Procedures**

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in the Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in certain exhibits annexed to the Conditional Disclosure Statement Order, which is attached hereto as **Exhibit D**.

The Conditional Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**

**PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

3. **Voting Deadline**

Ballots will be provided for Holders of Claims in the Voting Classes as of [●, 2019] to vote to accept or reject the Plan. Because all other Classes are unimpaired and deemed to accept or Impaired and deemed to reject, only the Voting Classes are entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, the applicable standards for tabulating Ballots, and opting out of the releases set forth in the Plan.

The Debtors have engaged Prime Clerk LLC ("***Prime Clerk***") as their claims, noticing, solicitation, and voting agent (the "***Voting Agent***") to assist in, among other things, the transmission of voting materials and in the tabulation of votes with respect to the Plan.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M., PREVAILING EASTERN TIME, ON [●], 2019, UNLESS EXTENDED BY THE DEBTORS. IF YOU HOLD YOUR CLAIMS THROUGH A NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE FOR RETURNING YOUR BENEFICIAL HOLDER BALLOT. UNLESS OTHERWISE INSTRUCTED, PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE OR YOUR VOTE WILL NOT BE COUNTED.**

**EACH BALLOT ADVISES THAT CREDITORS WHO (A) VOTE TO ACCEPT THE PLAN OR (B) DO NOT OPT OUT TO OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VII OF THE PLAN SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS SET FORTH IN ARTICLE VII OF THE PLAN AND UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE AND DISCHARGE THE RELEASED PARTIES FROM ANY AND ALL CAUSES OF ACTION.**

Delivery of a Ballot by facsimile, e-mail or any other electronic means will not be accepted. Ballots returnable to the Voting Agent must be returned by the Voting Deadline with an original signed copy to:

| **Via Hand Delivery, Overnight Courier, or First Class Mail:** |
|---|
| Cloud Peak Energy Ballot Processing<br>c/o Prime Clerk LLC<br>One Grand Central Place<br>60 East 42nd Street (Park Avenue), Suite 1440<br>New York, NY 10165<br>Phone: 844-217-3067 (U.S. toll free)<br>or 347-761-3264 (international) |

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE OF 5:00 P.M. (PREVAILING EASTERN TIME).

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth therein. All parties in interest retain their right to object to approval of this Disclosure Statement on final basis pursuant to Section 1125 of the Bankruptcy Code and Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the SAPSA.

4. **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Court, will be final and binding on all parties.

Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors determine, unless otherwise ordered by the Court. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will the Debtors or any other person incur any liabilities for failure to provide such notification. Unless otherwise directed by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## II. OVERVIEW OF THE DEBTORS' OPERATIONS

### A. The Debtors' Business and History

Cloud Peak has historically been one of the largest coal producers in the United States—supplying coal for approximately 2% of the United States' electricity demand—and is the only pure-play Powder River Basin coal company. The Company's three surface coal mines are located in northeastern Wyoming and southeastern Montana within the Powder River Basin (the "***PRB***"), which is the lowest-cost, major coal producing region in the United States. The Company mines and sells low sulfur, subbituminous coal and provides related logistics supply services. In 2018, Cloud Peak sold approximately 50 million tons from its three coal mines to customers, both domestic and

foreign. And, Cloud Peak is widely recognized in the industry for its exemplary performance in its safety and environmental programs.

Cloud Peak was formed in the summer of 2008 and commenced its initial public offering of common stock in November 2009, the proceeds of which were used to acquire approximately 51% of Cloud Peak Energy Resources LLC ("***CPE Resources***"), which held certain assets of Rio Tinto PLC and Rio Tinto Limited and certain of their affiliates (collectively, "***Rio Tinto***"). Cloud Peak acquired the remaining 49% interests in CPE Resources from Rio Tinto in December 2010 following a secondary offering of Cloud Peak common stock. As described further below, Cloud Peak is a public company that was traded on the NYSE prior to the Petition Date.

**B. The Debtors' Assets**

The Company prides itself on operating some of the safest mines in the coal industry, with one of the lowest employee injury incident rates among the largest coal producing companies in the United States.[5] The Company operates three surface mines in the PRB: the Antelope Mine, the Cordero Rojo Mine, and the Spring Creek Mine.

The Antelope and Cordero Rojo Mines are located in Wyoming and the Spring Creek Mine is located in Montana. The below map depicts the approximate locations of the Company's mines, as well as the locations of two development projects discussed in greater detail herein.




The Company engages exclusively in surface mining and produces subbituminous thermal coal with low sulfur content, which it sells primarily to domestic and foreign electric utility providers. Thermal coal is primarily consumed by electric utilities and industrial companies as fuel for electricity generation. In 2018, coal produced by the Company was used to generate approximately 2% of the electricity produced in the United States. As of December 31, 2018, the Company controlled approximately 975 million tons of proven and probable coal reserves.

Coal can be characterized by end use generally as either thermal or metallurgical. The most important variables in thermal coal are heat value and sulfur content. The coal produced in the PRB generally has a lower heat value than coal found in the eastern and midwestern regions of the United States, with the exception of lignite coal,

---

5 For 2018, the all-injury frequency rate for the Company's three owned and operated mines was 0.35 (based on Mine Safety and Health Administration methodologies). The all-injury frequency rate reflects the number of reportable injuries suffered by mine site employees per 200,000 hours worked. This rate is one of the lowest among the largest U.S. coal producing companies.

which has a lower heat value than subbituminous coal but is typically used by utilities that are located adjacent to a mine.

Environmental regulations limit the amount of sulfur dioxide that may be emitted as a result of coal combustion. The concentration of sulfur in coal affects the amount of sulfur dioxide that is produced in combustion. Coal-fired power plants comply with environmental regulations by burning coal with low sulfur content, blending coals with variable sulfur contents, and/or using sulfur-reduction technology to reduce sulfur dioxide emissions. PRB coal—the coal produced by Cloud Peak—typically has a lower sulfur content than coal produced in the eastern United States.

In addition to operating its three coal mines, the Company is in the process of developing two other projects in the PRB, the "***Youngs Creek Project***" and the "***Big Metal Project***." The Youngs Creek Project is an undeveloped surface mine in the northern PRB region, located approximately seven miles south of the Company's Spring Creek Mine. The Company acquired the Youngs Creek Project in June 2012, and has since acquired surface rights to enable future development of the project. The Company has been evaluating the development options and believes that the Youngs Creek Project's proximity to the Spring Creek Mine and Big Metal Project presents an opportunity to optimize mine developments in the northern PRB.

In 2013, the Company entered into an option and exploration agreement with the Crow Tribe of Indians to develop a coal project—the Big Metal Project—located on the Crow Indian Reservation in southeast Montana, near the Company's Spring Creek Mine and Youngs Creek Project. The Company has since made payments to exercise its option to lease one project area and extend the option on two other project areas under its option agreement with the Crow Tribe.

## C. The Debtors' Corporate Structure

All of the Debtors are direct or indirect subsidiaries of Cloud Peak. The Company's full corporate organization structure is detailed on **Exhibit C**, attached hereto. The following simplified organization chart depicts the Company's primary operating entities:




Cloud Peak, a Delaware corporation, is the ultimate parent company of each of the Debtors and the issuer of the Company's common stock. Cloud Peak has no investments or ownership interests other than its ownership of the equity in Cloud Peak Energy Resources LLC ("***CPE Resources***"). Cloud Peak also has four affiliates that are not Debtors in the Chapter 11 Cases (the "***Non-Debtor Affiliates***"), as described further below.

CPE Resources, a Delaware limited liability company and a wholly-owned direct subsidiary of Cloud Peak, was formed on August 19, 2008. The Company's bank accounts and contract rights are owned primarily by CPE Resources, but CPE Resources does not directly own any coal assets or real property.

Cloud Peak Energy Logistics LLC is party to certain important transportation contracts and is the contract counterparty on contracts for delivered coal sales to customers located in the United States and Asia.

Cordero Mining LLC, Antelope Coal LLC, and Spring Creek Coal LLC own and operate the Company's three coal mines. Certain of the Debtor entities not specified herein own various development rights, real property rights, contract rights, or otherwise do not own assets of material value or engage in material operations. As described further herein, the Company pursued the sale of substantially all of its operating assets in the Chapter 11 Cases.

The Non-Debtor Affiliates are not obligors under the Company's funded debt and consist of the following entities:

- Cloud Peak Energy Receivables LLC, which is the seller under the Company's AR Securitization Facility discussed herein;
- Wyoming Quality Healthcare Coalition, LLC, an entity that is owned jointly by the Company and two other coal producers, which provides healthcare benefits to certain of the Company's employees;
- The Interstate Ditch Company, that, for certain regulatory reasons, owns and insures a ditch in the state of Wyoming; and
- Venture Fuels Partnership, which is a general partnership between the Company and Midwest Energy Resource Co., a DTE Energy affiliate, that facilitates the marketing, sale, and delivery of coal to the Great Lakes region of the United States.

## D. The Debtors' Operations

### 1. The Debtors' Customers

The Company focuses on building long-term relationships with its customers through reliable performance and consistent customer service. The Company supplies coal to 46 domestic and foreign electrical utilities, and 84% of the Company's 2018 sales were made to customers with whom the Company has had relationships for over ten years. The Company's customers can be generally categorized as either "***Mine Customers***" or "***Logistics Customers***."

The Mine Customers purchase coal at the Company's mine locations, where the sale occurs and risk of loss passes to the customer. The Mine Customers typically consist of domestic utility companies located in the mid west and south central United States. The map below depicts, generally, the domestic destinations of coal produced by the Company's mines in 2018.




The Logistics Customers purchase coal from Debtor Cloud Peak Energy Logistics LLC along with the Company's logistics services to deliver coal to the customer at a shipping terminal or the customer's plant. In such cases, title and risk of loss passes to the customer at the remote delivery point. The Logistics Customers are primarily foreign and domestic utility companies. Approximately 9% of the coal produced by the Company in 2018 was sold to customers outside of the United States.

For the Logistics Customers, the Company, bolstered by the Spring Creek Mine's northern PRB operations, is able to provide a variety of services designed to facilitate the sale and delivery of coal. These services include coordination of the transportation and delivery of purchased coal, negotiation of take-or-pay rail agreements and take-or-pay port agreements, and demurrage settlements with vessel operators. These take-or-pay agreements require the Company to pay for a minimum quantity of coal to be transported on a railway or through a terminal regardless of whether the Company actually uses the transportation capacity. The Company has two significant agreements with BNSF Railway Company ("***BNSF***") and Westshore Terminals Limited Partnership that contain take-or-pay or take-or-pay type elements. Westshore is a port located in Vancouver, BC, that facilitates the transport of coal from the Spring Creek Mine to electric utility customers in Asia. In 2018, the Company delivered approximately 4.6 million tons of coal under these agreements. As of July 31, 2019, the Company had delivered 1.9 million tons of coal under these agreements for the year to date.

2. **The Debtors' Management and Employees**

The Company is led by an experienced management team that is comprised of the following members (the "***Management Team***"):

| Name | Years with Cloud Peak | Title |
|---|---|---|
| **Colin Marshall** | 11 | President and Chief Executive Officer |
| **Heath Hill** | 8 | Executive Vice President and Chief Financial Officer |
| **Bryan Pechersky** | 9 | Executive Vice President, General Counsel and Corporate Secretary |
| **Amy Clemetson** | 11 | Senior Vice President, Human Resources |

| Name | Years with Cloud Peak | Title |
|---|---|---|
| **Bruce Jones** | 11 | Executive Vice President and Chief Operating Officer |
| **Todd Myers** | 8 | Senior Vice President, Marketing and Business Development |

Prior to the Petition Date, on January 23, 2019, the compensation committee of Cloud Peak's Board of Directors approved a retention program (the "***Retention Program***") that provided a lump sum cash payment of a one-time retention bonus to the members of the Management Team and certain other key members of management in recognition of their demonstrated work and commitment, and for the significant benefits of retaining the Management Team to assist the Company through its exploration of potential strategic and restructuring alternatives. The retention payments were sized as a percentage of each Management Team member's annualized base salary. Importantly, in the event any member of the Management Team is terminated for "cause" or resigns without "good reason" before certain specified future events, such Management Team member is required to repay the full amount (after tax) of the retention payment to the Company. Additional information regarding the Retention Program is set forth in detail in the Company's Form 8-K filed on January 29, 2019.

In addition, prior to the Petition Date, Cloud Peak's Board of Directors approved a key employee incentive plan for the Management Team and certain other key members of management. Payments under this plan as well as under a key employee retention plan for certain non-Management Team members are supported by the parties to the SAPSA. The Court approved both the key employee incentive plan and key employee retention plan, which are described in further detail below.

As of July 31, 2019, the Company had approximately 1,227 full-time employees and approximately 25 part-time employees. None of the Company's employees are parties to collective bargaining agreements. Additionally, the Company utilizes approximately 150 external contractors, providing services on an as-needed basis.

**E. The Debtors' Capital Structure**

As of the Petition Date, the Company's funded debt liabilities were approximately $346.8 million in the aggregate.[6] In addition to funded debt liabilities, the Company has an AR Securitization Facility.[7] After effecting a series of liability management transactions, as described in detail below, as of the Petition Date, the Company's significant funded debt obligations include:

| ***($ in millions)*** | Maturity | Interest Rate | Approx. Amount Outstanding |
|---|---|---|---|
| **Prepetition 2021 Notes** | November 2021 | 12.00% | $290.4 |
| **2024 Prepetition Unsecured Notes** | March 2024 | 6.375% | $56.4 |

1. **Prepetition 2021 Notes**

On October 16, 2016, in connection with the Exchange Offers, CPE Resources and Cloud Peak Energy Finance Corp. ("***CPE Finance***") issued $290.4 million in principal amount of 12.00% second lien senior notes due 2021 (the "***Prepetition 2021 Notes***").

The Prepetition 2021 Notes were issued to certain third parties (the "***Prepetition Secured Noteholders***") pursuant to an indenture (as amended or otherwise modified, the "***Prepetition 2021 Notes Indenture***") with Wilmington Trust, N.A., as indenture trustee and collateral agent (the "***Prepetition 2021 Notes Indenture Trustee***"). The Prepetition 2021 Notes carry an interest rate of 12.0% with interest payments due semi-annually on May 1 and

6 Additionally, as of September 6, 2019, the Company had approximately $19 million in trade payables outstanding.

7 As of the Petition Date, there were undrawn letters of credit issued under the AR Securitization Facility totaling approximately $25.7 million.

November 1, subject to a 30-day grace period. On May 1, 2019, CPE Resources and CPE Finance entered the grace period with respect to the approximately $17.4 million interest payment on the Prepetition 2021 Notes.

The Prepetition 2021 Notes were issued with joint and several guarantees by Cloud Peak and all of its existing and future domestic restricted subsidiaries (the "***Prepetition 2021 Notes Subsidiary Guarantors***"), and secured by second liens[8] on substantially all assets of the Prepetition 2021 Notes Subsidiary Guarantors. The Prepetition 2021 Notes Indenture provides that each subsidiary guarantee will terminate and be automatically released "in connection with the release, other than the discharge through payment by the [Prepetition 2021 Notes Subsidiary Guarantors], of all other Guarantees by such Restricted Subsidiary of Debt of either Issuer or another Guarantor under the [Prepetition First Lien Credit Agreement]." In light of this language, in its Form 10-K filed with the U.S. Securities and Exchange Commission on March 15, 2019, Cloud Peak disclosed that the termination of the Prepetition First Lien Credit Agreement on November 15, 2018 may have resulted in a release of the liens and guarantees granted by the Prepetition 2021 Notes Subsidiary Guarantors. The Prepetition Secured Noteholders disputed the view that the termination of the Prepetition First Lien Credit Agreement resulted in a release of the subsidiary liens and guarantees.[9]

Prior to the Petition Date and in connection with entering into the SAPSA, the Debtors and the Prepetition Secured Noteholder Group settled their dispute regarding the liens and guarantees, and the Debtors acknowledged and reaffirmed the liens and guarantees of the Prepetition 2021 Notes Subsidiary Guarantors in favor of the Prepetition Secured Noteholders with respect to the Prepetition 2021 Notes.

The Committee also reviewed and analyzed the potential release of the subsidiary liens and guarantees following the commencement of the Chapter 11 cases. The Committee's position was that termination of the Prepetition First Lien Credit Agreement automatically resulted in a release of the subsidiary liens and guarantees based on a simple and straightforward application of the plain meaning of §§ 10.04(f) and 11.05 of the Prepetition 2021 Notes Indenture. Specifically, § 10.04(f) governs terminations of guarantees and § 11.05 governs lien releases, and the Committee's position was that these provisions unambiguously released the subsidiary liens and guarantees when the Prepetition First Lien Credit Agreement was terminated. The Committee argued that no further inquiry was needed after applying the text of the Secured Notes Indenture, and it disputed the numerous arguments made by the Prepetition Secured Noteholders, including that resolution of the dispute would require an inquiry into whether the releases were commercially reasonable and permissible under applicable law, whether the releases were contrary to the parties' behavior after termination of the Prepetition First Lien Credit Agreement, and whether the releases violated the Trust Indenture Act. The Committee also disputed the Debtors' assertions that litigating the dispute would have been complex, expensive and disruptive to a successful resolution of the Chapter 11 cases. In the end, the dispute was consensually resolved by the Court's approval of the SAPSA.

2. **Prepetition Unsecured Notes**

On March 11, 2014, CPE Resources and CPE Finance issued $200 million in principal amount of 6.375% senior notes due 2024 (the "***Prepetition Unsecured Notes***"). The Prepetition Unsecured Notes were issued pursuant to an indenture (as amended or otherwise modified, the "***Prepetition Unsecured Notes Indenture***") with Wells Fargo Bank, N.A., as indenture trustee. Thereafter, Wilmington Trust, N.A. replaced Wells Fargo Bank, N.A., as indenture trustee under the Prepetition Unsecured Notes Indenture and has since been replaced by BOKF, National Association.

The Prepetition Unsecured Notes were issued with joint and several guarantees by Cloud Peak and all of Cloud Peak's existing and future domestic restricted subsidiaries (the "***Prepetition Unsecured Notes Subsidiary Guarantors***"). The Prepetition Unsecured Notes Indenture contains language regarding the release of guarantees that mirrors the language contained in the Prepetition 2021 Notes Indenture, giving rise to a substantially similar dispute regarding the release of the guarantees of the Prepetition 2021 Notes Subsidiary Guarantors as described above in respect of the Prepetition 2021 Notes. This potential dispute was likewise settled in connection with entry into the SAPSA.

---

[8] As a result of the Debtors' termination of the Prepetition First Lien Credit Agreement in November 2018 (as defined and discussed in detail in Part III), the Prepetition Secured Noteholders effectively hold a first-lien position.

[9] The Debtors do not believe there was any dispute regarding the obligations or liens of Cloud Peak, CPE Resources, or CPE Finance with respect to the Prepetition 2021 Notes as a function of termination of the Prepetition First Lien Credit Agreement.

Interest under the Prepetition Unsecured Notes is payable semi-annually on March 15 and September 15, subject to a 30-day grace period. As outlined below, CPE Resources and CPE Finance entered the grace period with respect to the approximately $1.8 million interest payment on the Prepetition Unsecured Notes due on March 15, 2019. Prior to the expiration of the grace period, CPE Resources and CPE Finance entered into a forbearance agreement with Nomura, an investment advisor for the Holders or beneficial owners of a majority, but less than 75% of the Prepetition Unsecured Notes. The forbearance agreement with Nomura was subsequently extended, with an expiration date of May 10, 2019.

3. **Accounts Receivable Securitization Facility**

In 2013, the Company formed a wholly-owned, unrestricted subsidiary, Cloud Peak Energy Receivables LLC ("***CPE Receivables***"),[10] to purchase trade receivables generated by certain of the Company's subsidiaries without recourse (other than customary indemnification obligations). On February 11, 2013, CPE Receivables and CPE Resources entered into an account receivable securitization program (the "***AR Securitization Facility***") with committed capacity of up to $75 million, which was later amended and reduced to $70 million. The AR Securitization Facility allows for CPE Receivable to transfer undivided interests in its receivables to financial institutions for cash, and, additionally, provides for the issuance of letters of credit for the Company's ultimate benefit. Total borrowings under the AR Securitization Facility are limited by eligible accounts receivable.

The Company does not generally utilize the AR Securitization Facility to fund working capital. As of the Petition Date, the aggregate amount of outstanding letters of credit issued under the AR Securitization Facility was approximately $25.7 million. The letters of credit are secured by eligible accounts receivable and cash collateral.

Prepetition, the Company entered into a forbearance agreement with PNC Bank, the administrator under the AR Securitization Facility, which provided that PNC Bank would not exercise remedies under the AR Securitization Facility as a result of (i) the going-concern qualification contained in the Company's 2018 audited financials and (ii) the event of default under the Prepetition Unsecured Notes for failure to pay interest on the Prepetition Unsecured Notes.

Prior to the Petition Date, the Company and PNC Bank negotiated amendments to the purchase agreements through which CPE Receivables purchases accounts receivables from certain Debtors. Such amendments are described in detail in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, and III Granting Related Relief* [Docket No. 20] (the "***AR Securitization Facility Motion***") wherein the Debtors requested authority to enter into such amendments.

As discussed herein, the Debtors received the authority to, among other things, continue to purchase trade receivables, transfer undivided interests in receivables to financial institutions for cash, and issue letters of credit for the Company's ultimate benefit, on a final basis on June 17th as part of the *Final Order (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, and III Granting Related Relief* [Docket No. 466].

4. **Reclamation Obligations**

The Company is subject to the Surface Mining Control and Reclamation Act ("***SMCRA***"), which establishes mining, environmental protection, reclamation, and closure standards for all aspects of surface coal mining. Under SMCRA, coal mine operators must obtain a performance bond or otherwise secure the performance of all reclamation obligations associated with their coal mining activities.

The Company secures the performance of its reclamation and lease obligations required under SMCRA through the use of surety bonds to cover the costs that the state where the Company operates would incur if the Company were unable to fulfill its reclamation obligations. As of the Petition Date, there are approximately $395 million in third-party surety bonds outstanding with various insurance companies (the "***Sureties***") to primarily secure the performance of the Company's reclamation and lease obligations. Under various indemnity agreements, the Company is responsible to the Sureties for any amount the surety is required to pay under the surety bonds. The Company has obtained letters of credit in favor of the Sureties in the approximate amount of $25.6 million to secure

[10] CPE Receivables is not a Debtor in the Chapter 11 Cases.

its performance under the indemnity agreements. As discussed above, the letters of credit are secured in part by eligible accounts receivable under the AR Securitization Facility and in part by restricted cash.

In 2019, prior to the Petition Date, the Company received letters from certain of its Sureties demanding increased collateral or replacement of their bonds. Posting additional collateral or obtaining replacement bonds would immediately reduce the liquidity necessary to support the Company's operations. Leading up to the Petition Date, the Company engaged with the Sureties in order to address their concerns without negatively impacting the Company's liquidity.

5. **Common Stock**

Cloud Peak is a publicly held company that was listed on the New York Stock Exchange (the "***NYSE***") under the symbol "CLD" until March 26, 2019, when the NYSE commenced proceedings pursuant to Section 802.01 of the NYSE Listed Company Manual to immediately delist and suspend trading of Cloud Peak's common stock as a result of the share price falling below $0.16 per share. On March 27, 2019, Cloud Peak began trading on the OTC Pink under the symbol "CLDP." As of the Petition Date, Cloud Peak had 76,507,272 outstanding shares of common stock, par value $.01 per share.

## III. KEY EVENTS LEADING TO CHAPTER 11 CASES

The Company actively deployed a number of strategies and transactions prepetition in an effort to deleverage its balance sheet, bolster liquidity, and maximize value for stakeholders. The Company's chapter 11 filing, however, was precipitated by (i) general distress affecting the domestic U.S. thermal coal industry that produced a sustained low price environment that could not support profit margins to allow the Company to satisfy its funded debt obligations; (ii) export market price volatility that caused decreased demand from the Company's customers in Asia; (iii) particularly challenging weather conditions in the second quarter of 2018 that caused spoil failure and significant delays in coal production through the remainder of 2018 and into 2019, which reduced cash inflows from coal sales and limited credit availability; and (iv) recent flooding in the Midwestern United States that has significantly disrupted rail service, further reducing coal sales.

### A. Thermal Coal Distress

In the years leading up to the Petition Date, the prices for thermal coal have become more volatile and depressed due to an oversupply of coal and significantly reduced demand in the United States and a variety of other countries. This reality, compounded with the slowed demand domestically for coal-fueled electricity generation and resulting coal-fired power plant retirements have exacerbated these challenges.

Thermal coal producers in the United States generally are confronting challenges to their businesses from a variety of macroeconomic factors. In particular, the abundance of low cost alternatives to coal for electricity generation and heightened state and federal regulations applicable to both coal producers and electric utilities that utilize coal-fired power plants have created challenges for coal producers.

In particular, the availability and low cost of natural gas in the past years has caused a significant decline in demand for coal, resulting in reduced production. The trend toward natural gas is one that many industry experts believe will continue for the immediate future. In 2016, natural gas-fired power plants surpassed coal-fired electricity generation, and natural gas has remained the primary fuel source for electricity generation since that time. The transition to natural gas has been driven primarily by two factors: (i) a sustained low price environment and (ii) increased environmental regulations affecting coal-fired power plants. The regulatory environment in particular has also led to utility companies electing to retire a significant number of their coal-fired power plants in recent years.

In addition to the retirement of coal-fired power plants, decreased demand for coal in the United States has contributed to lower coal production and caused a number of coal mines to close. Though underground mines (which the Company does not operate) had a larger percentage of closures in recent years, surface mines have also seen large production declines.

### B. Export Market Volatility

The Company prices the coal it delivers to customers in Asia broadly in line with several relevant international coal indices adjusted for energy content and other quality and delivery criteria. These indices include the Newcastle benchmark price and the Kalimantan 5000. The Newcastle benchmark price is an established index for high Btu Australian bituminous thermal coal. The Kalimantan 5000 is an established index for subbituminous Indonesian thermal coal. Historically, the Company's coal delivered to customers in Asia is priced between 60% and

75% of the forward Newcastle price and at a lesser discount to the forward Kalimantan 5000 price index due to quality and freight cost differentials.

However, in late 2018, the collapse of the Indonesian rupiah lowered producers' cost in U.S. Dollars. In response, the Indonesian government removed export restrictions to increase USD exports, which has increased Indonesian exports and produced downward pressure on the price of thermal coal in the Kalimantan 5000 price index. During the fourth quarter of 2018, the Kalimantan 5000 price index decreased approximately 14%, which materially and negatively impacted the Company's economic position.

**C. Weather Impacts on Operations**

In addition to headwinds facing thermal coal producers and export market volatility, the Company's mines suffered from unusually heavy rains affecting Wyoming and Montana in the second quarter of 2018. For perspective, the 10-year average combined rainfall for May, June, and July at the Company's Antelope Mine is 6.79 inches. In 2018, it rained 10.2 inches during that period. While certain operational procedures put in place following heavy flooding in 2014 functioned effectively to mitigate equipment damage, the 2018 rains interrupted the Company's mining operations considerably. The rain affected the Antelope Mine to a greater degree than the Spring Creek or Cordero Rojo Mines due to the impact the rain had on truck-shovel overburden[11] removal at Antelope Mine.[12]

Subsequently, moisture from the rain caused spoil instability in the Antelope Mine dragline pits. Spoil is the term used for overburden and other waste rock removed during coal mining. The instability in the dragline pits caused wet spoil to slide into the pits that had to be removed by dragline and/or truck-shovel methods before the coal could be mined. This caused significant delays and diverted truck-shovel capacity from preliminary stripping work, which caused additional production delays at the Antelope Mine. The delays resulting from the spoil failure at the Antelope Mine caused the Company to have reduced shipments, increased costs, and delayed truck-shovel stripping in 2018. Consequently, the reduced cash inflows from coal sales limited the Company's credit availability under the financial covenants in the Prepetition First Lien Credit Agreement prior to its termination, and limited access to any new forms of capital.

Additionally, the severe weather affecting the Midwest region of the United States in mid-March 2019 caused, among other things, extensive flooding that damaged rail lines. One of Cloud Peak's primary suppliers of rail transportation services – BNSF – was negatively impacted by the flooding and has been unable to provide sufficient rail transportation services to satisfy the Company's targeted coal shipments. As of the Petition Date, BNSF's trains have resumed operations, but are operating on a less frequent schedule because of repairs being made to rail lines damaged by the extensive flooding. As a result, the Company's coal shipments were materially impacted, with cash flows significantly reduced through mid-June 2019. The Company is continuing to evaluate this impact as well as evaluate potential claims arising from business disruption.

**D. Deleveraging Strategies**

As set forth above, decreased domestic demand for thermal coal, pricing volatility in the export market, and severe weather events combined to adversely impact the Company's liquidity position in the months leading up to the Petition Date. As of September 30, 2018, the Company reported approximately $109 million in cash on hand. By December 31, 2018, total liquidity had reduced to approximately $91 million, and by March 8, 2019, liquidity reduced further to approximately $65.5 million. This dramatic decline in liquidity, together with the challenges described above, caused the Company to consider strategic transaction alternatives in late 2018 to determine if a consolidation opportunity could maximize value for stakeholders. Ultimately, when such efforts did not yield a viable solution that would satisfy the Company's funded debt obligations and provide a recovery for equity holders, the Company engaged restructuring advisors to explore potential deleveraging transactions and a process to market all or substantially all of the Company's operating assets.

Even before these precipitating events negatively impacted the Company's liquidity and caused the Company to file the Chapter 11 Cases, however, the Company recognized the distressed industry condition and took certain measures to deleverage and preserve capital.

---

[11] Overburden is the term used for the material such as rock and soil that lies above a coal seam.

[12] Dragline overburden removal is less affected by rain, but one of the two draglines at Antelope Mine was shut down for nine weeks during the second quarter of 2018 due to scheduled maintenance.

1. **Exchange Offers**

In October 2016, in an effort to extend maturities and reduce leverage, the Company completed offers to exchange (the "***Exchange Offers***") up to $400 million of its then outstanding $300 million aggregate principal balance of 8.5% Senior Notes due 2019 (the "***2019 Notes***") and $200 million aggregate principal balance of the Prepetition Unsecured Notes for the Prepetition 2021 Notes, and in some cases, cash consideration.

Holders of $237.9 million in aggregate principal amount of the 2019 Notes and $143.6 million in aggregate principal amount of the Prepetition Unsecured Notes tendered such notes pursuant to the Exchange Offers. On October 17, 2016, CPE Resources and Cloud Peak Energy Finance Corp. accepted for exchange all such 2019 Notes and Prepetition Unsecured Notes validly tendered and issued $290.4 million in aggregate principal amount of Prepetition 2021 Notes, and made cash payments of $26 million to tendering holders of the 2019 Notes and the Prepetition Unsecured Notes. Upon completion of the Exchange Offers, $62.1 million aggregate principal amount of the 2019 Notes remained outstanding and $56.4 million of the Prepetition Unsecured Notes remained outstanding. The Exchange Offers extended the Company's near-term maturities and provided runway for the Company to explore further strategic initiatives consistent with its long-term plan.

2. **Equity Offering and 2019 Notes Redemption**

Notwithstanding the broad participation in the Exchange Offers, the Company needed to satisfy the remaining stub 2019 Notes that did not participate in the Exchange Offers. On February 28, 2017, the Company issued 13.5 million shares of common stock through a public offering and received net proceeds of $64.7 million. The Company used the proceeds to fund the full redemption of its remaining 2019 Notes. On March 31, 2017, the Company redeemed the 2019 Notes at a total cost of $64.5 million. The primary purpose of such redemption was to reduce outstanding long-term debt and extend the Company's nearest term maturity date to 2021.

3. **Termination of Revolving Credit Facility**

Prior to the Petition Date, in February 2014, CPE Resources entered into a first lien credit agreement with PNC Bank, N.A. ("***PNC Bank***") as administrative agent, issuing lender, and swingline lender, and a syndicate of other lenders (collectively, the "***Revolving Credit Facility Lenders***"). Pursuant to the first lien credit agreement, the Revolving Credit Facility Lenders provided a senior secured revolving credit facility with a borrowing capacity of up to $500 million (the "***Revolving Credit Facility***"), which replaced a prior senior secured revolving credit facility agreement. On May 24, 2018, the Company entered into the Prepetition First Lien Credit Agreement. The Prepetition First Lien Credit Agreement extended the maturity of the Revolving Credit Facility to May 2021 and reduced the maximum borrowing capacity to $150 million.

As of September 30, 2018, the borrowing capacity under the Prepetition First Lien Credit Agreement was reduced to $16.2 million based upon the Company's quarterly financial covenant calculations (which were based on operational EBITDA). It was uncertain whether the Company would remain in compliance with the financial covenants under the Prepetition First Lien Credit Agreement, and, as a result, the Company elected to terminate the Prepetition First Lien Credit Agreement effective as of November 15, 2018. Termination resulted in a savings of over $3 million in additional commitment and administrative fees during the remaining term of the Prepetition First Lien Credit Agreement through May 2021. However, termination of the Prepetition First Lien Credit Agreement also adversely impacted the Company's liquidity by eliminating the ability to access the revolving line of credit. As described in further detail below, termination of the Prepetition First Lien Credit Agreement also gave rise to a dispute between the Company and the Prepetition Secured Noteholders Group regarding a potential release of certain of the Prepetition Secured Noteholders' liens and guarantees.

4. **Operational Liquidity and Cost Reduction Strategies**

In addition to implementing these balance sheet deleveraging strategies, the Company took several steps to improve operational efficiency and reduce costs. For example, in response to reduced market demand for 8400 Btu coal, the Company consolidated operations at the Antelope and Cordero Rojo Mines to utilize shared support and maintenance employees and improve operational efficiency. Additionally, the Company sold its Gillette, Wyoming office and relocated certain of its employees to the Cordero Rojo Mine site in an effort to further manage costs.

5. **2018 Sale Process**

Recognizing the need to explore all alternatives in the face of tightening liquidity, in November 2018, the Company commenced a review of strategic alternatives available to it, including a potential sale of the Company. To this end, the Company engaged J.P. Morgan Securities LLC ("***J.P. Morgan***") and legal counsel to advise in connection with a sale process.

J.P. Morgan engaged with 21 potentially interested parties in November and December 2018. Unfortunately, the process resulted in only one proposal that was not actionable due to significant execution risk, and the sale process concluded without resulting in a transaction.

**E. Hiring Advisors and Engaging with the Prepetition Secured Noteholders**

Once it became evident that the 2018 sale process was not going to produce a viable solution, the Company took steps to explore other strategic alternatives. In December 2018, as disclosed in Cloud Peak's January 29, 2019 Form 8-K, the Company engaged Vinson & Elkins LLP as legal advisor ("***V&E***"), Centerview Partners LLC as investment banking advisor ("***Centerview***"), and FTI Consulting, Inc. as financial advisor ("***FTI***" and collectively with V&E and Centerview, the "***Advisors***") to assist and advise the Company in connection with a review of its capital structure and potential restructuring alternatives. The Advisors assisted the Company in pursuing two strategies in parallel: first, to restart the marketing process to sell the Company; and second, to negotiate the terms of a potential restructuring transaction with the Prepetition Secured Noteholders.

In early March 2019, Centerview began assisting the Company in conducting a process to market to third parties a potential M&A transaction with the Company. Centerview, in consultation with the Company and the other Advisors, identified and contacted certain strategic and financial investors. Certain of these parties entered into confidentiality agreements with the Company and conducted diligence to determine their level of interest in the Company's assets.

In February 2019, a group (the "***Prepetition Secured Noteholder Group***") of Prepetition Secured Noteholders holding approximately 62% of the face value of the Prepetition 2021 Notes retained Davis Polk & Wardwell LLP as legal advisor ("***Davis Polk***") and Houlihan Lokey Capital, Inc. as investment banking advisor ("***Houlihan Lokey***"), and the Advisors began working in parallel with Davis Polk and Houlihan Lokey on a potential restructuring transaction supported by the Prepetition Secured Noteholder Group. Discussions with the Prepetition Secured Noteholder Group and its advisors continued into May 2019 and focused on the terms of a potential transaction, whether in the form of an out-of-court asset sale, a chapter 11 process to effect a sale of substantially all of the Company's assets, or a standalone deleveraging transaction through a chapter 11 plan.

1. **March 15 Interest Payment Under Prepetition Unsecured Notes**

In order to preserve liquidity and after taking numerous considerations into account, the Company elected not to make the semi-annual interest payment of approximately $1.8 million due on March 15, 2019 under the Prepetition Unsecured Notes. The Company used the 30-day grace period provided under the Prepetition Unsecured Notes Indenture to allow additional time to assess its restructuring alternatives, continue its marketing process, and continue negotiations with the Prepetition Secured Noteholder Group. Prior to the expiration of the grace period, CPE Resources and CPE Finance entered into a forbearance agreement with Nomura Corporate Research and Asset Management Inc. ("***Nomura***," and such agreement, the "***Nomura Forbearance Agreement***"), an investment advisor for the holders or beneficial owners of a majority, but less than 75% of the Prepetition Unsecured Notes, wherein Nomura agreed that it will not enforce any of its rights and remedies available under the Prepetition Unsecured Notes Indenture as a result of the event of default caused by the continued non-payment of interest on the Prepetition Unsecured Notes until May 1, 2019. The Nomura Forbearance Agreement was subsequently amended to extend the term of such agreement to May 10, 2019. As of the Petition Date, as described above, the interest payment remains unpaid.

2. **Securitization Facility Forbearance**

On March 14, 2019, CPE Receivables and CPE Resources entered into a forbearance agreement (the "***AR Securitization Facility Forbearance Agreement***") with PNC Bank, the lender under the Company's AR Securitization Facility, wherein PNC Bank agreed to forbear until April 14, 2019 from exercising remedies that would become available upon a default by the Company under the AR Securitization Facility by breaching the "going concern" covenant. On March 15, 2019, Cloud Peak issued its 2018 Form 10-K containing a statement that, due to liquidity constraints, there was substantial doubt about the Company's ability to continue as a going concern.



US 6484612

On April 12, 2019, CPE Receivables and CPE Resources entered into an amendment to the AR Securitization Facility Forbearance Agreement wherein PNC Bank agreed to forbear through May 1, 2019 from exercising remedies available to it under the AR Securitization Facility resulting from (i) breach of the "going concern" covenant and (ii) a cross default under the AR Securitization Facility caused by the event of default under the Prepetition Unsecured Notes Indenture that occurred after the Company elected not to make the interest payment under the Prepetition Unsecured Notes before the grace period under the Prepetition Unsecured Notes Indenture expired. The AR Securitization Facility Forbearance Agreement was subsequently amended to extend the term of such agreement to May 10, 2019.

3. **Sale and Plan Support Agreement**

Termination of the Prepetition First Lien Credit Agreement led to a dispute about whether the termination caused the release of certain liens and guarantees under the Company's Prepetition 2021 Notes Indenture and the guarantees under the Prepetition Unsecured Notes Indenture. As described above, the Prepetition 2021 Notes Indenture and the Prepetition Unsecured Notes Indenture contain language suggesting that (i) any liens granted by the Company's existing and future domestic restricted subsidiaries to secure the Prepetition 2021 Notes and (ii) any guarantees of the secured notes or unsecured notes granted by the Company's existing and future domestic restricted subsidiaries are terminated and released upon the termination of the Prepetition First Lien Credit Agreement. However, the Prepetition Secured Noteholder Group disagreed with that construction and raised several arguments as to why the subsidiary liens and guarantees were not released, including that: (i) the plain language of the indentures do not release the subsidiary liens and guarantees; (ii) any interpretation of the indentures that would release the subsidiary liens and guarantees would be commercially unreasonable and therefore impermissible under applicable state law; (iii) the position that the subsidiary liens and guarantees were released is contrary to the parties' behavior after the termination of the Prepetition First Lien Credit Agreement; (iv) resolution of the dispute would require discovery to determine the intent of the signatories to the indentures; and (v) the release of the subsidiary liens and guarantees would violate the Trust Indenture Act. Accordingly, as the Company began engaging with the Prepetition Secured Noteholder Group, it became clear that the Prepetition Secured Noteholder Group was prepared to vigorously litigate the issue of whether the liens and guarantees had been released.

If fully litigated, the dispute regarding the lien and guarantee release would have been complex, expensive, and likely would have hindered the Debtors' ability to proceed with a sale transaction in the Chapter 11 Cases in an efficient, orderly manner to the detriment of all of the Debtors' stakeholders. Moreover, the dispute would have made financing the chapter 11 process particularly difficult because there would have been substantial ambiguity as to the status of the Prepetition Secured Noteholders' liens, making potential third-party financing options difficult, if not impossible. Lastly, the Company anticipated that litigation surrounding the lien and guarantee dispute would have created significant uncertainty around the sale process, which would have chilled bidding due to the distraction and unknown outcome of the litigation.

After several months of arm's-length negotiations, the Company and the Prepetition Secured Noteholder Group ultimately agreed to a resolution of the lien and guarantee dispute and to terms for a process to market and sell substantially all of the Company's assets, as well as a chapter 11 plan process. These terms are embodied in that certain Sale and Plan Support Agreement, by and among the Debtors and the Consenting Noteholders, as amended, modified, or supplemented from time to time (the "***SAPSA***"). Pursuant to the SAPSA, in exchange for the Debtors agreeing to reaffirm the subsidiary guarantees and to stipulate to the validity of the subsidiary liens, the Prepetition Secured Noteholder Group, as well as Nomura, a holder of approximately 54% of the Prepetition Unsecured Notes, agreed, among other things, to:

- support a sale process designed to encourage a robust auction for substantially all of the Debtors' assets;
- consent to the Debtors' entry into debtor-in-possession financing with a third-party alternative lender, including the granting of necessary priming liens thereunder;
- consent to the Debtors' use of cash collateral (which cash was all held at entities not affected by the lien and guarantee dispute);
- provide a commitment from the Prepetition Secured Noteholder Group to provide debtor-in-possession financing, which was to serve as a backstop to the third-party debtor-in-possession financing; and
- consent to receiving sale proceeds distributions after the payment in full in cash of certain administrative and priority claims, in accordance with the waterfall set forth in the SAPSA.

Ultimately, the Debtors' respective boards of directors determined that the SAPSA, together with the settlement of the lien and guarantee dispute therein, was in the best interests of the Company and its creditors, and would best position the Company for a sale process that maximizes value for all stakeholders because it would allow the Company to (i) avoid costly and disruptive litigation, (ii) continue to negotiate the potential debtor-in-possession financing with both a third-party lender and the Prepetition Secured Noteholder Group so as to obtain the most favorable terms possible and best position the Company's sale process and pursuit of alternatives, and (iii) commence the Chapter 11 Cases with the support of the majority of the Company's largest financial stakeholders.

After the SAPSA was originally signed on May 6, 2019, the Prepetition Secured Noteholder Group submitted a revised debtor-in-possession financing proposal (as discussed more fully below) to the Company that offered materially improved terms, including more flexible covenants, improved key economic terms, and greater liquidity. As a result, the Debtors respective boards of directors determined that the Prepetition Secured Noteholder Group's revised debtor-in-possession financing proposal was economically superior to the third-party alternative lender's proposal. Thus, on May 9, 2019, the parties entered into an amended and restated SAPSA in order to incorporate such improved terms and to reflect the Debtors' decision to go with the Prepetition Secured Noteholder Group's debtor-in-possession financing proposal.

### F. Negotiations with Potential Purchasers

As previously noted, in the weeks leading up to the Petition Date, Centerview assisted the Company in pursuing a marketing process to sell substantially all of the Company's assets. In the course of such efforts, Centerview, with the assistance of the Company, developed a list of parties whom it believed may be interested in and had the financial wherewithal to consummate a purchase of such assets.

## IV. DEVELOPMENTS DURING THE CHAPTER 11 CASES

The Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 10, 2019. Set forth below is a summary of certain material events that have occurred since the Petition Date.

### A. First Day Pleadings

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "***Petitions***"), the Debtors filed several motions (the "***First Day Pleadings***") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, insurers, and taxing authorities, among others, following the commencement of the Chapter 11 Cases. On May 14, the Court entered orders approving the following First Day Pleadings on a final basis:

- *Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Waiving the Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(n)* [Docket No. 89];
- *Order Authorizing Retention and Appointment of Prime Clerk LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [Docket No. 92];
- *Order Approving (I) Continuation of Surety Bond Program and (II) Granting Related Relief* [Docket No. 93];
- *Order (I) Authorizing the Debtors to (A) File a Consolidated Creditors Matrix, (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information and (II) Granting Related Relief* [Docket No. 97];

On the same day, the Court entered orders approving other First Day Pleadings on an interim basis.

On or before June 17, 2019, the Court entered orders approving certain First Day Pleadings on a final basis, including:

- *Final Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* [Docket No. 234];
- *Final Order (I) Authorizing the Debtors to Pay (A) Certain Prepetition Claims of Shippers, Warehousemen, and Service Providers (B) Claims Arising Under Section 503(b)(9) of the Bankruptcy*

*Code, and (C) Certain Royalty and Lease Obligations and (II) Granting Related Relief* [Docket No. 245];

- *Final Order (I) Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and (II) Granting Related Relief* [Docket No. 237];
- *Final Order (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, and III Granting Related Relief* [Docket No. 466];
- *Final Order (I) Authorizing the Debtors to Enter into and Perform Under Coal Contracts in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 239];
- *Final Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 236];
- *Final Order (I) Approving Debtors Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving Debtors Proposed Procedures Resolving Additional Assurance Requests* [Docket No. 235];
- *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates* [Docket No. 242];
- *Final Order (I) Authorizing the Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Checks and Business Forms, and (C) Continue Intercompany Arrangements, (II) Providing Administrative Expense Priority Status for Postpetition Intercompany Claims, and (III) Granting Related Relief* [Docket No. 262]; and
- *Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* [Docket No. 244].

The First Day Pleadings, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.primeclerk.com/cloudpeakenergy.

**B. Other Administrative Motions and Retention Applications**

The Debtors also filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases. The Debtors have also filed applications to retain various professionals to assist them in the Chapter 11 Cases. On or before July 29, 2019, the Court entered orders approving the following retention applications:

- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Vinson & Elkins LLP as Attorneys for the Debtors and Debtors in Possession Effective Nunc Pro Tunc to the Petition Date* [Docket No. 152];
- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Richards, Layton & Finger, P.A. as Co-Counsel Pursuant to Section 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016 and Local Rule 2014-1, Nunc pro Tunc to the Petition Date* [Docket No. 151];
- *Debtors' Application for entry of an Order (I) Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor for the Debtors and Debtors in Possession Effective Nunc pro Tunc to the Petition Date, (II) Waiving Certain Reporting Requirements Pursuant to Local Rule 2016-2(h) and (III) Granting Related Relief* [Docket No. 150];
- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Centerview Partners LLC as Investment Banker for the Debtors and Debtors in Possession Effective Nunc pro Tunc to the Petition Date* [Docket No. 146];
- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Powers Land Brokerage, LLC as the Real Estate Broker for the Debtors and Debtors in Possession, Nunc pro Tunc to July 12, 2019* [Docket No. 450];

- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of KPMG LLP as Tax Consultant to the Debtors and Debtors in Possession Effective Nunc pro Tunc to the Petition Date* [Docket No. 438]; and
- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of PricewaterhouseCoopers LLP as Tax Advisor and Auditor to the Debtors and Debtors in Possession Effective Nunc pro Tunc to the Petition Date* [Docket No. 439].

**C. Appointment of Official Committee**

On May 22, 2019, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 143], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "***Committee***") in the Chapter 11 Cases. The Committee is currently composed of the following members: (a) BOKF, National Association; (b) Nelson Brothers Mining Services, LLC; (c) Wyoming Machinery Company; (d) Cummins Inc.; (e) ESCO Group, LLC; (f) Tractor & Equipment Co.; and (g) Kennebec Global. The Committee has retained Morrison & Foerster LLP as its legal counsel and Jefferies Group LLC as its investment banker.

The Debtors and their advisors have engaged in telephonic conferences and in-person meetings with the Committee and its advisors since the Committee was appointed in order to discuss, among other things, treatment of unsecured creditors under a chapter 11 plan and the Committee's investigation of potentially unencumbered property of the estates and other estate property. As described further in Section IV.E and more fully set forth in the terms of the SAPSA, these conferences and meetings culminated in an agreement reached between the Debtors and the Consenting Noteholders that was supported by the Committee.

**D. Debtor-in-Possession Financing and Tender Offer**

Prior to the commencement of the Chapter 11 Cases, the Debtors, in consultation with their advisors, determined that they would require debtor-in-possession financing to fund the operational and administrative costs of the Chapter 11 Cases. To that end, beginning in February 2019, the Debtors, with the assistance of Centerview, commenced a process to obtain debtor-in-possession financing. During this process, the Debtors and Centerview contacted approximately 21 potential third-party debtor-in-possession financing providers, eight of which executed non-disclosure agreements with the Debtors and were offered access to a virtual data room established by the Debtors.

Ultimately, the Debtors received three third-party proposals for debtor-in-possession financing, and received a fourth proposal from the Prepetition Secured Noteholder Group. After review of the debtor-in-possession financing alternatives, the Debtors, with the assistance of Centerview, determined that the proposals from the Prepetition Secured Noteholder Group and a third-party alternative lender (the "***Alternative Lender***") were the most actionable and favorable proposals, and moved forward in negotiating the terms of each such proposal simultaneously. During the course of these negotiations, it became clear that the Alternative Lender's proposed debtor-in-possession financing would likely provide less liquidity to the Debtors than originally anticipated. Further, the Prepetition Secured Noteholder Group submitted a revised financing proposal to the Debtors that materially increased the liquidity available and improved the proposed fee structure. Accordingly, the Debtors, with the assistance of their advisors, negotiated and documented a debtor-in-possession financing facility consistent with the Prepetition Secured Noteholder Group's improved debtor-in-possession financing proposal.

On May 15, 2019, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expenses Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 106] (the "***Interim DIP Order***"). Among other things, the Interim DIP Order authorized the Debtors, on an interim basis, to obtain debtor-in-possession financing (the "***DIP Facility***") from a lender group comprised of Prepetition Secured Noteholders (the "***DIP Lenders***"), including a $10 million new-money term loan (the "***Initial Borrowing***"), and to use cash collateral of the Notes Secured Parties (as defined in the Interim DIP Order) for disbursements set forth in the Budget (as defined in the Interim DIP Order). In addition to authorizing the Debtors to obtain the Initial Borrowing, the Interim DIP Order and the DIP Credit Agreement contemplated a second and possibly a third borrowing under the DIP Facility in the aggregate amount of up to an additional $25 million, subject to entry of the Final DIP Order and the satisfaction or waiver of certain funding conditions, including a certain tax-related condition (as defined in the DIP Credit Agreement, the "***Specified Tax Condition***"). The Specified Tax Condition required that the liens securing the DIP Facility be senior in priority to any liens securing certain tax obligations, under both state and federal law. Accordingly, the Debtors sought language in

the Final DIP Order establishing that certain counties do not hold a lien, interest, or claim that constitutes a DIP Permitted Prior Lien (as defined in the Final DIP Order). The Interim DIP Order and the DIP Credit Agreement further contain a "roll-up" feature, providing that subject to entry of the Final DIP Order, whereby the DIP Lenders' Prepetition Notes would be exchanged for additional loans under the DIP Facility ("***Roll-up Loans***") in an amount equal to 80% of each DIP Lender's commitment under the DIP Credit Agreement. Finally, the Interim DIP Order and the DIP Credit Agreement contain an "incremental financing" feature that enable the Debtors to obtain an additional $10 million in debtor-in-possession financing from the DIP Lenders under certain circumstances, but such funding does not constitute a commitment under the DIP Facility.

Only those Prepetition Secured Noteholders that are members of the Prepetition Secured Noteholder Group agreed to backstop the DIP Facility (the "***Backstop Parties***") and were initially offered the opportunity to become DIP Lenders, and such Backstop Parties provided the Initial Borrowing under the DIP Facility pursuant to the Interim DIP Order. The Debtors provided all eligible Prepetition Secured Noteholders other than the Backstop Parties the opportunity to participate as DIP Lenders under the DIP Facility. Accordingly, the Debtors, with the assistance of Prime Clerk LLC as information agent, commenced a tender offer (the "***Tender Offer***") on June 13, 2019 by serving all eligible holders of Prepetition 2021 Notes as of the record date of May 17, 2019 with applicable documentation regarding the Tender Offer, which expired on July 26, 2019. Thirteen additional eligible Prepetition Secured Noteholders (the "***Non-Backstop Parties***") with an aggregate of approximately $3.8 million of principal amount of Prepetition 2021 Notes elected to participate in the Tender Offer and the DIP Facility. As a result of the Tender Offer, Prepetition Secured Noteholders comprised of both Backstop Parties and Non-Backstop Parties participate as DIP Lenders pursuant to the Final DIP Order.

Prior to the hearing to consider entry of the Final DIP Order, the Debtors received several filed objections to entry of the Final DIP Order, as well as informal comments from other parties in interest, including the Committee. The majority of these objections were resolved prior to the hearing on the Final DIP Order held on July 18, 2019. The Board of Commissioners of Campbell County, Wyoming ("***Campbell County***") filed a limited objection to the Final DIP Order seeking the deletion of certain language in the Final DIP Order regarding the relative priority of the DIP Lenders' liens as against any potential liens of certain Campbell County and with respect to the Specified Tax Condition. The Court overruled Campbell County's objection and approved the Final DIP Order.

On July 18, 2019, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expenses Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 477] (the "***Final DIP Order***"). The Final DIP Order, among other things, authorized the Debtors, on a final basis, to enter into the DIP Facility, obtain from the DIP Lenders the debtor-in-possession financing contemplated thereunder, and use cash collateral for disbursements set forth in the Budget (as defined in the Final DIP Order). The entry of the Final DIP Order satisfied the Specified Tax Condition and enabled the Debtors to obtain the full remaining amount of commitments under the DIP Facility in the amount of $25 million in a single, second borrowing on August 1, 2019. As of August 16, 2019, the full $35 million in term loans under the DIP Facility have been funded, provided that $31 million remain in an escrow account. The Debtors' may request draws out of the escrow account subject to the satisfaction of conditions set forth in the DIP Facility. At the time of the second borrowing and pursuant to the Tender Offer, on August 1, 2019, $28.0 million of Roll-up Loans were issued to the Backstop and Non-Backstop Parties under the DIP Facility.

As part of the negotiations over the Final DIP Order and the Amended SAPSA, the Committee agreed to stipulate to the liens granted to the Parent-Issuer Liens (as defined in the Final DIP Order), subject to certain exclusions set forth on Schedule I to the Final DIP Order. *See* Final DIP Order ¶ L(i). The Consenting Noteholders agreed to extend the Committee's challenge period with respect to the Debtors' assets at the Subsidiary Guarantors and the Reserved Challenge Assets until "the date that is the earlier of (i) the effective date of a chapter 11 plan that is consistent with the Support Agreement or (ii) fourteen (14) days following termination of the Support Agreement in accordance with its terms, (b) any such later date as has been agreed to in writing by the holders of a majority in principal amount of Secured Notes Debt."

**E. Committee SAPSA Settlement**

As detailed below in Section IV.F, following appointment of the Committee, the Committee began conducting an investigation into potential unencumbered estate property and claims and causes of action. The Company and its advisors engaged in multiple telephone conferences and in-person meetings with the Committee regarding, among other things, the Committee's investigation, the sale process, the SAPSA, and the strategic direction

of the Chapter 11 Cases generally. During this process, the Committee provided informal comments to the Final DIP Order. The Committee also communicated its opposition to entry of an order approving the SAPSA Assumption Motion and conducted discovery regarding the matters pertaining to the SAPSA and related issues. Following extensive negotiations between the Company, the Committee, and the Consenting Noteholders, the parties were able to consensually resolve the Committee's issues with the Final DIP Order and the SAPSA by incorporating mutually agreeable modifications to the Final DIP Order and the SAPSA.

The modifications to the SAPSA that reflect the settlement with the Committee include: (i) an agreement under the Plan to waive avoidance actions against holders of General Unsecured Claims; (ii) an agreement under the Plan to appoint a claims administrator chosen by the Debtors and the Committee to reconcile General Unsecured Claims; (iii) an agreement under the Plan to release the trustee of the Prepetition Unsecured Notes; (iv) an agreement with the Consenting Noteholders to use cash on hand to pay certain critical vendor claims, administrative expense claims, and priority claims to effectuate the Sale; and (iv) the Unsecured Creditor Sharing Agreement, which is discussed in greater detail below.

The Unsecured Creditor Sharing Agreement is contained in section 4(e) of the SAPSA and provides, among other things, a General Unsecured Claims Sharing Right whereby Allowed General Unsecured Claims can potentially obtain a recovery from net sale proceeds that exceed certain specified recovery thresholds for Holders of Prepetition 2021 Notes Secured Claims. The Unsecured Claims Sharing Agreement provides as follows: "Pursuant to the Plan, following (x) the payment in full in cash of all DIP New Money Claims, the DIP Final Roll-Up Claims and (y) the receipt of a 50% recovery by [Prepetition 2021 Notes Secured Claims] and DIP Contingent Roll-Up Claims (as such recovery is valued by the Debtors or, if challenged, as determined by the Court), any additional distribution to holders of [Prepetition 2021 Notes Secured Claims] and DIP Contingent Roll-Up Claims shall be shared as follows:

(i) until such time as [Prepetition 2021 Notes Secured Claims] and DIP Contingent Roll-Up Claims have received a 75% recovery (as such recovery is valued by the Debtors or, if challenged, as determined by the Court), 90% shall be distributed to [Prepetition 2021 Notes Secured Claims] and DIP Contingent Roll-Up Claims and 10% shall be distributed to unsecured claims; and

(ii) after such time as [Prepetition 2021 Notes Secured Claims] and DIP Roll-Up Contingent Claims have received a 75% recovery, and until such time as [Prepetition 2021 Notes Secured Claims] and DIP Contingent Roll-Up Claims are paid in full (as such recovery is valued by the Debtors or, if challenged, as determined by the Court), 80% shall be distributed to [Prepetition 2021 Notes Secured Claims] and DIP Contingent Roll-Up Claims and 20% shall be distributed to unsecured claims."

On June 11, 2019, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Assume the Amended and Restated Sale and Plan Support Agreement, (II) Approving the Lien and Guaranty Settlement Contained in the Amended and Restated Sale and Plan Support Agreement, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 258] (the "***SAPSA Assumption Motion***"). The SAPSA Assumption Motion sought Court authority to, among other things, (i) assume the SAPSA (as amended), and (ii) approve the settlement regarding the lien and guarantee dispute.

On July 18, 2019, the Court entered an order [Docket No. 478] authorizing the assumption of the SAPSA and approving the settlement contained therein to reflect the settlement with the Committee. Thus, the Debtors, the Prepetition Secured Noteholder Group, Nomura, and Prepetition Secured Noteholders who later become signatories to the SAPSA as a result of their participation in the Tender Offer and the DIP Facility are signatories to and are bound by the terms of the SAPSA. As described further herein, the Committee supported the Debtors' assumption of the SAPSA and the Committee SAPSA settlement contained therein.

Further detail regarding the SAPSA and the settlement provided for therein is set forth in the *Declaration of Marc Puntus in Support of Debtors' (a) Motion to Obtain Postpetition Debtor-in-Possession Financing and (b) Motion to Continue Selling Receivables Pursuant to Securitization Facility* [Docket No. 32] (the "***Puntus Declaration***") and the declarations of Colin Marshall, Heath Hill, and Alan Boyko in support of the SAPSA Assumption Motion (as defined herein) [Docket Nos. 267, 268, and 269]. The SAPSA is attached hereto as **Exhibit B**.

**F. The Committee's Lien Investigation**

Immediately following its appointment on May 22, 2019, the Committee commenced a thorough investigation into the extent, priority, and validity of the liens and security interests with respect to the assets that

purport to secure the Secured Notes Debt (as defined in the Final DIP Order) (the "***Lien Investigation***"). As part of the Lien Investigation, the Committee conducted a detailed review of Uniform Commercial Code filings and recent search results, documents and diligence provided to the Committee's professionals by the Debtors, documents contained in the Debtors' dataroom, various public filings, and other documents relevant to the analysis.[13]

As detailed in Section III.E, the Committee was involved in negotiating certain modifications to the SAPSA that provided for, among other things, language clarifying the Consenting Noteholders' consent to the use of the Debtors' cash on hand to pay certain claims and the Unsecured Creditor Sharing Agreement. *See* Art. III.E. The Committee agreed to support the Debtors' assumption of the Amended and Restated Sale and Plan Support Agreement dated as of May 9, 2019, pursuant to which the Debtors agreed to reaffirm the (a) the 2021 Notes Subsidiary Guaranties, (b) the 2024 Notes Subsidiary Guaranties, and (c) the Subsidiary Liens, as more fully described in section 9 of the SAPSA. As part of the settlement reflected in the SAPSA, the Committee stipulated to the validity of the Notes Secured Parties' liens and security interests on cash held in accounts owned by CPE Resources, subject to the exclusions listed on Schedule I to the Final DIP Order.[14] *See* Final DIP Order ¶ L(i). With respect to those assets, and the assets at the Subsidiary Debtors, the Final DIP Order was amended to extend the Committee's challenge period to the date that is the earlier of (i) the effective date of a chapter 11 plan that is consistent with the [SAPSA] or (ii) fourteen (14) days following termination of the [SAPSA] in accordance with its terms. *See* Final DIP Order ¶ 31(a). So, while the Committee agreed to support the Debtors' reaffirmation of liens against the Subsidiary Debtors through the SAPSA, the Committee's challenge rights with respect to (a) assets that the Committee asserts were not properly pledged and (b) assets excluded under the Secured Notes Indenture were preserved.

**G. Schedules of Assets and Liabilities and Statements of Financial Affairs**

On June 10, 2019, the Court entered the *Order Extending the Debtors' Deadline to File (A) Schedules of Assets and Liabilities, (B) Schedules of Executory Contracts and Unexpired Leases, (C) Schedules of Income and Expenditures and (D) Statements of Financial Affairs* [Docket. No. 214] (the "***SOFA Extension Order***"). The SOFA Extension Order extended the deadline for the Debtors to file Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (collectively, the "***Schedules and Statements***") to June 24, 2019, without prejudice to the Debtors' right to seek an additional extension upon cause shown therefor.

On June 24, the Debtors filed their Schedules and Statements, providing creditors ample time to review the Schedules and Statements prior to the hearing to approve this Disclosure Statement.

**H. Claims Bar Date**

On July 1, 2019, the Court entered the Order (I) Establishing Bar Dates and Procedures and (II) Approving the Form and Manner of Notice Thereof [Docket No. 372] (the "***Bar Date Order***"). The Bar Date Order sets August 1, 2019 at 5:00 p.m. (Eastern Time) as the general bar date and deadline by which unsecured creditors must file proofs of claim. The Bar Date Order sets November 6, 2019 at 5:00 p.m. (Eastern Time) as the government bar date and deadline by which governmental entities holding claims against the Debtors must file proofs of claim. On July 2, 2019, the Debtors filed the Notice of Deadlines for Filing Proofs of Claim [Docket No. 379], and also published a publication notice identifying certain information set forth in the Bar Date Order in *USA Today*.

**I. Key Employee Retention Plan and Key Employee Incentive Program**

1. **Key Employee Retention Plan**

Prior to the Petition Date, the Debtors, in consultation with their advisors, developed a key employee retention plan (the "***KERP***") for approximately 50 critical non-insider employees, which was designed to retain such employees

---

[13] If the Committee is authorized to pursue a Challenge, the Committee asserts that it would seek additional documents and other discovery from the Debtors and the Secured Notes Parties.

[14] The exclusions include Reserved Challenge Assets (as defined in the Final DIP Order) identified on Schedule I to the Final DIP Order: (1) cash or other proceeds held in five (5) bank accounts, (2) equity interests in Wyoming Quality Healthcare Coalition, (3) certain identified light vehicles, (4) foreign trademarks, (5) tax attributes, including net operating losses and capital losses (but excluding any entitlement to a tax refund), (6) commercial tort claims, and (7) postpetition proceeds of any of the foregoing. *See* Final DIP Order, Sch. I.

in the months leading up to and through the pendency of the Chapter 11 Cases. The KERP was subject to oversight, review, and approval by the independent compensation committee of the Cloud Peak board of directors. On July 1, 2019, the Court entered the *Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 371] (the "***KERP Order***"). The KERP Order was entered after the *Certificate of No Objection Regarding Motion of Debtors for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 349] was filed with the support of the Debtors' major stakeholders. The KERP Order authorizes the Debtors to continue the KERP on a postpetition basis and to enter into postpetition retention agreements with certain employees, and allows the Debtors' payment obligations under the KERP as administrative expenses of the Debtors' estates. The aggregate KERP payout is up to approximately $1.87 million, approximately $981,899 of which has already been paid. The remaining amounts payable under the KERP are scheduled to be paid on or around October 11, 2019 and October 25, 2019, respectively, subject to the KERP participants' continued employment with the Debtors through the Closing Date (as defined in the APA).

#### 2. Key Employee Incentive Plan

Prior to the Petition Date, the Debtors, in consultation with their advisors, developed a key employee incentive plan (the "***KEIP***") for eleven crucial senior level employees, which was designed to incentivize such employees to achieve challenging financial, operational, and safety targets. The KEIP was subject to oversight, review, and approval by the independent compensation committee of the Cloud Peak board of directors. On July 15, 2019, the Court entered the (i) *Order (I) Approving the Debtors' Key Employee Incentive Plan and (II) Granting Related Relief* [Docket No. 453] (the "***KEIP Order***"). The KEIP Order was entered after the *Certificate of no Objection Regarding Motion of Debtors for Entry of an Order (I) Approving the Debtors' Key Employee Incentive Plan and (II) Granting Related Relief* [Docket No. 449] was filed with the support of the Debtors' major stakeholders. The KEIP Order authorizes the Debtors to continue the KEIP on a postpetition basis and allows the Debtors' payment obligations under the KEIP as administrative expenses of the Debtors' estates. The aggregate KEIP payout is up to approximately $5.5 million, approximately $1,247,292 of which has already been paid. The remaining amounts payable under the KEIP are scheduled to be paid on or around October 25, 2019 and December 31, 2019, respectively, subject to the KEIP participants' continued employment with the Debtors through such dates.

### J. Post-Effective Date Minimum Cash Amount

The Debtors have negotiated with major stakeholders, including the Required Consenting Noteholders, to determine an amount of Cash required to fund the Reorganized Debtors on the Effective Date. In order for the Effective Date to occur and after giving effect to the terms of the Plan, the Reorganized Debtors shall have Cash in an amount not less than the Post-Effective Date Minimum Cash Amount.

## V. THE CHAPTER 11 SALE PROCESS

### A. Bidding Procedures

The Debtors filed the Chapter 11 Cases with the goal of continuing their robust and value-maximizing marketing and sale process for selling substantially all of their operating assets to maximize recoveries for all of their stakeholders. Accordingly, at the outset of the Chapter 11 Cases, the Debtors filed the *Motion of Debtors for Entry of Orders (A)(I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief and (B)(I) Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 52] (the "***Bidding Procedures Motion***"), which sought, among other things, approval of sale and auction procedures for a sale of all or substantially all of the Debtors' operating assets. On June 13, 2019, the Court entered an order approving the Bidding Procedures Motion [Docket No. 272] (the "***Bidding Procedures Order***").[15]

### B. Bidding Process

Following entry of the Bidding Procedures Order, the Debtors received Indications of Interest from various parties in accordance with the Bidding Procedures. Based on these Indications of Interest, and based on numerous discussions with potential bidders, the Debtors, in consultation with their restructuring advisors and the Consultation

---

[15] Capitalized terms used in Sections V.A- V.C but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order or the Plan, as applicable.

Parties, determined that it would be in the best interests of the Debtors to extend the Bid Deadline until July 25, 2019 at 5:00 p.m. prevailing Eastern time, in order to give all bidders the opportunity to materially improve their bids so as to maximize estate value for all of the Debtors' stakeholders.

Prior to or shortly after the Bid Deadline, the Debtors received bids for substantially all of the Debtors' assets from three companies: (1) Navajo Transitional Energy Company, LLC ("***NTEC***" or the "***Purchaser***"); (2) Aspen Coal & Energy, LLC ("***Aspen***"); and (3) Lighthouse Resources, Inc. ("***Lighthouse***"). The Debtors also received one bid for one standalone mine and various other bids for certain real property. After receiving all bids, Centerview and the Debtors, with the assistance of the Debtors' other restructuring advisors, reviewed these bids to ensure that they complied with the terms of the Bidding Procedures. Moreover, Centerview and the Debtors worked closely with all of the bidders in an effort to assist them in structuring and improving their bids so as to maximize the potential value of each bid and to address any necessary clarifications.

On August 6, 2019, the Debtors determined that NTEC, Aspen, and Lighthouse were Qualified Bidders for substantially all of the Debtors' operating assets (the "***Qualified WholeCo Bidders***" and their bids, individually, the "***Qualified WholeCo Bids***"). Again, Centerview and the Debtors, along with the assistance of the Debtors' other restructuring advisors, continued to work with each of the Qualified WholeCo Bidders in an effort to improve the bids and to negotiate details of each proposed transaction structure and associated transaction documents.

Each Qualified WholeCo Bid contained various components of non-cash consideration, including assumption of certain liabilities, but none of the Qualified WholeCo Bids contained any meaningful cash consideration. Centerview and the Debtors, with the assistance of the Debtors' other restructuring advisors, and in consultation with the Consultation Parties, evaluated and compared the different components of the Qualified WholeCo Bids and attempted to determine a value for various components of non-cash consideration for each Qualified WholeCo Bid. Based on this analysis, Centerview and the Debtors determined that Aspen's bid provided the most distributable value to the estates at approximately $282.33 million. Accordingly, on August 14, 2019, in advance of the August 15, 2019 Auction, the Debtors designated Aspen's $282.33 million bid as the Baseline Bid.

In order to stimulate improved bids and to maximize value at the Auction, Centerview and the Debtors provided each Qualified WholeCo Bidder with a breakdown of the various components of the Baseline Bid and that Qualified WholeCo Bidder's own bid, as well as the Debtors' valuation of those components, in advance of the Auction. Moreover, Centerview and the Debtors provided each Qualified WholeCo Bidder with a menu of potential components of additional non-cash consideration – with pre-determined, fixed values – that each Qualified WholeCo Bidder could choose to add to their bid at the Auction to improve their bid. Additionally, Centerview and the Debtors again offered to and did work closely with each of the Qualified WholeCo Bidders to discuss ways that each Qualified WholeCo Bidder could materially improve their bids in light of the Baseline Bid. Specifically, Centerview and the Debtors discussed with the Qualified WholeCo Bidders the potential effects that noncash consideration could have on the total value of a bid, including the fact that increasing certain components of non-cash consideration could negatively impact the value of other components of non-cash consideration. For example, increasing the total amount of offered take-back debt, could have the effect of lowering the value of offered equity in the purchased assets.

## C. Auction

On August 15, 2019, the Debtors commenced the Auction in accordance with the Bidding Procedures. Each of the Qualified WholeCo Bidders participated in the Auction and was represented by their own in-house and/or outside professional advisors. At the outset of the Auction, Centerview and the Debtors advised the Qualified WholeCo Bidders that, in assessing bids, the Debtors would consider a variety of factors, including not only the various components of consideration, but also the relative risks and uncertainties associated with the proposed transaction. The Auction continued for several hours during which at least two overbids were received that significantly increased the total distributable value for the Debtors. Because the overbids contained various components of non-cash consideration, there was significant time spent between each overbid to value the bid and assess whether it was the then-current best or highest bid.

By early evening, as certain of the Qualified WholeCo Bidders increased their bids through the contribution of incremental non-cash consideration, including take-back debt and equity-like instruments, it became increasingly difficult for the Debtors to value those non-cash components and compare relative bid values. For example, as more debt was offered as additional consideration, it became increasingly difficult to value the various non-cash components, as the transaction as a whole became potentially higher-risk and less certain. Moreover, the Auction had reached a point where, as previewed with the Qualified WholeCo Bidders in advance of the Auction, increases in

certain non-cash consideration components were likely to have a reciprocal negative impact on the value of other components of non-cash consideration.

Accordingly, at approximately 8:30 p.m. prevailing Eastern Time, Centerview and the Debtors, with the assistance of the Debtors' other restructuring advisors, and with the unanimous support of the Consultation Parties, announced that the Debtors were modifying the rules of the Auction, as permitted by the Bidding Procedures, in order to maximize value for all stakeholders and to enable the Debtors to efficiently obtain the highest and best potential bids for a final comparison. Thus, the Debtors instructed the Qualified WholeCo Bidders that each Qualified WholeCo Bidder was invited to submit a best and final bid on a blind basis by 10:30 a.m. prevailing Eastern Time the following morning (the "***Final Bids***"), at which point the Debtors would convene with their restructuring advisors and the Consultation Parties to value and compare the bids and select the Winning Bid and the Backup Bid. Centerview, the Debtors, and the Debtors' other restructuring advisors offered to and did continue to work with each of the Qualified WholeCo Bidders throughout the evening to answer any questions and to assist the Qualified WholeCo Bidders in structuring their improved bids so as to provide the most potential value. The Debtors then adjourned the Auction for the evening. None of the Qualified WholeCo Bidders objected to the Debtors' modification of the Bidding Procedures.

On August 16, 2019, the Debtors received a Final Bid from each of the Qualified WholeCo Bidders. Centerview and the Debtors, along with the Debtors' other restructuring advisors, and in consultation with the Consultation Parties, carefully reviewed each of the Final Bids, requested clarifying information from the Qualified WholeCo Bidders, where necessary, and considered the relative value of each bid as a complete package. As indicated at the outset of the Auction, in comparing the relative value of the Final Bids, the Debtors and their restructuring advisors, considered both the value of the different components of consideration as well as the relative risks and uncertainty inherent in each of the proposed transactions.

After discussing with their restructuring advisors and the Consultation Parties, the Debtors ultimately determined that NTEC's Final Bid was the best and/or highest bid and therefore the Winning Bid, and Aspen's Final Bid was the Backup Bid. Based on Centerview's analysis and valuation, the Winning Bid provided the Debtors with a substantially higher total distributable value than NTEC's pre-Auction bid, NTEC's initial bid submitted at the Auction, and the Baseline Bid.

**D. The Sale Hearing**

On August 19, 2019, the Court held a hearing (the "***Sale Hearing***") to consider approval of the sale of substantially all of the Debtors' assets to the Purchaser free and clear of all liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code and approved the sale to the Purchaser subject to the Debtors finalizing and submitting a proposed order approving the sale to the Purchaser (the "***Sale Order***").

**E. ONRR Settlement**

Following the Sale Hearing, as part of the finalization of the proposed Sale Order, the United States Justice Department asserted that the Sale Order should expressly require NTEC to assume any potential exposure with respect to certain open federal royalty audits and a related appeal. To resolve this issue, the Debtors, NTEC, and the United States Justice Department negotiated the terms of a settlement (such settlement, the "***ONRR Settlement***") to revise the Sale Order to preserve the United States Justice Department's police and regulatory powers regarding the open federal royalty audits and related appeal, and to provide for NTEC's assumption of the federal royalty audits and the related appeal. On October 2, 2019, the Court entered the Sale Order [Docket No. 674].

In connection with the entry of the Sale Order, the Debtors and NTEC, in consultation with the Prepetition Secured Noteholder Group and the Committee, negotiated certain modifications to the Asset Purchase Agreement, as amended, modified, or supplemented from time to time (the "***APA***"), by and among NTEC and the Debtors.[16] The modifications provided, among other things, for NTEC to acquire certain additional assets and assume certain additional liabilities, to modify NTEC's assumption and rejection of certain contracts, to provide that the Debtors bear certain expenses, including with respect to certain cure costs and administrative liabilities related to the Purchaser

---

16 Capitalized terms used in sections V.E through V.G but not otherwise defined therein shall have the meanings ascribed to such terms in the APA or the Plan, as applicable. For the avoidance of doubt, the description of the Purchased Assets set forth therein is for informational purposes only. Further information regarding the assets proposed to be acquired by NTEC is available in the APA and the exhibits and schedules thereto which are included as exhibits to the Sale Order [Docket No. 674].

Take-Back Notes and to modify certain negative covenant terms of the Purchaser Take-Back Notes. The APA is described in further detail below.

**F. Purchaser Overview**

NTEC is a wholly owned limited liability company of the Navajo Nation that is focused on being a reliable, safe producer of coal while diversifying the Navajo Nation's energy resources to create economic and environmental sustainability for the Navajo people. NTEC's goal is to develop and operate an energy company that values the Navajo Nation, its people, its resources, now and in the future. NTEC and its subsidiaries have been recognized for 20 Excellence in Surface Coal Mining Reclamation Awards by the Office of Surface Mining Reclamation and Enforcement and have received highest in safety ranks based on Mine Safety and Health Administration records. NTEC continues to focus on providing local jobs, income for local businesses, and charitable contributions to various institutions, including, among others, the Navajo and San Juan United Way, Navajo Nation General Fund, and by providing scholarships to Navajo students. NTEC takes pride in acting as an arm of the Navajo Nation with accountability to the Navajo People and the Navajo Nation.

NTEC was authorized by the Navajo Nation to purchase the Navajo surface thermal mine in 2013. The Navajo surface level mine is located near Farmington, New Mexico on the Navajo Nation, a vast Indian reservation that spans three states and has boundaries that encompass 27,000 square miles of traditional Navajo homelands. As such, the Navajo surface level mine has an 85 percent workforce that are Native Americans, most of whom are Navajo. Many workers live in the local area, but others commute as many as two hours one way to be a part of the Navajo surface level mine's workforce. The Navajo surface thermal mine produced approximately 3.4 million tons in 2018. Mined coal is sold to the Four Corners Power Plant which is located adjacent to the Navajo surface level mine. A coal sale agreement between the Navajo surface level mine and Four Corners Power Plant ensures the mine is operational through 2031, thus providing secure jobs that many families will continue to prosper and increase their quality of life for years to come.

NTEC has an experienced management team that has extensive experience in the mining and energy development sector. NTEC's Chief Executive Officer, Clark Moseley has over 40 years of mining and energy development experience and has previously served as President and Chief Executive Officer of Marrow Pacific, as the Senior Vice President of North American Coal Corporation, and in various other management capacities. NTEC's Chief Financial Officer, Michael Gisin, has over 20 years of corporate finance experience and has previously served as the Vice President of Corporate Accounting at Alpha Natural Resources Inc. and as an audit manager at PricewaterhouseCoopers LLP. NTEC's Chief Operating Officer, Tim Fagley, has over 35 years of engineering, operations, and mine management experience and has previously served as the Director of Engineering at Westmoreland Coal Company and as the Manager of Minerals at Schlumberger Limited.

**G. Sale Transaction**

NTEC has agreed to acquire substantially all of the Debtors' operating assets (the "***Sale Transaction***") in accordance with the terms and conditions set forth in the APA. The specific components of the total distributable value provided by NTEC in connection with the Sale Transaction are set forth below:

- $15,700,000 in cash;
- $40 million notes secured by a first lien on all assets of the Debtors and NTEC, but subordinated to collateral for certain permitted senior lien debt (not to exceed $120 million); additionally, the collateral for the $40 million notes shall exclude any collateral pledged to a certain Arizona Public Service Company promissory note, as long as this note remains outstanding (the "***Purchaser Take-Back Notes***");
- a $0.15/ton royalty, payable quarterly for a period of five years, on all tons produced and sold at the Antelope and Spring Creek mines and on all tons produced and sold in excess of 10 million tons per year at the Cordero Rojo mine (the "***Royalty Interest***");
- assumption of pre- and post-petition non-income tax liabilities and coal-production related royalties projected to be approximately $91.01 million as of October 31, 2019;
- assumption of $20 million of post-petition accounts payable;

- agreement that the Debtors will retain all pre-closing cash on hand, accounts receivable, cash collateral securing letters of credit, and future AMT tax refunds; and
- cash to fund approximately $1.018 million in cure costs.

Generally, the Sale Transaction contemplates that: (a) the Debtors shall, among other things, transfer the Purchased Assets to NTEC free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code; and (b) NTEC shall assume all Assumed Liabilities.

The Purchased Assets are generally comprised of all of each applicable Debtor's right, title and interest in, to and under, but not limited to, the following properties, assets and rights, in each case used or held for use in the conduct of the Business except for Excluded Assets:

- all Owned Real Property;
- the Leases and the Leased Real Property (and any agreements and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is a Purchased Contract);
- all equipment, fixed assets and tangible assets (including all vehicles, mobile mining equipment, supplies and spare parts, consumables, maintenance equipment, forklifts and other warehouse equipment, samples (including drill core samples), fixtures, leasehold improvements, loading and unloading machinery and equipment, crushing equipment, conveyors and other machinery and equipment, furniture, furnishings, office equipment, computers, information technology equipment and cabling, telephone numbers, and laboratory and testing equipment), whether situated on the Purchased Real Property or elsewhere, and all of the Debtors' rights under warranties, indemnities, licenses and all similar rights against third parties with respect to the equipment, fixed assets and tangible assets referenced in this clause 3 (to the extent such rights are assignable at no cost, expense or penalty to the Debtors or their Affiliates, or at NTEC's election if NTEC agrees to pay for such cost, expense or penalty);
- all coal inventory located on (or, to the extent in the possession of the Debtors at the Closing, mined or extracted from) the Purchased Real Property or all coal in transit to the extent title or ownership has not been transferred to the applicable customer, together with all parts and supplies;
- the Purchased Contracts, in each case as each such Contract may have been amended or otherwise modified prior to the date of (or as permitted in accordance with the terms of) the APA;
- the Permits and the Licenses and all other Permits and Licenses held by any Debtor;
- all rights of the Debtors to use haul roads, utility easements and other rights of way and easements used or held for use primarily in the operation of the Business;
- all warranties, guarantees and similar rights primarily related to the other Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the other Purchased Assets, and claims against suppliers and other third parties in connection with the Purchased Contracts (to the extent such rights are assignable at no cost, expense or penalty to the Debtors or their Affiliates, or at NTEC's election if NTEC agrees to pay for such cost, expense or penalty);
- all goodwill directly associated with the Purchased Assets;
- all Documents (other than those described in the Excluded Assets);
- all rights, claims, causes of action and credits owned by any Debtor to the extent primarily relating to any Purchased Asset or Assumed Liability, including any such item arising under any guarantee, warranty, indemnity, right of recovery, right of set-off or similar right in favor of such Debtor in respect of any Purchased Asset or Assumed Liability (to the extent such rights are assignable at no cost, expense or penalty to the Debtors or their Affiliates, or at NTEC's election if NTEC agrees to pay for such cost, expense or penalty);
- all insurance proceeds or other awards for damage primarily related to the Purchased Assets (including in respect of a Casualty Event);

- all Intellectual Property Rights primarily related to the Business;
- all Pre-Paid Expenses to the extent primarily related to the other Purchased Assets;
- all (i) estates and mineral rights created by certain oil and gas leases, (ii) of the Sellers' working interest in the oil and/or gas well located on such oil and gas leases and fee mineral interests, and (iii) agreements in connection with the foregoing; and
- any and all claims for refunds of, credits attributable to, loss carryforwards with respect to, or similar Tax assets, relating to Prepetition Non-Income Taxes.

NTEC will assume and will timely perform and discharge in accordance with their respective terms, the following Assumed Liabilities:

- all Liabilities of any kind or character to the extent resulting from, arising out of or in connection with the use, operation, possession or ownership of or interest in the Purchased Assets and/or the Business after the Closing Date;
- the Assumed Cure Costs that NTEC is required to pay pursuant to section 365 of the Bankruptcy Code (subject to certain exceptions for agreed upon cure costs that will be paid by the Debtors);
- all Liabilities of the Sellers under the Purchased Contracts that arise on or after the Closing Date;
- all Liabilities under all Laws arising from the Purchased Assets and the operation of the Business that arise on or after the Closing Date including those arising out of or relating to (i) the Transferred Permits/Licenses, (ii) any mine operation or safety compliance matters related to the condition of the Purchased Assets or the mining areas of the Business, (iii) the Purchased Assets' or the Business's compliance with Environmental Laws and Mining or Mining Safety Laws, and (iv) any conditions arising from a spill, emission, release or disposal into the Environment of, or human exposure to, hazardous materials resulting from the operation of the Business or Purchased Assets;
- all healthcare continuation coverage to the extent required by law to any employee or former employee who is currently receiving COBRA coverage;
- all Liabilities under all Laws arising out of or relating to Reclamation Liabilities of the Business or the Purchased Assets;
- all Liabilities for all (i) Transfer Taxes, (ii) Prepetition Non-Income Taxes, and (iii) Non-Income Taxes that are allocated to NTEC;
- all Trade Payables arising (i) after the Petition Date that remain unpaid as of the Closing Date (with an aggregate face value equal to the lesser of (x) all such Trade Payables as of the Closing Date and (y) $20,000,000 and (ii) after the Closing Date;
- certain ONRR Liabilities; and
- certain 503(b)(9) Claims.

All provided that the Sale Order is entered and the Sale Transaction is expected to close on or about October 19. Following the Sale Transaction, the remaining assets will consist primarily of:

- cash on the balance sheet;
- cash;
- the Purchaser Take-Back Notes;
- Royalty Interest payments received from the Purchaser;
- the lease and ultimate sale of the Retained Real Estate; and
- the AMT Refund.

## VI. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The issuance and the distribution under the Plan of the Purchaser Take-Back Notes and the New Parent Equity and the amendment, reinstatement, offer, sale, issuance, and delivery under the Plan of the Amended Prepetition Notes will be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. The Plan provides for, among other things, (i) the distribution of the Purchaser Take-Back Notes, (ii) the issuance of the New Parent Equity, and (iii) the amendment, reinstatement, offer, sale, issuance, and delivery of the Amended Prepetition Notes to the Holders of Prepetition 2021 Notes Secured Claims. Subject to liquidity constraints, the Purchaser Take-Back Notes, the New Parent Equity, and the Amended Prepetition Notes may be resold without registration under the Securities Act or federal securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash or property. Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan for persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

***In any case, recipients of new securities issued or transferred under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.***

## VII. SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

### A. Administrative Claims, Professional Fee Claims, and Priority Claims

#### 1. Administrative Claims

Except with respect to Administrative Claims that are Professional Fee Claims or Assumed Purchaser Administrative Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses may be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. Notwithstanding the foregoing, Assumed Purchaser Allowed Administrative Claims shall be (and have been) assumed by the Purchaser and shall be paid by the Purchaser. From and after the Effective Date, each Holder of an Allowed Assumed Purchaser Administrative Claim shall have recourse for payment of such Claim solely against the Purchaser and its assets and

property and shall be deemed to have waived and released any recourse against the Debtors, the Reorganized Debtors, or their respective assets or property for payment of or recovery on such Claim.

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such dates shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, or their respective assets or property or the Claims Reserve Amount and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, and the requesting party no later than 90 days after the Effective Date or such other date fixed by the Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed or an Assumed Purchaser Administrative Claim.

2. **Professional Compensation**

**a.** Final Fee Applications

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Debtors and the Reorganized Debtors no later than 60 days after the Effective Date. Each such final request will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, and once approved by the Court, shall be promptly paid in Cash using only the Professional Fee Escrow Account up to its full Allowed amount.

Except as otherwise provided in the Plan, Professionals shall be paid pursuant to the Interim Compensation Order.

Objections to any Professional Fee Claim must be Filed and served on the Debtors and the Reorganized Debtors and the requesting party no later than 20 days after such Professional Fee Claim is Filed with the Court.

**b.** Professional Fee Escrow Account

As soon as possible after Confirmation, and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall not be subject to any Lien and shall be maintained in trust solely for the benefit of the Professionals, including with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order. The funds in the Professional Fee Escrow Account shall not be considered property of the Estates or of the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be turned over to the Reorganized Debtors without any further action or order of the Court.

**c.** Professional Fee Reserve Account

Professionals shall reasonably estimate their unpaid Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors in writing via email no later than five Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not timely provide an estimate the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

**d.** Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or the Reorganized Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall

terminate, and the Debtors or the Reorganized Debtors may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Court.

3. **DIP Facility Claims**

All DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment, and (c) any and all accrued and unpaid fees, expenses and indemnification or other obligations of any kind payable under the DIP Credit Agreement Documents.

Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed DIP Facility Claim, each Holder of an Allowed DIP Facility Claim shall receive payment in full in Cash of such Holder's Allowed DIP Facility Claim on the Effective Date, which Allowed amount shall not be subject to setoff, defense, counterclaim, recharacterization or avoidance. Upon the indefeasible payment or satisfaction in full in Cash, or other satisfactory treatment, of the DIP Facility Claims (other than any DIP Facility Claims based on the Debtors' contingent obligations under the DIP Facility Loan Agreement for which no claim has been made) in accordance with the terms of the Plan, on the Effective Date, all Liens granted to secure the Allowed DIP Facility Claims shall be automatically terminated and of no further force and effect without any further notice to, or action, order, or approval of, the Court or any other Entity. Notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors' contingent or unliquidated obligations under the DIP Facility Loan Agreement, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner reasonably acceptable to the DIP Facility Agent, any affected lender under the DIP Credit Agreement Documents, or any other Holder of a DIP Facility Claim, as applicable, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision thereof or thereof to the contrary.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, professionals compensated pursuant to the DIP Order shall continue to be compensated pursuant to the procedures set forth in the DIP Order and, for the avoidance of doubt, requests for payment and expenses of professionals compensated pursuant to the Final DIP Order are not required to be filed and served other than in compliance with the procedures set forth in the Final DIP Order, and, after the Effective Date, the Reorganized Debtors shall continue to reimburse such professionals for reasonable fees and expenses.

4. **Adequate Protection Claims**

On the Effective Date, any Prepetition Secured Noteholder Adequate Protection Claims shall be deemed to be waived and released.

5. **Indenture Trustee**

On the Effective Date, the reasonable fees and costs (including reasonable attorneys' fees and disbursements) of the Prepetition 2021 Notes Indenture Trustee shall be paid in full, and the reasonable fees and costs of the Prepetition Unsecured Notes Indenture Trustee shall be paid the Prepetition Unsecured Notes Indenture Trustee Payment Amount. For the avoidance of doubt, the payment of the Prepetition Unsecured Notes Indenture Trustee Payment Amount shall not impact the General Unsecured Claims Cash Distribution Amount.

6. **Priority Tax Claims**

Except with respect to Assumed Purchaser Priority Tax Claims, and except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be paid pursuant to a Reinstatement of such Claim or in accordance with the terms set forth in sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. From and after the Closing Date, each Holder of an Assumed Purchaser Priority Tax Claim shall have recourse for payment of such Claim solely against the Purchaser and its assets and property and shall be deemed to have waived and released any recourse against the Debtors, the Reorganized Debtors, or their respective assets or property for payment of or recovery on such Claim.

7. **Statutory Fees**

All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Reorganized Debtors shall pay any and all such fees for

each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or a final decree is issued, whichever occurs first. The Debtors shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Reorganized Debtors shall File quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Reorganized Debtors during the applicable period, attested to by an authorized representative of the Reorganized Debtors.

**B. Classification and Treatment of Claims and Interests**

1. **Summary of Classification**

Claims and Interests, except for Administrative Claims, Professional Fee Claims, Cure Claims, DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Plan constitutes a separate chapter 11 plan for each Debtor and the classifications set forth in Classes 1 through 7 shall be deemed to apply to each Debtor. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be seven Classes for each Debtor); *provided that* any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.E below.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Prepetition 2021 Notes Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | Intercompany Interests | Impaired | Deemed to Reject |
| 7 | Parent Interests | Impaired | Deemed to Reject |

2. **Treatment of Claims and Interests**

**a.** Class 1 – Other Priority Claims

*Classification*: Class 1 consists of Other Priority Claims.

*Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder thereof shall receive (i) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim from the Administrative and Priority Claims Reserve Account or (ii) such other treatment as may be agreed to by such Holder and the Debtors.

*Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Allowed Other Priority Claims will not be entitled to vote to accept or reject the Plan.

**b**. Class 2 – Other Secured Claims

*Classification*: Class 2 consists of Other Secured Claims.

*Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each such Holder shall receive, at the Debtors' election, either (i) Cash equal to the full Allowed amount of its Claim from the Administrative and Priority Claims Reserve Account, (ii) the return or abandonment of the collateral securing its Claim, or (iii) such other treatment as may be agreed to by such Holder and the Debtors.

*Voting*: Class 2 is Unimpaired under the Plan. Each Holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Other Secured Claims will not be entitled to vote to accept or reject the Plan.

**c**. Class 3 – Prepetition 2021 Notes Secured Claims

*Classification*: Class 3 consists of the Prepetition 2021 Notes Claims.

*Allowance*: On the Effective Date, the Prepetition 2021 Notes Secured Claims shall be deemed Allowed in the aggregate principal amount of $[290,366,000], plus any accrued interest, fees, and costs under the Prepetition 2021 Notes Indenture as of the Petition Date, minus the DIP Roll-Up Amount.

*Treatment*: On the Effective Date, (i) the Reorganized Debtors shall be deemed to have reinstated the Prepetition 2021 Notes in the aggregate principal amount of [•], as amended by the Amended Prepetition Notes Indenture, as further described in **Error! Reference source not found.** of the Plan. In addition, on the Effective Date, each Holder of an Allowed Prepetition 2021 Notes Claim shall receive its Pro Rata share, based on the Allowed amount of its Prepetition 2021 Notes Claim, of the following:

i. the Purchaser Take-Back Notes;

ii. the New Parent Equity; and

iii. the Prepetition 2021 Notes Secured Claim Cash Distribution.

*Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Prepetition 2021 Notes Claims will be entitled to vote to accept or reject the Plan.

**d**. Class 4 – General Unsecured Claims

*Classification*: Class 4 consists of all Allowed General Unsecured Claims.

*Treatment*: Unless otherwise agreed by any Holder of an Allowed General Unsecured Claim, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of its General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall be entitled to its Pro Rata share of the General Unsecured Claims Cash Distribution Amount *less* GUC Administrator Expenses. Holders of Prepetition 2021 Notes Deficiency Claims will waive, or will be deemed to have waived, any recovery or distribution on account of any Prepetition 2021 Notes Deficiency Claim; *provided, however*, for the avoidance of doubt, in addition to being permitted to vote in Class 3, Holders of Prepetition 2021 Notes Deficiency Claims shall be entitled to vote in Class 4 on account of such Claims.

*Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 General Unsecured Claims will be entitled to vote to accept or reject the Plan.

**e**. Class 5 – Intercompany Claims

*Classification*: Class 5 consists of all Intercompany Claims.

*Treatment*: On the Effective Date, all Intercompany Claims shall be cancelled, released, discharged, and extinguished. Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claims.

*Voting*: Class 5 Intercompany Claims are Impaired under the Plan. Each Holder of an Intercompany Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

**f**. Class 6 ─ Intercompany Interests

*Classification*: Class 6 consists of all Intercompany Interests.

*Treatment*: On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Noteholders, either:

iv. Reinstated; or

v. Cancelled, released, discharged, and extinguished.

In each case (i) and (ii) in a tax and business efficient manner acceptable to the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Noteholders. Such election may be made at any time, including after the Effective Date. Holders of Intercompany Interests shall not receive any distribution on account of such Intercompany Interests.

*Voting*: Class 6 Intercompany Interests are Impaired under the Plan. Each Holder of an Intercompany Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

**f**. Class 7 – Parent Interests

*Classification*: Class 7 consists of all Parent Interests.

*Treatment*: On the Effective Date, all Parent Interests shall be cancelled, released, discharged, and extinguished; *provided* that all New Parent Equity shall be issued to Holders of Prepetition 2021 Notes Secured Claims as set forth above.

*Voting*: Parent Interests are Impaired under the Plan. Each Holder of a Parent Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Parent Interest will not be entitled to vote to accept or reject the Plan.

3. **Special Provision Governing Unimpaired Claims**

Nothing under the Plan shall affect the Debtors’ rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

4. **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests, and the filing of the Plan shall constitute a motion for such relief.

5. **Elimination of Vacant Classes**

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6. **Subordinated Claims**

The allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**C. Means for Implementation of the Plan**

1. **Sources of Plan Consideration**

Distributions to Holders or Allowed Claims against the Debtors under the Plan will be funded with, or effectuated by, as applicable: (1) Cash on hand, (2) the Purchaser Take-Back Notes and, (3) New Parent Equity in accordance with the treatment of such Claims and subject to the terms provided herein. Unless otherwise agreed in writing by the Debtors and the Purchaser, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Purchaser, and each Holder of such Claims shall not have recourse against the Debtors, the Reorganized Debtors, or their respective assets or property for payment of such Claims. For the avoidance of doubt, Holders of General Unsecured Claims shall be paid from the General Unsecured Claims Cash Distribution Amount.

2. **Sale**

**a.** <u>Sale Transaction</u>.

(i) The Purchased Assets.

Following the Petition Date, the Debtors conducted the Sale Process for all or substantially all of their assets in accordance with the Bidding Procedures. On the Closing Date, the Debtors consummated the Sale to the Purchaser pursuant to the terms of the Sale Transaction Documentation.

(ii) The Retained Real Estate.

In accordance with the Bidding Procedures Order, and independent from the contemplated Sale Transaction, the Debtors have not sold the Retained Real Estate. Cash proceeds (if any) of any sale, lease, or other transaction involving the Retained Real Estate shall be retained by the Reorganized Debtors.

**b.** <u>Continued Corporate Existence.</u>

Except as otherwise provided in the Plan, the Reorganized Debtors shall continue to exist after the Effective Date, in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such actions as permitted by applicable law and the New Corporate Governance Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (v) the further reorganization or liquidation of a Reorganized Debtor, and such actions and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

**c.** Amended Prepetition Notes.

On the Effective Date, the Prepetition 2021 Notes Indenture shall be automatically amended to contain the terms set forth in the Amended Prepetition Notes Indenture. On the Effective Date, the Amended Prepetition Notes Documents shall constitute legal, valid, binding and authorized joint and several obligations of the Reorganized Debtors, enforceable in accordance with their terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization or subordination under applicable law, the Plan or the Confirmation Order. On the Effective Date, each Lien and security interest that secures the obligations arising under the Prepetition 2021 Notes Documents and each guarantee of the obligations outstanding under the Prepetition 2021 Notes Documents, including, for the avoidance of doubt, the 2021 Note Subsidiary Guaranties and the Subsidiary Liens (in each case, as defined in the SAPSA), shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors pursuant to the Amended Prepetition Notes Documents to guarantee and secure all obligations of the Reorganized Debtors arising under the Amended Prepetition Notes Documents. All Liens and security interests granted to secure the obligations arising under the Prepetition 2021 Notes Documents shall survive the Effective Date, shall not be discharged or released pursuant to the Plan or the Confirmation Order and continue to secure the obligations under the Amended Prepetition Notes Documents. On the Effective Date, all Liens and security interests granted or purported to be granted pursuant to, or in connection with, the Amended Prepetition Notes Documents (x) shall be in full force and effect, (y) shall be valid, binding, perfected, enforceable Liens and security interests in the property and collateral described in the Amended Prepetition Notes Documents, with priorities established in respect thereof under applicable non-bankruptcy law and (z) shall not (nor shall any payments made pursuant to the Amended Prepetition Notes Documents, including payments of principal, interest, fees, expenses, costs or other charges) be enjoined or subject to discharge, impairment, release, avoidance, recharacterization or subordination under any applicable law, the Plan or the Confirmation Order in any subsequent proceeding. Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors and the Reorganized Debtors have waived any discharge of the Claims and obligations arising under the Prepetition 2021 Notes Indenture as modified by the Amended Prepetition Notes Documents. Upon the Effective Date and pursuant to the Amended Prepetition Notes Documents, the Prepetition 2021 Notes Post-Emergence Indenture Trustee shall be deemed (i) the successor to the Prepetition 2021 Notes Indenture Trustee as indenture trustee under the Prepetition 2021 Notes Indenture, who shall have been deemed replaced pursuant to Section 7.08 to the Prepetition 2021 Notes Indenture, and (ii) the successor to the Prepetition 2021 Notes Indenture Trustee in each of its other capacities under the Prepetition 2021 Notes Documents, who shall have been deemed replaced pursuant to each such applicable Prepetition 2021 Notes Document. Pursuant to section 1145(a) of the Bankruptcy Code, section 5 of the Securities Act and any State or local law requiring registration for offer or sale of a security shall not apply to the amendment, reinstatement, offer, sale, issuance, and delivery of the Amended Prepetition Notes under the Plan.

**d.** Purchaser Take-Back Notes.

On the Effective Date, (i) if the Purchaser Take-Back Notes have not been delivered to the Parent, the Purchaser shall issue the Purchaser Take-Back Notes pursuant to the Purchaser Take-Back Notes Indenture consistent with the Description of Transaction Steps directly to the Holders of Allowed Prepetition 2021 Notes Claims or (ii) if the Purchaser Take-Back Notes have been delivered to Parent, Reorganized Parent shall distribute the Purchaser Take-Back Notes to the Holders of Allowed Prepetition 2021 Notes Claims as partial repayment of the Prepetition 2021 Notes in accordance with the terms of the Plan without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, corporate action, consent, authorization or approval of any Person. All Holders of Allowed Prepetition 2021 Notes Claims entitled to distributions of Purchaser Take-Back Notes

hereunder and the Purchaser Take-Back Notes Indenture Trustee shall be deemed party to, or beneficiaries of, the Purchaser Take-Back Notes and Purchaser Take-Back Notes Documents as applicable. Parent shall pay the first $50,000 of the reasonable and documented costs and expenses of the Purchaser Take-Back Notes Indenture Trustee.

The Liens granted and contemplated by the Purchaser Take-Back Notes Documents shall be valid, binding, perfected and enforceable liens on the collateral specified in the Purchaser Take-Back Notes Documents, the obligations, guarantees, mortgages, pledges, liens and other security interests granted or contemplated by the Purchaser Take-Back Notes Documents shall be deemed to have been granted in good faith, for good and valuable consideration and for legitimate business purposes as an inducement to the holders thereunder to enter into the contemplated transactions, and such guarantees, mortgages, pledges, liens other security interests and other obligations incurred under the Purchaser Take-Back Notes Documents shall be deemed to not constitute a fraudulent conveyance or fraudulent or preferential transfer, shall not otherwise be subject to avoidance or recharacterization under applicable federal or state laws and will not subject the secured parties thereunder (including the Purchaser Take-Back Notes Indenture Trustee) to any liability by reason of incurrence of such obligation or grant of such Liens under applicable federal or state laws, including successor or transferee liability, and the priorities of such Liens and security interests shall be as set forth in the Purchaser Take-Back Notes Documents. The Purchaser Take-Back Notes Documents shall, upon execution, constitute the legal, valid and binding obligations of the obligors and guarantors thereunder, enforceable in accordance with their terms and not in contravention of any state or federal law. In the event of an order dismissing any of these Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such Liens and obligations shall not be affected and shall continue in full force and effect in all respects and such liens shall maintain their priorities and perfected status as provided in such documents.

The Purchaser, Parent, Reorganized Parent and the Purchaser Take-Back Notes Indenture Trustee shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect all Liens and security interests granted in accordance with the Purchaser Take-Back Notes Documents under the provisions of the applicable state, federal, tribal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of the Confirmation Order, and any such filings, recordings, approvals and consents shall not be required), and the Purchaser, Parent and the Reorganized Parent shall cooperate to make all other filings and recordings that otherwise would be necessary under applicable law or custom to give notice of such Liens and security interests to third parties.

Pursuant to section 1145(a) of the Bankruptcy Code, section 5 of the Securities Act and any State or local law requiring registration for offer or sale of a security shall not apply to the issuance and distribution of the Purchaser Take-Back Notes under the Plan.

**e.** Royalty Interest.

Upon the Closing Date, the Royalty Interest Documents shall be in full force and effect and constitute valid and binding obligations of the Purchaser and its applicable affiliates party thereto and shall be enforceable in accordance with their respective terms and shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. In the event of an order dismissing any of these Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, the obligations arising under the Royalty Interest Documents shall not be affected and shall continue in full force and effect in all respects.

**f.** Restructuring Transactions.

Upon the entry of the Confirmation Order, the Debtors, the Reorganized Debtors, the Purchaser, and the GUC Administrator are authorized, without further order of the Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under or in connection with the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) issuance of the Purchaser Take-Back Notes and Royalty Interest as set forth in the Plan and consistent with the Description of Transaction Steps; (6) the

amendment of any Reorganized Subsidiary Organizational Documents; and (7) any transaction described in the Description of Transaction Steps.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1145(a) of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**g.** Payment of Cure Claims and Other Amounts.

On or prior to the Effective Date, the Debtors or the Purchaser (as provided in the Asset Purchase Agreement) shall pay all Cure Claims that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation. Except as otherwise set forth in the Asset Purchase Agreement or the Plan (with respect to Executory Contracts or Unexpired Leases assumed pursuant to the Plan), the Debtors shall not have any obligation to make any payment or other distribution on account of any Cure Claims.

**h.** Transactions Effective as of the Effective Date.

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their respective boards of directors, their stockholders, or any other Person or Entity.

Before the Effective Date, the Debtors will have consummated the Sale pursuant to the terms and conditions of the Sale Transaction Documentation, including selling the Purchased Assets free and clear of Liens other than Permitted Exceptions and Assumed Liabilities to the extent set forth in the Sale Transaction Documentation, and assuming and assigning to the Purchaser certain Executory Contracts and Unexpired Leases, as further provided in the Sale Transaction Documentation.

3. **Vesting of Assets**

Except as otherwise provided in the Plan, the Sale Transaction Documentation, or any agreement, instrument, or other document incorporated herein or therein, on or before the Effective Date: (a) the Purchased Assets shall be preserved and shall vest in the Purchaser, free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities); (b) the Royalty Interest shall be vested in Reorganized Cloud Peak Energy Resources LLC; (c) the AMT Refund shall be vested in the Reorganized Debtors; and (d) all other Excluded Assets, including (1) the Retained Real Estate and (2) the Causes of Action Set forth in the List of Retained Causes of Action, shall vest in the Reorganized Debtors, in the case of (b), (c) and (d), subject to the Liens securing the obligations under the Amended Prepetition Notes Documents, which shall continue in full force and effect.

On and after the Effective Date, except as otherwise provided in the Plan and subject in all respects to the Sale Transaction Documentation and the Plan, the Debtors may operate their businesses and use, acquire, or dispose of property and, as applicable, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, but, for the avoidance of doubt, subject to the restrictions set forth in the Amended Prepetition Notes Documents.

4. **GUC Administrator**

On and after the Effective Date, the GUC Administrator shall be authorized to administer the reconciliation and settlement process of General Unsecured Claims and such other matters as may be agreed upon between the GUC Administrator, the Reorganized Debtors, and prior to its dissolution, the Committee. As soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall create a segregated account and escrow the General Unsecured Claims Cash Distribution Amount, which shall not be subject to any Lien and shall be maintained in trust and shall not be considered property of the Estates or of the Reorganized Debtors.

The Reorganized Debtors shall cooperate with the GUC Administrator and provide it with copies or access to any books and records necessary for the GUC Administrator to perform its duties under the Plan at no cost to the Reorganized Debtors. The GUC Administrator shall have the ability to enforce the rights of the Debtors or Reorganized Debtors, as applicable, under § 8.1(b) of the Asset Purchase Agreement (entitled Covenants, Access to Information). The GUC Administrator and the Reorganized Debtors shall, as necessary, allocate responsibility for

reconciling and objecting to Claims that assert both a General Unsecured Claim and another type of Claim, recognizing that the GUC Administrator's responsibilities are limited solely to General Unsecured Claims. If the Reorganized Debtors file any Non-Substantive Objection (as understood under Rule 3007-1 of the Local Rules) to any Claim seeking to reclassify such Claim as a General Unsecured Claim, the GUC Administrator may subsequently file a Substantive Objection (as understood under Rule 3007-1 of the Local Rules) to such Claim.

The GUC Administrator may employ professionals to assist in carrying out its duties and may resign at any time upon 30 days' written notice to the Reorganized Debtors. The role and responsibilities of the GUC Administrator shall terminate after all distributions of the General Unsecured Claims Cash Distribution Amount have been made. All GUC Administrator Expenses shall be paid from the General Unsecured Claims Cash Distribution Amount.

5. **Corporate Action**

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Court in all respects. Upon the Effective Date, all matters provided for in the Plan involving any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors. On or (as applicable) before the Effective Date, the appropriate officers or managers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as applicable, and any and all other agreements, documents, and instruments relating to the foregoing, to the extent not previously authorized by the Court. The authorizations and approvals contemplated by this Article IV.E shall be effective notwithstanding any requirements under non-bankruptcy law.

6. **Filing of Monthly and Quarterly Reports and Payment of Statutory Fees**

The filing of the final monthly report (for the period after the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Reorganized Debtors. All Statutory Fees with respect to the period prior to the Effective Date shall be paid by the Debtors in Cash on the Effective Date or other required payment date. With respect to the period after the Effective Date, the Reorganized Debtors shall be obligated to pay quarterly Statutory Fees from the Reorganized Debtors Assets to the Office of the United States Trustee, and such obligation shall continue until such time as a particular Chapter 11 Case is closed, dismissed, or converted to chapter 7.

7. **Cancellation of Existing Securities and Agreements**

Except (a) with respect to the Amended Prepetition Notes Documents, which shall continue to be in full force and effect in accordance with the Plan, and (b) as otherwise provided in the Plan, on the Effective Date: (1) each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument, agreement, or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in any of the Debtors or giving rise to any Claim or Interest, including the obligations of the Debtors under the Prepetition Unsecured Notes Indenture and all Interests, shall be cancelled, extinguished, and deemed rejected without any need for further action or approval of the Court, and the Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; provided that notwithstanding the releases set forth in Article VIII of the Plan, Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein.

Notwithstanding the foregoing, with the exclusion of the Amended Prepetition Notes Documents, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Article IV.G shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such executory contract or unexpired lease has been assumed by such Debtor pursuant to the Plan or a Final Order of the Court.

8. **Causes of Action**

From and after the Effective Date, in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain, and shall have sole responsibility for enforcing, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the List of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court. Notwithstanding the foregoing, the Debtors shall retain and release all Avoidance Actions against Holders of General Unsecured Claims. For the avoidance of doubt, the Avoidance Actions against Holders of General Unsecured Claims shall be released and waived on the Effective Date by the Debtors and shall not vest in the Reorganized Debtors, and the Debtors and the Reorganized Debtors shall not pursue or prosecute any Avoidance Actions; provided, however, that notwithstanding anything to the contrary, neither the Debtors nor the Reorganized Debtors shall waive Avoidance Actions as a defense to any General Unsecured Claims asserted against the Debtors, their Estates, or the Reorganized Debtors, pursuant to section 502(d) of the Bankruptcy Code. The Purchaser or the Reorganized Debtors, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Purchaser or the Reorganized Debtors, as the case may be. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Purchaser, the Debtors, or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Purchaser, the Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, pursuant to Article VIII of the Plan, the Purchaser, the Debtors, or the Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.H include any claim or Cause of Action with respect to, or against, a Released Party.

9. **Effecting Documents; Further Transactions**

Prior to the Effective Date, the Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan. On and after the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

10. **Directors and Officers of the Debtors**

On and after the Effective Date, the board of managers or directors of each Debtor shall be terminated and all of the officers and directors of the Debtors, to the extent they have not already done so, shall be deemed to have resigned from their respective positions with the Debtors, as applicable. Following the Confirmation Date and prior to the occurrence of the Effective Date, the then current officers and directors of each of the Debtors shall continue in their respective capacities and the Debtors shall execute such documents and take such other action as is necessary to effectuate the actions provided for in the Plan.

11. **Director and Officer Liability Insurance**

[Reserved.]

12. **Key Employee Incentive Plans and Key Employee Retention Plan**

On the Effective Date, to the extent not paid as such amounts become earned and payable at an earlier time in accordance with the terms thereof, the Debtors shall make all applicable payments under the KEIP/KERP Plans, in accordance with the Court's orders authorizing the same and the SAPSA. Any earned and unpaid award under the

KEIP/KERP Plans shall be deemed due and payable on the Effective Date, and all such amounts shall constitute Allowed Administrative Claims without the need for any participant in the KEIP/KERP Plans to File or serve any request for payment of such amounts under the Plan or otherwise.

13. **Employee and Retiree Benefits**

All employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors' employees, including retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, as and to the extent set forth in the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief [Docket No. 7], shall remain in full force and effect until the resignation or termination of all employees of the Debtors. Pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding anything to the contrary herein or in the Confirmation Order, on and after the Effective Date, the Reorganized Debtors shall remain solely responsible and liable for, and shall honor and pay in the ordinary course of business, all claims for medical, retiree healthcare, dental, life insurance, health, accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors, or consultants of the Debtors or the spouses, dependents, or beneficiaries thereof accrued as of the Closing Date. In addition, the Reorganized Debtors shall remain solely responsible and liable for all worker's compensation claims of any current or former employees, officers, directors, independent contractors, or consultants of the Debtors that relate to events occurring on or before the Closing Date. The Reorganized Debtors shall pay, or cause to be paid, all such amounts to the appropriate Entities as and when due.

14. **Exemption from Certain Taxes and Fees**

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a Security or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan, the Sale, or the Sale Transaction Documentation shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**D. Treatment of Executory Contracts and Unexpired Leases**

1. **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to reject Executory Contracts and Unexpired Leases, and the Debtors shall be deemed to have rejected all Executory Contracts or Unexpired Leases in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Court, other than: (1) those that have been previously assumed and assigned, including pursuant to the Sale Transaction Documentation; (2) those that are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (3) those that relate to the Retained Real Estate; or (4) those that have been previously rejected by a Final Order or expired under their own terms prior to the Effective Date.

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless

otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than 3 days' notice to the applicable non-Debtor counterparties.

2. **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Court within 30 days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in any Proof of Claim to the contrary**. Claims arising from or related to the rejection of an Executory Contract or Unexpired Lease shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

3. **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed by the Debtors as set forth in Article V.A, as reflected on any notice setting forth proposed Cure Claims shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of such Cure Claims in Cash by the Purchaser on or about the Effective Date, subject to the limitations described below and set forth in the Sale Transaction Documentation, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the Cure Claims, (2) the ability of the Purchaser or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or, with respect to any Executory Contracts and Unexpired Leases assigned to the Purchaser, the Purchaser (in accordance with and to the extent provided in the Sale Transaction Documentation) will have the right to remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. **All liabilities reflected in the Schedules and any Proof of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Court.**

4. **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

5. **Reservation of Rights**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors or the Reorganized Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have 60 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

6. **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

7. **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases that have not been rejected as of the Confirmation Date will survive and remain unaffected by entry of the Confirmation Order.

**E. Provisions Governing Distributions**

1. **Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions**

**a**. Timing and Calculation of Amounts to Be Distributed.

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim, shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class; *provided, however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.E of the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**b**. Entitlement to Distributions

On and after the Effective Date, the Disbursing Agent shall be authorized to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date. Accordingly, the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Distribution Record Date.

2. **Disbursing Agent**

Except as otherwise provided herein, all distributions under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable, as Disbursing Agent or the GUC Administrator solely with respect to the General Unsecured Claims Cash Distribution Amount. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court. For purposes of the distribution of Cash on account of the Prepetition 2021 Notes Claims, the Prepetition 2021 Notes Indenture Trustee

(a) shall be the Holder of all Prepetition 2021 Notes Claims and (b) is hereby directed to make Cash distributions to the Holders of Allowed Prepetition 2021 Notes Claims pursuant to Section 6.09 and 6.10 of the Prepetition 2021 Notes Indenture. In accordance with the foregoing, the delivery of any applicable Cash to be distributed to Holders of Prepetition 2021 Notes Claims to the Prepetition 2021 Notes Indenture Trustee shall satisfy all applicable distribution obligations under the Plan with respect to the distribution of Cash to the Holders of Prepetition 2021 Notes Claims.[17]

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, shall be the Disbursing Agent as to and shall cause all distributions (including New Parent Equity and Purchaser Take-Back Notes) to be made to Holders of Claims and directly to the Holders of Prepetition 2021 Notes Claims other than the distribution of Cash to Holders of Prepetition 2021 Notes Claims and the disbursement of the General Unsecured Claims Cash Distribution Amount by the GUC Administrator.

3. **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

In the event that any distribution is returned as undeliverable or is unclaimed, such distribution shall remain in the Debtors', the Reorganized Debtors', or the GUC Administrator's possession, as applicable, until such time as a distribution becomes deliverable or such Holder accepts distribution, or such distribution reverts back to the Debtors or the Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of attempted distribution. After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors (or the escrow account holding the General Unsecured Claims Cash Distribution Amount for Pro Rata distribution to General Unsecured Creditors, as applicable), and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred.

4. **Distributions on Account of Claims Allowed After the Effective Date**

**a**. Payments and Distributions on Disputed Claims.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**b**. Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding anything to the contrary in the Plan, and except as otherwise agreed to by the Reorganized Debtors or GUC Administrator with respect to distributions of the General Unsecured Claims Cash Distribution Amount, (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.

5. **Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors or the GUC Administrator (solely with respect to any General Unsecured Claims), as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors or the GUC Administrator (solely with respect to any General Unsecured Claims), as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, the Reorganized Debtors or the GUC Administrator (solely with respect to any General Unsecured Claims), as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

[17] The Parent shall cooperate with the Purchaser and the Purchaser Takeback Notes Indenture Trustee to cause the Purchaser Takeback Notes to be made eligible for clearance and settlement through The Depository Trust Company ("**DTC**") and shall hold the Purchaser Takeback Notes through DTC as soon as the Purchaser Takeback Notes have been made so eligible.

6. **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled pursuant to Article IV.G hereto, except to the extent otherwise provided herein.

7. **Allocations**

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

8. **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

9. **Setoffs and Recoupment**

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim against a Debtor of any nature whatsoever that the applicable Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor of any such Claim it may have against the Holder of such Allowed Claim.

10. **Claims Paid or Payable by Third Parties**

**a**. Claims Paid by Third Parties.

The Debtors, the Reorganized Debtors, or the GUC Administrator (solely with respect to any General Unsecured Claims), as applicable, shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Reorganized Debtors; *provided that* the Debtors, the Reorganized Debtors, or the GUC Administrator (solely with respect to any General Unsecured Claims), as applicable, shall provide 21 days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not the Debtors, the Reorganized Debtors, or the GUC Administrator (solely with respect to any General Unsecured Claims), as applicable, on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Debtors, the Reorganized Debtors, or the GUC Administrator (solely with respect to any General Unsecured Claims), as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

**b**. Claims Payable by Insurers.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided that* the Debtors, the Reorganized Debtors, or the GUC Administrator (solely with respect to any General Unsecured Claims), as applicable, shall provide 21 days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

**c**. Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

11. **Exemption from Securities Laws**

The issuance of and the distribution under the Plan of the New Parent Equity and the Purchaser Take-Back Notes, shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. These Securities are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "affiliate" of the Purchaser within the meaning of Rule 144 under the Securities Act. In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

**F. Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

1. **Allowance of Claims and Interests**

After the Effective Date, the Reorganized Debtors, and the GUC Administrator, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order and the DIP Orders), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

2. **Claims and Interests Administration Responsibilities**

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the authority to (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court, (x) solely with respect to any General Unsecured Claims shall vest in the GUC Administrator and (y) solely with respect to all other Claims shall vest in the Reorganized Debtors. The Reorganized Debtors shall consult with the GUC Administrator before seeking to reclassify any Claim as a General Unsecured Claim.

3. **Estimation of Claims**

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, or the GUC Administrator solely with respect to any General Unsecured Claims, may at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection. In the event that the Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Debtors, as applicable, or the GUC Administrator solely with respect to any General Unsecured Claims, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

4. **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, superseded, settled, resolved by agreement, or otherwise resolved or addressed may be adjusted or expunged on the Claims Register by the Reorganized Debtors, or the GUC Administrator solely with respect to any General Unsecured Claims, without the Reorganized Debtors or the GUC Administrator, as applicable, having to File or take any legal action, including Filing an application, motion, complaint, objection, or any other legal proceeding with the Court.

5. **Disallowance of Claims**

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

6. **No Distributions Pending Allowance**

No payment or distribution provided under the Plan shall be made to the extent that any Claim is a Disputed Claim, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII, unless and until such Disputed Claim becomes an Allowed Claim; provided that any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

7. **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals shall be paid to the Holder of such Allowed Claim on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided herein.

8. **Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim plus applicable interest.

**G. Settlement, Release, Injunction, And Related Provisions**

1. **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all

such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and are fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors, or the GUC Administrator solely with respect to any General Unsecured Claims, may compromise and settle Claims against the Reorganized Debtors and Causes of Action against other Entities.

2. **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in a contract, instrument, or other agreement or document executed pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors or the GUC Administrator solely with respect to any General Unsecured Claims), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

3. **Term of Injunctions or Stays**

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

4. **Release of Liens**

**Except as otherwise specifically provided in the Plan, or in any other contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors. For the avoidance of doubt, notwithstanding anything in the Plan or the Confirmation Order to the contrary, this Section VIII.D shall not apply to the Liens securing the Prepetition 2021 Notes, which shall continue to be secured by all existing Liens and other security interests granted under the Prepetition 2021 Notes Documents as amended by the Amended Prepetition Notes Documents.**

5. **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties to facilitate the Sale Process and the implementation of the transactions contemplated by the Plan, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Affiliates, their Estates, the Reorganized Debtors, and their respective successors and assigns from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or that could be asserted on behalf of the Debtors, that the Debtors and their Affiliates, their Estates, the Reorganized Debtors, or their respective successors and assigns would have been legally entitled to assert in their own right**

**(whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' in- or out-of-court sale efforts or the Sale Process (including the Sale and the Sale Transaction Documentation), the Debtors' intercompany transactions, the Prepetition First Lien Credit Agreement, the Prepetition 2021 Notes Documents, the Amended Prepetition Notes Documents, the Purchaser Take-Back Notes Documents, the Royalty Interest Documents, the Prepetition Unsecured Notes Indenture, the Tender Offer, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of any of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the SAPSA, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Sale, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the SAPSA, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the distribution of property pursuant to the Plan, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in this Article VIII.E do not release any post-Effective Date obligations of any party or Entity under the Plan; (ii) obligations of Purchaser under the Sale Transaction Documentation; and (iii) nothing in this Article VIII.E shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.**

**Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors, their Estates, and the Reorganized Debtors set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Sale; and (7) a bar to any of the Debtors, their Estates, or the Reorganized Debtors asserting any Claim or Cause of Action released pursuant to such releases.**

6. **Releases by Holders of Claims and Interests**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, each Estate, the Reorganized Debtors, and each Released Party from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court sale efforts or the Sale Process (including the Sale and the Sale Transaction Documentation), the Debtors' intercompany transactions, the Prepetition First Lien Credit Agreement, the Prepetition 2021 Notes Documents, the Amended Prepetition Notes Documents, the Purchaser Take-Back Notes Documents, the Royalty Interest Documents, the Prepetition Unsecured Notes Indenture, the Tender Offer, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of any of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the SAPSA, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any sale, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the SAPSA, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other**

**documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the distribution of property pursuant to the Plan, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release obligations arising under agreements among the Releasing Parties and the Released Parties other than the Debtors; *provided, further* that the releases set forth in this Article VIII.F shall not be deemed to release any of the Debtors' obligations under the SAPSA. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in this Article VIII.F do not release any post-Effective Date obligations of any party or Entity under the Plan, including under the Prepetition 2021 Notes Documents (as amended pursuant to the Plan); (ii) obligations of Purchaser under the Sale Transaction Documentation; and (iii) nothing in this Article VIII.F shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.**

**Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.**

7. **Exculpation**

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, liability, or remedy for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the SAPSA and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other documents (including the Definitive Documentation), the solicitation of votes with respect to the Plan, or any sale (including the Sale and the Sale Transaction Documentation), contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in- or out-of-court sale efforts or Sale Process, the Disclosure Statement, the Plan, the SAPSA, the related agreements, instruments, and other documents (including the Definitive Documentation), the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), or any other related agreement, except for claims related to any act or omission by such Exculpated Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

8. **Injunction**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests**

**that have been released or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.**

9. **Recoupment**

In no event shall any Holder of an Allowed Claim be entitled to recoup against any Claim, right, or Cause of Action of the Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

10. **Subordination Rights**

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

11. **Reimbursement or Contribution**

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**H. Provisions Regarding Governance of the Reorganized Debtors**

1. **Organizational Action**

On and after the Effective Date, the adoption, filing, approval and ratification, as necessary, of all limited liability company, corporate or related actions contemplated hereby for each of the Reorganized Debtors, including the Restructuring Transactions, shall be deemed authorized and approved in all respects.

All matters provided for herein involving the organizational structure of any Debtor or any Reorganized Debtor, or any limited liability company or corporate action required by any Debtor or any Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder, including with respect to (i) the adoption and filing of an amendment and restatement of the New Certificate of Incorporation, (ii) the adoption of the New Bylaws, (iii) the adoption and filing of any Reorganized Subsidiary Certificates of Incorporation and Reorganized Subsidiary Certificates of Formation, as applicable, (iv) the approval of any Reorganized Subsidiary Bylaws and Reorganized Subsidiary Operating Agreements, as applicable, (v) the election or appointment, as the case may be, of directors, officers, managers or managing members for the Reorganized Debtors,

(vi) the issuance of the New Parent Equity, (vii) the Restructuring Transactions to be effectuated pursuant to the Plan and (viii) the qualification of any Reorganized Debtors as foreign corporations if and wherever the conduct of business by such entities requires such qualifications.

Any party that is to receive New Parent Equity is deemed to be bound to the terms of the New Stockholders Agreement from and after the Effective Date, even if not a signatory thereto.

On and after the Effective Date, the appropriate officers of each Reorganized Debtor and members of the board of directors, board of managers or equivalent body of each Reorganized Debtor are authorized and directed to issue, execute, deliver, file and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments contemplated by the Plan in the name of and on behalf of such Reorganized Debtor and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan

2. **Organizational Documents**

The New Certificate of Incorporation, the New Bylaws, and any Reorganized Subsidiary Organization Documents shall be effective as of the Effective Date and shall, among other things, authorize the New Parent Equity. After the Effective Date, the Reorganized Debtors may amend and restate their certificates of incorporation, bylaw, limited liability company agreements, shareholders agreements or other analogous organizational documents, as applicable, as permitted by applicable law. Subject to the Restructuring Transactions, the governance and organizational documents of the Reorganized Subsidiaries that were in effect before the Effective Date shall remain in effect after the Effective Date. After the Effective Date, any of the Reorganized Debtors may file amended and restated certificates of incorporation (or other formation documents, if applicable) with the Secretary of State in any appropriate jurisdiction.

3. **Directors and Officers of the Reorganized Debtors**

Subject to the Restructuring Transactions, on the Effective Date, the management, control and operation of each Reorganized Debtor shall become the general responsibility of the board of directors, members or managing members, as applicable, of such Reorganized Debtor or other governing body as provided in the applicable governing documents.

On the Effective Date, the term of the members of the Board shall expire and such members shall be replaced by the New Board. The classification and composition of the New Board shall be consistent with the New Certificate of Incorporation and the New Bylaws. In the Plan Supplement, to the extent known, the Debtors will disclose pursuant to section 1129(a)(5) of the Bankruptcy Code the identity and affiliations of the Persons proposed to serve on the New Board. The New Board members shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the New Certificate of Incorporation and the New Bylaws.

The classification and composition of the managers, managing members and members of the boards of directors, as applicable, of the Reorganized Subsidiary Debtors shall be consistent with the applicable Reorganized Subsidiary Certificate of Formation, Reorganized Subsidiary Certificate of Incorporation, Reorganized Subsidiary Bylaws or Reorganized Subsidiary Operating Agreement. Each such director, manager or managing member, as applicable, shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the relevant Reorganized Debtor's constituent documents.

**I. Conditions Precedent to Confirmation and Consummation of the Plan**

1. **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article X.C of the Plan):

a. the SAPSA shall not have been breached or terminated and shall remain in full force and effect;

b. an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders, shall have been entered by the Court;

c. the Sale pursuant to the Sale Transaction Documentation shall have been approved by the Court prior to, or contemporaneously with, Confirmation, and the Sale Transaction Documentation and the Sale

Order shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders;

d. the Sale Transaction Documentation shall not have been terminated in accordance with its terms;

e. the Confirmation Order shall have been entered by the Court in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders; and

f. the Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, shall have been Filed subject to the terms thereof and shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders, and the Committee (but solely with respect to documents impacting General Unsecured Claims); *provided*, *however*, that the GUC Administrator Budget shall be acceptable to the Committee or otherwise determined by the Court.

2. **Conditions Precedent to the Effective Date**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article X.C of the Plan):

a. the Confirmation Order, which order shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Noteholders, and the Committee, shall have been entered and the Confirmation Order shall have become a Final Order that has not been stayed, modified, or vacated on appeal;

b. the Purchaser Take-Back Notes Indenture shall have been qualified pursuant to the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa et seq. prior to the voting deadline with respect to the Plan;

c. the Purchaser Take-Back Notes and the Royalty Interest shall have been delivered by the Purchaser (i) directly to the Holders of Allowed 2021 Notes Claims or (ii) to Parent, in either case, in accordance with the Asset Purchase Agreement and shall be in full force and effect and binding on all parties thereto;

d. the Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Noteholders, and the Committee (but solely as such documents may impact the General Unsecured Claims);

e. all other Definitive Documentation, which Definitive Documentation shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Noteholders, and the Committee (but solely with respect to Definitive Documentation impacting General Unsecured Claims), shall have been effected or executed in accordance with the terms thereof and in accordance with the SAPSA;

f. the New Certificate of Incorporation and New Bylaws shall become have effective and shall be in full force and effect;

g. the Amended Prepetition Notes Indenture shall have been qualified pursuant to the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa et seq. prior to the voting deadline with respect to the Plan;

h. the Amended Prepetition Notes Documents shall be in full force and effect and binding on all parties thereto;

i. all DIP Facility Claims shall have been paid in Cash in full;

j. all required governmental and third-party approvals and consents, including Court approval, necessary in connection with the transactions provided for in the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

k. all documents and agreements necessary to implement the Plan, which documents shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Note-holders shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions

related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

l. all Allowed Professional Fee Claims approved by the Court shall have been paid in full and the Professional Fee Reserve Amount shall have been fully funded in Cash into the Professional Fee Escrow Account;

m. the Closing Date shall have occurred on terms, and pursuant to the Sale Transaction Documents, reasonably acceptable to the Debtors and the Required Consenting Noteholders; and

n. after giving effect to the terms of the Plan, the Reorganized Debtors shall have Cash in an amount not less than the Post-Effective Date Minimum Cash Amount.

3. **Waiver of Conditions**

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article X may be waived only by the Debtors with the prior written consent of the Required Consenting Noteholders and, if applicable, the Committee, without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan.

4. **Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

5. **Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date**

If the Confirmation Date and/or the Effective Date do(es) not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

**J. Modification, Revocation, or Withdrawal of the Plan**

1. **Modification and Amendment**

Subject to the limitations contained herein, the Debtors reserve the right, with the consent of the Required Consenting Noteholders and the Committee (such consent not to be unreasonably withheld), to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, and the terms of the SAPSA, the Debtors expressly reserve their rights to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

2. **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3. **Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any

manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

**K. Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

a. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections relating to any of the foregoing;

b. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

c. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, any Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Debtors or the Reorganized Debtors, as applicable, amending, modifying, or supplementing, pursuant to Article V of the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

d. ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

e. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

f. adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

g. adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

h. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, the SAPSA, the Sale, and the Plan Supplement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the SAPSA, the Sale, and the Plan Supplement;

i. enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code, including the Sale Order;

j. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, the SAPSA, the Sale Transaction Documentation, or the Plan Supplement;

k. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

l. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

m. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1 of the Plan;

n. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

o. determine any other matters that may arise in connection with or relate to the SAPSA, the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, the Sale, or the Sale Transaction Documentation;

p. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including the Sale;

q. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

r. determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

s. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

t. hear and determine matters concerning section 1145 of the Bankruptcy Code;

u. hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

v. enforce all orders previously entered by the Court;

w. resolve any disputes arising under the Sale Transaction Documentation or other documents related to the Sale;

x. hear any other matter not inconsistent with the Bankruptcy Code;

y. enter an order concluding or closing the Chapter 11 Cases; and

z. enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

**L. Miscellaneous Provisions**

1. **Immediate Binding Effect**

Subject to Article X.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and the Purchaser, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2. **Additional Documents**

On or before the Effective Date, the Debtors may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the SAPSA. The Debtors, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest (including the Purchaser) shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3. **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs. Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan

Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests.

4. **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, if any, of such Entity.

5. **Service of Documents**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Reorganized Debtors shall be served on:

| | |
|---|---|
| **Debtors** | **Cloud Peak Energy Inc.**<br>385 Interlocken Crescent, Suite 400<br>Broomfield, Colorado 80021<br>Attn: Bryan Pechersky |
| **Counsel for the Debtors** | **Vinson & Elkins LLP**<br>666 Fifth Avenue, 26th Floor<br>New York, New York 10103-0040<br>Attn: David S. Meyer<br>Jessica C. Peet<br>Lauren R. Kanzer<br><br>-and-<br><br>**Vinson & Elkins LLP**<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3900<br>Dallas, Texas 75201<br>Attn: Paul E. Heath |
| **Counsel to Ad Hoc Prepetition Secured Noteholder Group and DIP Lenders** | **Davis Polk & Wardwell LLP**<br>450 Lexington Avenue<br>New York, New York 10017<br>Attn: Damian S. Schaible<br>Aryeh E. Falk |
| **Counsel to the Committee** | **Morrison & Foerster LLP**<br>250 West 55th Street<br>New York, NY 10019-9601<br>Attn: Jennifer L. Marines<br>Lorenzo Marinuzzi |

6. **Terms of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

7. **Entire Agreement**

Except as otherwise indicated, on the Effective Date, the Plan and the Plan Supplement shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

8. **Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' case website at https://cases.primeclerk.com/cloudpeakenergy or the Court's website at http://www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

9. **Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, provided that any such alteration or interpretation shall be acceptable to the Debtors. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

10. **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Purchaser, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of securities thereunder.

11. **Dissolution of any Committee**

On the Effective Date, any Committee shall remain in place solely for the purpose of addressing (a) final fee applications for all Professionals and(b) the resolution of any appeals of the Confirmation Order. Upon the dissolution of the Committee, the GUC Administrator shall become the successor in interest to the Committee and the members of the Committee and their respective Professionals will cease to have any duty, obligation, or role arising from or related to the Reorganized Debtors' Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Reorganized Debtors' Chapter 11 Cases.

12. **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

13. **No Stay of Confirmation Order**

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

14. **Waiver of Estoppel**

Except with respect to the SAPSA and the parties thereto, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors' or Reorganized Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court or the Notice and Claims Agent prior to the Confirmation Date.

# VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A. Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to the holders of Allowed Prepetition 2021 Notes Claims.

This discussion is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the Plan to the Debtors or any holder of a Claim or Interest. The Debtors will not seek a ruling from the Internal Revenue Service (the "***IRS***") and have not obtained an opinion of counsel regarding any tax consequences of the Plan to the Debtors or any holder of a Claim or Interest. No assurances can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This discussion only addresses U.S. federal income tax consequences and does not address any other U.S. federal tax consequences (such as estate and gift tax consequences), or the tax consequences arising under the laws of any foreign, state, local or other jurisdiction or any income tax treaty. The Debtors intend to treat, and this discussion assumes that, the Prepetition 2021 Notes, the Amended Prepetition Notes, and the Purchaser Take-Back Notes (together with the Amended Prepetition Notes, the "***New/Amended Notes***") will be treated for U.S. federal income tax purposes in accordance with their form and as interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. There could be consequences to Non-U.S. holders if the New/Amended Notes are treated as interests in the Debtors other than "solely as a creditor" for purposes of section 897 of the Tax Code. See Section VIII.D.5 of this Disclosure Statement entitled "Sale, Redemption or Repurchase of the New Parent Equity."

This discussion does not describe all of the tax consequences that may be relevant in light of a holder's particular circumstances, including the potential application of provisions of the Tax Code known as the Medicare Contribution Tax, or tax consequences applicable to apply to holders of Allowed Prepetition 2021 Notes Claims that are otherwise subject to special treatment under the Tax Code, such as: financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; certain former U.S. citizens or long-term residents; persons who hold Allowed Prepetition 2021 Notes Claims, New/Amended Notes or New Parent Equity as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; governments or governmental organizations; partnerships or other pass-through entities or holders of interests therein; persons who received their Allowed Prepetition 2021 Notes Claims upon exercise of employee stock options or otherwise as compensation; persons required to accelerate the recognition of any item of gross income with respect to the Allowed Prepetition 2021 Notes Claims or the New/Amended Notes as a result of such income being recognized on an "applicable financial statement" (within the meaning of Section 451(b) of the Code); and holders not entitled to vote on the Plan. The following discussion assumes that holders hold their Allowed Prepetition 2021 Notes Claims, New/Amended Notes and New Parent Equity as "capital assets" (as defined in section 1221 of the Tax Code).

If an entity that is classified as a partnership for U.S. federal income tax purposes holds Allowed Prepetition 2021 Notes Claims, New/Amended Notes and New Parent Equity, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the activities of the partnership. Partnerships holding Allowed Prepetition 2021 Notes Claims, New/Amended Notes and New Parent Equity and partners in such partnerships should consult their tax advisors as to the particular U.S. federal income tax consequences of holding and disposing of the Allowed Prepetition 2021 Notes Claims, New/Amended Notes and New Parent Equity.

For purposes of this discussion, a "U.S. holder" is a beneficial owner of an Allowed Prepetition 2021 Notes Claim, that is, for U.S. federal income tax purposes:

(i) an individual who is a U.S. citizen or U.S. resident alien;

(ii) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

(iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

(iv) a trust (a) the administration of which is subject to the primary supervision of a U.S. court and that has one or more United States persons that have the authority to control all substantial decisions of the trust or (b) that has made a valid election under applicable Treasury regulations to be treated as a United States person.

A "Non-U.S. holder" is a beneficial owner of an Allowed Prepetition 2021 Notes Claim that is an individual, corporation, estate or trust that is not a U.S. holder.

THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF ALLOWED PREPETITION 2021 NOTES CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

1. **Characterization of Restructuring Transactions under the Plan**

Pursuant to the Plan, the Debtors will transfer the Purchased Assets to Purchaser in a taxable exchange. The Debtors anticipate that they will recognize substantial losses as a result of the Sale equal to the difference between (i) the sum of (a) the cash consideration, (b) the issue price of a debt instrument (or an instrument treated as a debt instrument for U.S. federal income tax purposes) received as consideration (or, if certain conditions are satisfied and a debt instrument is subject to Treasury Regulation section 1.1275-4(c), the issue price of the debt instrument plus the fair market value of the contingent payments payable on the debt instrument), (c) the fair market value of any other non-cash consideration and (d) certain assumed liabilities that are properly treated as consideration for U.S. federal income tax purposes and (ii) the Debtors' adjusted basis in the Purchased Assets sold.

In addition, as discussed below, the Debtors will recognize cancellation of indebtedness income ("***CODI***") as a result of the exchange of the Prepetition 2021 Notes for (x) the Prepetition 2021 Notes Secured Claim Cash Distribution, (y) the New/Amended Notes and (z) the New Parent Equity, in each case, under the Plan (the "***2021 Note Exchange***").

2. **Cancellation of Debt and Reduction of Tax Attributes**

It is anticipated that the 2021 Note Exchange will result in cancellation of a significant portion of the Debtors' outstanding indebtedness. Absent an exception, the Debtors would generally recognize CODI upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. However, with respect to CODI generated upon implementation of the 2021 Note Exchange, the Debtors anticipate that they will not be required to include any amount of such CODI in gross income, because the discharge of debt will occur pursuant to a proceeding under title 11 of the Bankruptcy Code.

The Debtors expect that they will be required to reduce their tax attributes by the amount of CODI that is excluded from gross income, in accordance with the methodology set forth in the Treasury regulations addressing such reduction for consolidated groups (the "***Tax Attribute Reduction Rules***"). Generally, tax attributes are reduced in the following order: (a) net operating losses and net operating loss carryforwards; (b) certain tax credit carryovers; (c) net capital losses and capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Debtors remain subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. However, the Debtors may elect to first reduce the basis of their remaining depreciable assets, in which case the limitation on reduction in tax basis in assets described above in (d) will not apply.

As of December 31, 2018, the Debtors have a U.S. federal net operating loss carryforward of approximately $304.5 million (the "***2018 NOL Carryforward***"), a U.S. federal business interest deduction carryforward of approximately $39.7 million (the "***Interest Deduction Carryforward***"), and an Alternative Minimum Tax Credit of approximately $15.7 million (the "***AMT Credit***"). The Debtors further estimate that they will generate additional net operating losses, including substantial net operating losses as a result of the Sale (together with the 2018 NOL Carryforward, the "***NOLs***") and business interest not allowed as a deduction (together with the NOLs, the Interest Deduction Carryforward, the AMT Credit and certain other tax attributes, the "***Tax Attributes***") in 2019. The Debtors expect that the NOLs and other tax attributes may be substantially reduced under the Tax Attribute Reduction Rules

as a result of CODI generated during 2019 and upon implementation of the 2021 Note Exchange. In addition, as described below, any remaining NOLs and certain other Tax Attributes may be subject to limitations on their use.

3. **Limitation of NOL Carryforwards and Other Tax Attributes**

After giving effect to the reduction in Tax Attributes due to excluded CODI under the Tax Attribute Reduction Rules described above, the Debtor's ability to use any remaining Tax Attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the Tax Code or other rules or tax principles. Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change" (an "***Ownership Change***") the amount of their pre-Ownership Change NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other Tax Attributes allocable to periods prior to the Effective Date (collectively, "***Pre-Change Losses***") that may be utilized to offset future taxable income generally is subject to an annual limitation (the "***Annual Limitation***").

In general, the Debtors anticipate the Restructuring Transactions pursuant to the Plan will result in an Ownership Change. The Debtors have not yet determined whether they will be eligible for the special rule under section 382(l)(5) of the Tax Code (as described below).

**a. General Annual Limitation**

The amount of the Annual Limitation on a corporation's Pre-Change Losses is generally equal to the product of (a) the fair market value of the stock of the corporation immediately before the Ownership Change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar month period ending with the calendar month in which the Ownership Change occurs, or 1.77 percent for an Ownership Change that occurs in October 2019). If a corporation has a net unrealized built-in gain immediately prior to an Ownership Change, the Annual Limitation may be increased during the subsequent five-year period (the "***Recognition Period***"). If a corporation has a net-unrealized built-in loss immediately prior to an Ownership Change, certain losses or deductions recognized during the Recognition Period also would be subject to the Annual Limitation and thus would reduce the amount of Pre-Change Losses that could be used by a corporation during the Recognition Period. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an Ownership Change as the result of a bankruptcy proceeding.

**b. Special Bankruptcy Exceptions**

An exception to the foregoing Annual Limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation in Chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). A qualified creditor generally is any creditor who has been the beneficial owner of the debt of a debtor corporation continuously during the period beginning at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" at all times since it has been outstanding. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor corporation as having always held any debt exchanged for stock for purposes of determining whether such creditor is a qualified creditor unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor corporation that the creditor has not owned the debt for the requisite period.

Under the 382(l)(5) Exception, a debtor corporation's Pre-Change Losses are not subject to the Annual Limitation. However, if the 382(l)(5) Exception applies, the debtor's NOL carryforwards will be reduced by the amount of any interest deductions claimed with respect to debt converted into stock in the plan of reorganization during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization. Any further ownership change of Reorganized Parent (as defined in the Plan) within a two-year period after the Effective Date would preclude the utilization of any Pre-Change Losses at the time of the subsequent ownership change against future income.

Where the 382(l)(5) Exception is not applicable to a debtor corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "***382(l)(6) Exception***"). Under the 382(l)(6) Exception, the Annual Limitation will be calculated by reference to the lesser of (a) the value of the equity interests in the debtor corporation (with certain adjustments) immediately after the Ownership Change or (b) the value of the debtor

corporation's assets (determined without regard to liabilities surrendered or cancelled pursuant to the Plan) immediately before the Ownership Change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an Ownership Change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo an Ownership Change within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for an Ownership Change.

If the Debtors are eligible for the 382(l)(5) Exception, the Debtors anticipate that they would not elect out of its application in order to preserve the Debtors' Tax Attributes. However, the Debtor's ability to qualify for the 382(l)(5) Exception is subject to further analysis and depends on whether the 2021 Note Exchange satisfies the requirements of the 382(l)(5) Exception, including whether the holders of the Allowed Prepetition 2021 Notes Claims may be treated as qualified creditors for purposes of Section 382(l)(5) of the Tax Code.

4. **Alternative Minimum Tax; Refundable Credits**

Corporations are no longer subject to the alternative minimum tax ("***AMT***"), however, where a corporation has an AMT credit from a prior taxable year, the corporation will continue to carry the AMT credit forward and may use, subject to some limitations, a portion of it as a refundable credit in any taxable year beginning after 2017 but before 2022. Generally, 50 percent of the corporation's AMT credit carried forward to one of these years will be claimable and refundable for that year. In the taxable year beginning in 2021, however, the entire remaining carryforward generally will be fully refundable (collectively the "***AMT Credit Refunds***"). The Debtors expect to recover total AMT Credit Refunds of approximately $15.7 million contingent upon the Debtors filing applicable 2019, 2020, and 2021 U.S. federal income tax returns. However, in the event the Debtors are subject to an Annual Limitation under sections 382 and 383 of the Tax Code (as described above), the total amount of the recoverable AMT Credit Refunds may be limited under certain circumstances as a result of an Ownership Change or if the Debtors liquidate (or are deemed to liquidate for U.S. federal income tax purposes) before the 2022 taxable year.

**C. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Prepetition 2021 Notes Secured Claims**

1. **U.S. Federal Income Tax Consequences to U.S. Holders in the 2021 Note Exchange**

Pursuant to the 2021 Note Exchange, a U.S. holder of an Allowed Prepetition 2021 Notes Claim will be treated as exchanging on the Effective Date such Claim for its Pro Rata share of, among other things: (i) the Prepetition 2021 Notes Secured Claim Cash Distribution, (ii) the New/Amended Notes and (iii) the New Parent Equity. The U.S. federal income tax treatment of the 2021 Note Exchange is uncertain. The discussion below describes the U.S. federal income tax consequences associated with the potential characterization of the 2021 Note Exchange as either a taxable exchange or a recapitalization for U.S. federal income tax purposes.

**a. Taxable Exchange**

The discussion below assumes that the 2021 Note Exchange is treated as taxable exchange for U.S. federal income tax purposes. If the 2021 Note Exchange is treated as a taxable exchange, each U.S. holder of such Allowed Prepetition 2021 Notes Claim should recognize gain or loss equal to the difference between (x) the sum of (a) the amount of the Prepetition 2021 Notes Secured Claim Cash Distribution, (b) the issue price of the Amended Prepetition Notes (as described below), (c) the fair market value of the Purchaser Take-Back Notes and (d) the fair market value of the New Parent Equity it received in exchange for such Claim and (y) such U.S. holder's adjusted basis, if any, in such Allowed Prepetition 2021 Notes Claim. Whether such gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Allowed Prepetition 2021 Notes Claim in such U.S. holder's hands, whether such Claim was purchased at a discount, and whether and to what extent the U.S. holder previously has claimed a bad debt deduction with respect to such Claim. A U.S. holder's initial tax basis in the Amended Prepetition Notes should equal the issue price of such Amended Prepetition Notes and the U.S. holder's initial tax basis in the Purchaser Take-Back Notes should equal the fair market value of such Purchaser Take-Back Notes. A U.S. holder's holding period for the Amended Prepetition Notes and the Purchaser Take-Back Notes received should begin on the day following the Effective Date. See Sections VIII.C.2 and VIII.C.3 of this Disclosure Statement entitled "Accrued Interest" and "Market Discount."

**b. Recapitalization**

The 2021 Note Exchange should qualify as a recapitalization if the Prepetition 2021 Notes qualify as "securities" for U.S. federal income tax purposes. Neither the Code nor the Treasury regulations define the term "security" for this purpose, and the term has not been clearly defined by judicial decisions. Rather, whether a debt instrument is a security is based on all of the facts and circumstances, including the degree of participation and continuing interest in the affairs of the business and the extent of the proprietary interest of the debt instrument in the corporate assets. Most authorities have held that the term to maturity of the debt instrument is one of the most significant factors in determining whether a debt instrument is a security. In this regard, debt instruments with a term of ten years or more generally qualify as securities, debt instruments with a term between five and ten years may qualify as securities, and debt instruments with a term of less than five years generally do not qualify as securities. Irrespective of the term of a debt instrument, it is not certain whether a debt instrument issued by a disregarded entity owned by a corporation would be considered a security.

The U.S. federal income tax treatment of the 2021 Note Exchange is uncertain, as the original term of the Prepetition 2021 Notes was just over five years and the expected term of the Amended Prepetition Notes will be just over five years. The Prepetition 2021 Notes were issued by Cloud Peak Energy Resources LLC, a disregarded entity of Parent. The discussion below assumes that the New Parent Equity is received by a U.S. holder in exchange for a portion of the Allowed Prepetition 2021 Notes Claims. If both of the Prepetition 2021 Notes and the Amended Prepetition Notes constitute securities of Parent, the 2021 Note Exchange should be treated as a recapitalization with cash or other property that is not a security or stock ("***boot***") for U.S. federal income tax purposes. If treated as a recapitalization with boot, no loss should be recognized by a U.S. holder on the 2021 Note Exchange, but gain, if any, realized should be recognized to the extent of the Prepetition 2021 Notes Secured Claim Cash Distribution and fair market value of the Purchaser Take-Back Notes. The amount of gain realized on such exchange should equal the excess, if any, of the total consideration received (i.e., the sum of (w) the Prepetition 2021 Notes Secured Claim Cash Distribution, (x) the fair market value of the Purchaser Take-Back Notes, (y) the issue price of the Amended Prepetition Notes and (z) the fair market value of the New Parent Equity) over the U.S. Holder's adjusted tax basis in the Prepetition 2021 Notes. A U.S. holder's aggregate tax basis in New Parent Equity and the Amended Prepetition Notes should equal its tax basis in the Prepetition 2021 Notes Claims exchanged therefor, increased by the amount of gain recognized on the 2021 Note Exchange and reduced by the Prepetition 2021 Notes Secured Claim Cash Distribution and the fair market value of the Purchaser Take-Back Notes (which aggregate basis should be allocated between the New Parent Equity and Amended Prepetition Notes based on their relative fair market values). The holding period for the New Parent Equity and the Amended Prepetition Notes should include the holding period for the Allowed Prepetition 2021 Notes Claims exchanged therefor (except to the extent any New Parent Equity or Amended Prepetition Notes is allocable to accrued but unpaid interest, in which case its holding period would begin on the day following the Effective Date). The holding period for the Purchaser Take-Back Notes should begin on the day following the Effective Date. See Sections VIII.C.2 and VIII.C.3 of this Disclosure Statement entitled "Accrued Interest" and "Market Discount."

However, if only the Prepetition 2021 Notes (but not the Amended Prepetition Notes) constitute securities of Parent, a U.S. holder's tax basis in the New Parent Equity should equal its tax basis in the Prepetition 2021 Notes exchanged therefor, increased by the amount of gain recognized on the 2021 Note Exchange and reduced by the fair market value of the Purchaser Take-Back Notes and the issue price of the Amended Prepetition Notes. The amount of gain, if any, realized should be recognized to the extent of the Prepetition 2021 Notes Secured Claim Cash Distribution, the fair market value of the Purchaser Take-Back Notes and the issue price of the Amended Prepetition Notes. The holding period for the New Parent Equity should include the holding period for the Allowed Prepetition 2021 Notes Claims exchanged therefor (except to the extent any New Parent Equity is allocable to accrued but unpaid interest, in which case its holding period would begin on the day following the Effective Date). The holding period for the Purchaser Take-Back Notes and the Amended Prepetition Notes should begin on the day following the Effective Date.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE UNCERTAINTY OF THE TAX TREATMENT OF THE 2021 NOTE EXCHANGE, INCLUDING WHETHER THE 2021 NOTE EXCHANGE QUALIFIES AS A TAXABLE TRANSACTION OR A RECAPITALIZATION FOR U.S. FEDERAL INCOME TAX PURPOSES AND THE ASSOCIATED TAX CONSEQUENCES TO THEM RELATED THERETO.**

2. **Accrued Interest**

To the extent that any amount received by a U.S. holder of an Allowed Prepetition 2021 Notes Claim in the 2021 Note Exchange is attributable to accrued but unpaid interest on the debt instrument constituting the surrendered Allowed Prepetition 2021 Notes Claim, the receipt of such amount should be taxable to the U.S. holder as ordinary interest income (to the extent not already taken into income by the U.S. holder). Conversely, a U.S. holder of an Allowed Prepetition 2021 Notes Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the U.S. holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Prepetition 2021 Notes Claim, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Prepetition 2021 Notes Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest, while certain Treasury regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a holder should be allocated in a manner other than as provided in the Plan, which could include allocating consideration first to any accrued but unpaid interest under the aforementioned Treasury regulations.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR PREPETITION 2021 NOTES CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

3. **Market Discount**

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("***OID***"), its adjusted issue price, by at least a de minimis amount. Any gain recognized by a U.S. holder on the 2021 Note Exchange of a Prepetition 2021 Note that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Prepetition 2021 Note was considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued).

4. **Distributions on New Parent Equity**

Reorganized Parent does not expect to pay cash distributions on New Parent Equity in the foreseeable future. However, any distributions of cash or property made to a U.S. holder with respect to New Parent Equity generally will be includible in gross income by a U.S. holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed Reorganized Parent's current and accumulated earnings and profits, the distribution (i) will be treated as a non-taxable return of the U.S. holder's adjusted basis in New Parent Equity and (ii) thereafter as capital gain. A distribution which is treated as a dividend and paid to a corporate U.S. holder of the New Parent Equity may be eligible for the dividends-received deduction, and a distribution which is treated as a dividend and paid to a non-corporate U.S. holder of the New Parent Equity may be subject to tax at the preferential tax rates applicable to "qualified dividend income." Amended Prepetition Notes and Purchaser Take-Back Notes

5. **Amended Prepetition Notes and Purchaser Take-Back Notes**

**a. Issue Price**

The issue price of the Amended Prepetition Notes would be determined based on whether the Amended Prepetition Notes or the Prepetition 2021 Notes are considered to be publicly traded under the applicable provisions of the Tax Code and Treasury regulations. A debt instrument is not treated as publicly traded if the stated principal amount of the issue that includes the debt instrument does not exceed $100 million (the "***Small Issue Exception***"). The Amended Prepetition Notes will have a stated principal amount of less than $100 million and, therefore, the

Debtors believe that the Amended Prepetition Notes should not be considered to be publicly traded based on the Small Issue Exception. If the Prepetition 2021 Notes are considered to be publicly traded, the "issue price" of the Amended Prepetition Notes should be determined based on the fair market value of the Prepetition 2021 Notes (as of the date of the Effective Date) exchanged for such Amended Prepetition Notes. If neither the Prepetition 2021 Notes nor the Amended Prepetition Notes are publicly traded, the issue price of the Amended Prepetition Notes should equal their stated principal amount. The Debtors expect that the Prepetition Secured Notes should be considered to be publicly traded and that accordingly the issue price of the Amended Prepetition Notes will be determined based on the fair market value of the Prepetition 2021 Notes exchanged for such Amended Prepetition Notes. The Debtors will provide investors with information regarding the Debtors' determination of the issue price of the Amended Prepetition Notes in a manner consistent with applicable Treasury regulations.

The Debtors expect that the issue price of the Purchaser Take-Back Notes should equal their stated principal amount.

**b. Ownership and Disposition**

**i. Qualified Stated Interest and OID**

Qualified stated interest on the New/Amended Notes will be taxed as ordinary interest income at the time it is received or accrued in accordance with a U.S. holder's regular method of accounting for U.S. federal income tax purposes. Qualified stated interest is generally stated interest that is unconditionally payable in cash or property (other than a debt instrument of the issuer) at least annually at a single fixed rate.

The Purchaser Take-Back Notes are not expected to be issued with OID for U.S. federal income tax purposes because the stated redemption price at maturity is expected to be equal to their issue price and all interest payments due on the Purchaser Take-Back Notes are expected to be qualified stated interest.

If the stated redemption price at maturity of the Amended Prepetition Notes exceeds its issue price, as determined above (see Section VIII.C.5.a of this Disclosure Statement entitled "Issue Price"), by an amount equal to or greater than a specified de minimis amount, then the Amended Prepetition Notes will be treated as issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of an Amended Prepetition Note will include all payments to be made on the Amended Prepetition Note other than payments of qualified stated interest. Interest that is payable in kind (by increasing the principal amount of an Amended Prepetition Note or by issuing a new Amended Prepetition Note) will not be treated as qualified stated interest and thus will be added to the stated redemption price at maturity. The Debtors expect that all or a portion of the interest payable on the Amended Prepetition Notes may be paid in kind.

If an Amended Prepetition Note is treated as issued with OID, then a U.S. holder generally will be required to include such OID in gross income as it accrues over the term of the Amended Prepetition Note at a constant yield without regard to their regular method of accounting for U.S. federal income tax purposes and in advance of the receipt of cash payments attributable to that income. The amount of OID that will be included in income generally will equal the sum of the "daily portions" of OID with respect to the Amended Prepetition Note for each day during the taxable year or portion of the taxable year in which such Amended Prepetition Note was held. The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a note may be of any length and may vary in length over the term of the Amended Prepetition Note, provided that each accrual period is no longer than one year and each scheduled payment of principal and interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the excess, if any, of (a) the product of (x) the Amended Prepetition Note's adjusted issue price at the beginning of such accrual period and (y) its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (b) the aggregate of all qualified stated interest allocable to the accrual period. OID allocable to a final accrual period is the difference between (x) the amount payable at maturity (other than a payment of qualified stated interest) and (y) the adjusted issue price of the Amended Prepetition Note at the beginning of the final accrual period. The "adjusted issue price" of an Amended Prepetition Note at the beginning of any accrual period is generally equal to its issue price increased by the accrued OID for each prior accrual period and reduced by the amount of any payment on the Amended Prepetition Note other than qualified stated interest.

A U.S. holder may elect to treat all interest on an Amended Prepetition Note as OID and calculate the amount includible in gross income under the constant yield method described above. The election is to be made for the taxable

year in which the Amended Prepetition Note was acquired, and may not be revoked without the consent of the IRS. U.S. Holders should consult their own tax advisors about this election.

ii. **Sale, Exchange or Other Taxable Disposition**

Upon the sale, exchange, redemption, retirement or other taxable disposition of a New/Amended Note, a U.S. holder will recognize taxable gain or loss equal to the difference between (x) the amount realized on such disposition (except to the extent any amount realized is attributable to accrued but unpaid interest, which amount will be taxed as ordinary income to the extent not previously included in income) and (y) the U.S. holder's adjusted tax basis in the New/Amended Note. A U.S. holder's initial tax basis in a New/Amended Note will be determined as described above (see Section VIII.C.1 of this Disclosure Statement entitled "U.S. Federal Income Tax Consequences to U.S. Holders in the 2021 Note Exchange"). A U.S. holder's adjusted tax basis in a New/Amended Note will be its initial tax basis, increased by the amount of any accrued OID on such New/Amended Note previously included in income by the U.S. holder, and decreased by the amount of any payment other than qualified stated interest. Any capital gain or loss on the disposition of a New/Amended Note will be long-term capital gain or loss if, at the time of such disposition, the U.S. holder's holding period in a New/Amended Note is more than one year. Long-term capital gains of non-corporate taxpayers are generally eligible for preferential rates of taxation. The deductibility of capital losses is subject to certain limitations.

**c. Amortizable Bond Premium**

If a U.S. holder's tax basis in a New/Amended Note immediately after the 2021 Note Exchange for such New/Amended Note is greater than the stated redemption price at maturity, the U.S. holder will be considered to have acquired such New/Amended Note with amortizable bond premium, in an amount equal to such excess (any such New/Amended Note, a "***Bond Premium Note***"). A U.S. holder's tax basis in a New/Amended Note acquired pursuant to the 2021 Note Exchange will be determined as described above (see Section VIII.C.1 of this Disclosure Statement entitled "U.S. Federal Income Tax Consequences to U.S. Holders in the 2021 Note Exchange"). A U.S. holder may elect to amortize this bond premium, using a constant-yield method, over the remaining term of such Bond Premium Note. Subject to the discussion in the following paragraph, a U.S. holder generally may use the amortizable bond premium allocable to an accrual period to offset qualified stated interest otherwise required to be included in income with respect to the Bond Premium Note in that accrual period. An election to amortize bond premium applies to all taxable debt obligations then owned or thereafter acquired and may be revoked only with the consent of the IRS. U.S. holders should consult their own tax advisors regarding the amortization of any amortizable bond premium.

**d. Acquisition Premium**

If a U.S. holder's adjusted basis in a New/Amended Note immediately after the 2021 Note Exchange is greater than the issue price of the New/Amended Note but less than the stated redemption price at maturity of such New/Amended Note, the U.S. holder will be considered to have acquired the New/Amended Note at an acquisition premium. Under the acquisition premium rules, the amount of any OID that the U.S. holder must include in gross income with respect to the New/Amended Note for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.

**e. Market Discount**

If a U.S. holder's tax basis in a New/Amended Note received in an exchange is less than the issue price of the New/Amended Note, the amount of the difference will be treated as market discount for U.S. federal income tax purposes, unless this difference is less than a specified de minimis amount. If a New/Amended Note has market discount, a U.S. holder generally will be required to treat any principal payment, any payment that is not qualified stated interest, or any gain on the sale or other taxable disposition of the New/Amended Note as ordinary income to the extent of the market discount accrued on the New/Amended Note at the time of the payment or disposition unless the U.S. holder has previously included this market discount in income.

**THE PRECEDING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT LEGAL OR TAX ADVICE. ACCORDINGLY, U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSIDERATIONS RELATING TO THE EXCHANGE AND THE OWNERSHIP AND DISPOSITION OF THE NEW/AMENDED NOTES ACQUIRED PURSUANT TO THE 2021 NOTE EXCHANGE.**

### D. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion includes only certain U.S. federal income tax consequences of the 2021 Note Exchange pursuant to the Restructuring Transactions under the Plan to Non-U.S. holders. The rules governing the U.S. federal income tax consequences to Non-U.S. holders are complex. Each Non-U.S. holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of 2021 Note Exchange to such Non-U.S. holder and the ownership and disposition of the New Parent Equity.

#### 1. Gain Recognition

Whether a Non-U.S. holder realizes gain or loss on the 2021 Note Exchange or the sale, exchange, redemption, retirement or other taxable disposition of a New/Amended Note and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders. Subject to the rules discussed below under Sections VIII.D.6 and VIII.E of this Disclosure Statement entitled “FATCA” and “Information Reporting and Back-Up Withholding,” any gain realized by a Non-U.S. holder on the 2021 Note Exchange or the taxable disposition of a New/Amended Note generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the 2021 Note Exchange or taxable disposition of a New/Amended Note occurs and certain other conditions are met, or (ii) such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States).

If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or lower applicable income tax treaty rate) on any gain realized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax in the manner described in Section VIII.D.3 of this Disclosure Statement entitled “Income or Gain Effectively Connected with a U.S. Trade or Business.”

#### 2. Accrued Interest

Subject to the rules discussed below under Sections VIII.D.6 and VIII.E of this Disclosure Statement entitled “FATCA” and “Information Reporting and Back-Up Withholding,” payments attributable to (a) accrued but unpaid interest on a Prepetition 2021 Notes Claim to a Non-U.S. holder and (b) accrued but unpaid interest (including any OID) on a New/Amended Note generally will not be subject to U.S. federal income tax and will be exempt from withholding under the “portfolio interest” exemption if the Non-U.S. holder properly certifies to its foreign status (generally, by providing the withholding agent IRS Form W-8BEN or W-8BEN-E prior to payment), and:

(i) the Non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of the stock of Reorganized Parent;

(ii) the Non-U.S. holder is not a “controlled foreign corporation” that is a “related person” with respect to Reorganized Parent;

(iii) the Non-U.S. holder is not a bank whose receipt of interest on a Prepetition 2021 Notes Claim or a New/Amended Note is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of the Non-U.S. holder’s trade or business; and

(iv) such interest is not effectively connected with the Non-U.S. holder’s conduct of a U.S. trade or business.

A Non-U.S. holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or lower applicable income tax treaty rate) on payments that are attributable to (a) accrued but unpaid interest on a Prepetition 2021 Notes Claim or (b) accrued but unpaid interest (including any accrued OID) on a New/Amended Note. For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers’ securities in the ordinary course of their trade or business.

If any accrued but unpaid interest is effectively connected income, the Non-U.S. holder generally will be subject to U.S. federal income tax in the manner described below in Section VIII.D.3 of this Disclosure Statement entitled “Income or Gain Effectively Connected with a U.S. Trade or Business.”

### 3. Income or Gain Effectively Connected with a U.S. Trade or Business

If (i) any interest on a Prepetition 2021 Note or a New/Amended Note, (ii) gain realized by a Non-U.S. holder on the 2021 Note Exchange, or (iii) dividends on the New Parent Equity, as described below under Section D.4 of this Disclosure Statement entitled "Distributions on the New Parent Equity", is effectively connected with such holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, the holder maintains a permanent establishment in the United States to which such interest, gain or dividends is attributable), then the interest income, gain or dividends will be subject to U.S. federal income tax at regular graduated income tax rates generally in the same manner as if such Non-U.S. holder were a U.S. holder. Effectively connected income will not be subject to U.S. federal withholding tax if the Non-U.S. holder satisfies certain certification requirements by providing to the applicable withholding agent a properly executed IRS Form W-8ECI (or successor form), in addition, if such a Non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of its effectively connected earnings and profits effectively connected with a U.S. trade or business.

### 4. Distributions on the New Parent Equity

Any distributions made with respect to the New Parent Equity that is owned by a Non-U.S. holder will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Parent's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent those distributions exceed Reorganized Parent's current and accumulated earnings and profits, the distributions will be treated as a non-taxable return of capital to the extent of the Non-U.S. holder's tax basis in the New Parent Equity and thereafter as capital gain. Subject to the rules discussed above under Section VIII.D.3, of this Disclosure Statement entitled "Income or Gain Effectively Connected with a U.S. Trade or Business," and below under Sections VIII.D.5 and VIII.D.6 of this Disclosure Statement entitled "Sale, Redemption or Repurchase of the New Parent Equity" and "FATCA," any distribution made to a Non-U.S. holder on account of the New Parent Equity generally will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the distribution unless an applicable income tax treaty provides for a lower rate. To receive the benefit of a reduced treaty rate, a Non-U.S. holder must provide the applicable withholding agent with an IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) certifying qualification for the reduced rate.

### 5. Sale, Redemption or Repurchase of the New Parent Equity

Subject to the rules discussed below under Section VIII.E of this Disclosure Statement entitled "Information Reporting and Back-Up Withholding," a Non-U.S. holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of any of its New Parent Equity, including any gain resulting from a non-dividend distribution in excess of the holder's tax basis in its New Parent Equity, unless

- the Non-U.S. holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met;
- such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States); or
- Reorganized Parent is or has been during a specified testing period a USRPHC.

A Non-U.S. holder described in the first bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate as specified by an applicable income tax treaty) on the amount of such gain, which generally may be offset by U.S. source capital losses.

A Non-U.S. holder whose gain is described in the second bullet point above or, subject to the exceptions described in the next paragraph, the third bullet point above, generally will be taxed on a net income basis at the rates and in the manner generally applicable to United States persons (as defined under the Code) unless an applicable income tax treaty provides otherwise. If the Non-U.S. holder is a corporation for U.S. federal income tax purposes whose gain is described in the second bullet point above, then such gain would also be included in its effectively connected earnings and profits (as adjusted for certain items), which may be subject to a branch profits tax (at a 30% rate or such lower rate as specified by an applicable income tax treaty).

Generally, a corporation is a USRPHC if the fair market value of its United States real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business. The Debtors expect that Reorganized Parent currently is, and expects to remain for the foreseeable future, a USRPHC for U.S. federal income tax purposes. If the New Parent Equity is "regularly traded on an established securities market" (within the meaning of the Treasury regulations), only a Non-U.S. holder that actually or constructively owns, or owned at any time during the shorter of the five-year period ending on the date of the disposition or the Non-U.S. holder's holding period for the New Parent Equity, more than 5% of the New Parent Equity will be treated as disposing of a United States real property interest and will be taxable on gain realized on the disposition of the New Parent Equity (or on certain distributions in excess of Reorganized Parent's earnings and profits) as a result of Parent's status as a USRPHC. If the New Parent Equity were not considered to be regularly traded on an established securities market, a holder (regardless of the percentage of stock owned) would be treated as disposing of a United States real property interest and would be subject to U.S. federal income tax on a taxable disposition of the New Parent Equity (as described in the preceding paragraph), and a 15% withholding tax would apply to the gross proceeds from such disposition. Following the Effective Date, there is no assurance whether Reorganized Parent will take steps to create a market for the New Parent Equity and if any such steps are taken, whether New Parent Equity will be treated as regularly traded on an established securities market.

**NON-U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE OWNERSHIP AND DISPOSITION OF THE NEW PARENT EQUITY.**

6. **FATCA**

The Foreign Account Tax Compliance Act ("***FATCA***") imposes a 30% withholding tax on "withholdable payments" (as defined in the Tax Code, including payments of interest on an Allowed Prepetition 2021 Note Claim or a New/Amended Note and dividends on the New Parent Equity) if paid to a "foreign financial institution" or a "non-financial entity" (each as defined in the Tax Code) (including in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are non-U.S. entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies that it does not have any "substantial United States owners" (as defined in the Tax Code) or provides the applicable withholding agent with a certification identifying the direct and indirect substantial United States owners of the entity (in either case, generally on an IRS Form W-8BEN-E), or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules and provides appropriate documentation (such as an IRS Form W-8BEN-E). While withholdable payments would have originally included payments of gross proceeds from the sale or other disposition of a note or stock which can produce U.S. source interest or dividends, recently proposed Treasury regulations provide that such payments of gross proceeds (other than amounts treated as interest (including any OID)) do not constitute withholdable payments. Taxpayers may rely generally on these proposed Treasury regulations until they are revoked or final Treasury regulations are issued.

Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these rules may be subject to different rules. Under certain circumstances, a holder might be eligible for refunds or credits of such taxes.

**NON-U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE APPLICATION OF FATCA TO THE RESTRUCTURING TRANSACTIONS PURSUANT TO THE PLAN.**

**E. Information Reporting and Back-Up Withholding**

Under the Tax Code, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding. Backup withholding may apply to payments made pursuant to the Plan, unless the holder provides to the applicable withholding agent its taxpayer identification number, certified under penalties of perjury, as well as certain other information or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

In addition, from an information reporting perspective, the Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated,

including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury regulations and whether the Restructuring Transactions contemplated by the Plan would be subject to these Treasury regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF ALLOWED PREPETITION SECURED NOTES CLAIMS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

# IX. CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, Holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with the attachments, exhibits, or documents incorporated by reference hereto. The risk factors below should not be regarded as the only risks associated with the Debtors' businesses or the Plan and its implementation. Documents filed with the SEC may contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

## A. Certain Bankruptcy Law Considerations

### 1. General

While the Debtors believe that the Chapter 11 Cases will be efficient and not materially harmful to the value of their assets, the Debtors cannot be certain that this will be the case. Further, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure the parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on subsequent ownership of the Debtors' assets or on the amount of distributable value available to the Holders of Claims or Interests.

### 2. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

### 3. The Conditions Precedent to the Confirmation Date and/or Effective Date of the Plan May Not Occur

As more fully set forth in Article X of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

### 4. The Debtors May Fail to Satisfy Voting Requirements

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors' operating assets pursuant to section 363 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

5. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

6. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

7. **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to nonaccepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan is not confirmed by the Court, it is unclear what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article X of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the SAPSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

8. **Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can

be no assurance that the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 9. Risk of Termination of the SAPSA

The SAPSA contains certain provisions that give the Required Consenting Noteholders the ability to terminate the SAPSA if various conditions are satisfied, such as the failure to meet the obligations under the DIP Facility following the occurrence of an Event of Default under Section 8.01 of the DIP Credit Agreement or the conversion of one or more of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code. Should a termination event occur, all obligations of the Parties under the SAPSA will terminate, except that any party's termination solely with respect to itself will not result in the termination of the SAPSA with respect to any other party. Termination of the SAPSA could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the distributable value available to the Holders of Claims or Interests.

### 10. Conversion into Cases under Chapter 7 of the Bankruptcy Code

If no plan can be confirmed, or if the Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than selling in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations. See the Liquidation Analysis attached hereto as **Exhibit E** for further discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

## B. Additional Factors Affecting the Value of Claims

### 1. The Total Amount of Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than what the Debtors have estimated, which, in turn, could cause the value of distributions to be reduced substantially.

### 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

## C. Risks Relating to the Debtors' Business and Financial Condition

### 1. Risks Associated with the Debtors' Business and Industry

The risks associated with the Debtors' business and industry are more fully described in the Debtors' SEC filings, including:

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed on March 15, 2019;
- Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2019 and June 30, 2019, filed on May 10, 2019 and September 19, 2019, respectively;
- Current Reports on Form 8-K filed January 14, 2019, January 29, 2019, March 27, 2019, April 15, 2019, May 1, 2019, May 8, 2019, May 10, 2019, May 17, 2019, June 25, 2019, July 19, 2019, August 14, 2019,

August 20, 2019 August 23, 2019, August 29, 2019, September 5, 2019, September 11, 2019, September 19, 2019, September 26, 2019, and October 1, 2019.

The risks associated with the Debtors' business and industry described in the Debtors' filings with the SEC include, but are not limited to, the following:

- the timing and extent of any sustained recovery of the currently depressed PRB thermal coal industry and the impact of ongoing or further depressed PRB thermal coal industry conditions on our financial performance, liquidity, and any financial covenant compliance;
- the timing of reductions or increases in customer coal inventories;
- the impact of increasingly variable and less predictable demand for thermal coal based on natural gas prices, summer cooling demand, winter heating demand, economic growth rates, and other factors that impact overall demand for electricity;
- the impact of the Company's anticipated impairment charge for the three and six months ended June 30, 2019 and any additional asset impairment charges if required as a result of challenging industry conditions or other factors;
- the impact of "keep coal in the ground" campaigns and other well-funded, anti-coal initiatives by environmental activist groups and others targeting substantially all aspects of our industry;
- competition with natural gas, wind, solar, and other non-coal energy resources, which may continue to increase as a result of low domestic natural gas prices, the declining cost of renewables and due to environmental, energy and tax policies, regulations, subsidies, and other government actions that encourage or mandate use of alternative energy sources, as well as competition with other coal producers in the PRB, including the recently-announced joint venture between Peabody and Arch Coal;
- operational, geological, equipment, permit, labor, and other risks inherent in surface coal mining;
- any increases in rates or changes in regulatory interpretations or assessment methodologies with respect to royalties or severance and production taxes and the potential impact of associated interest and penalties;
- railroad, export terminal and other transportation performance, costs and availability, including the availability of sufficient and reliable rail capacity to transport PRB coal, any development of future export terminal capacity and our ability to access capacity on commercially reasonable terms; and
- failure of the Purchaser to close on the Sale Transaction pursuant to the terms of the APA.

### 2. Liquidity During the Chapter 11 Cases

In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.

The Debtors' current liquidity may not be sufficient to allow the Debtors to satisfy their obligations related to the Chapter 11 Cases and proceed with the confirmation of a chapter 11 plan. As of October 4, 2019, the Debtors' liquidity is expected to be $113.1 million.

## D. Factors Relating to Securities to Be Issued Under the Plan

### 1. Market for Securities

The Purchaser Take-Back Notes and the New Parent Equity will be newly issued securities for which there is no established trading market, and the Debtors cannot make any assurances that any market for resales of such securities will develop in the foreseeable future, or to the extent that such markets do develop, the liquidity of such market. Further, the Purchaser, the Debtors, and the Reorganized Debtors have no duty under the Plan and do not intend to register the resales of such securities under the Securities Act of 1933, as amended or the classes of such securities under the Securities Exchange Act of 1934, as amended. As a result, the Holders of the Purchaser Take-Back Notes may be unable to resell these securities at acceptable prices, or at all. In addition, affiliates of the Purchaser

will be subject to restrictions of resales of their securities pursuant to Rule 144. See "Transfer Restrictions and Consequences Under Federal Securities Laws" below.

2. **Ability of Reorganized Debtors to Pay Principal and Interest on the Amended Prepetition Notes**

The Reorganized Debtors' ability to make scheduled payments on the Amended Prepetition Notes depends on the Purchaser's ability to make Royalty Interest payments and the Reorganized Debtors' ability to obtain proceeds from the sale, lease, or other transaction related to the Retained Real Estate. This may be affected by economic, financial, competitive, legislative, regulatory and other factors beyond their control. No assurance can be given that the Reorganized Debtors will be able to satisfy their obligations with respect to the Amended Prepetition Notes.

3. **Ability of Purchaser to Pay Principal and Interest on the Purchaser Take-Back Notes**

The Purchaser's ability to make scheduled payments on the Purchaser Take-Back Notes depends on the future operating and financial performance of the Purchaser, as well as its ability to integrate the Purchased Assets into its business and its ability to generate cash. This may be affected by economic, financial, competitive, legislative, regulatory and other factors beyond its control. If it cannot generate sufficient cash to meet its debt service obligations or fund our other business needs, the Purchaser may, among other things, need to refinance all or a portion of its obligations, including the Purchaser Take-Back Notes, obtain additional financing, delay planned acquisitions or capital expenditures, or sell assets. No assurance can be given that the Purchaser will be able to generate sufficient cash through any of the foregoing. If the Purchaser is not able to refinance any of its debt, obtain additional financing or sell assets on commercially reasonable terms or at all, it may not be able to satisfy its obligations with respect to its debt, including the Purchaser Take-Back Notes.

4. **Ability of the Purchaser to Make Royalty Interest Payments**

The Royalty Interest as contemplated by the Plan may result in greater recoveries for Holders of Allowed Prepetition 2021 Notes Secured Claims based on the future performance of the Purchaser. Any payments in respect of the Royalty Interest may vary based on a number of additional factors, including, among others, the ongoing risks related to business and industry trends for the Purchaser in the preceding risk factor as well as those discussed above under Section IX.C.1. For the avoidance of doubt, any Royalty Interest payments are uncertain, may not ultimately be paid, and are subject to certain restrictions that may limit the timing and ultimately realization of recoveries for Holders of the Allowed Prepetition 2021 Notes Secured Claims.

**E. Additional Factors**

1. **The Debtors Could Withdraw Plan**

Subject to the terms of, and without prejudice to, the rights of any party to the SAPSA, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

2. **The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Court.

3. **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

4. **No Legal or Tax Advice Is Provided by this Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of Claims or Interests should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5. **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

6. **Certain Tax Consequences**

For a discussion of certain tax considerations to the Debtors and certain Holders of Claims in connection with the implementation of the Plan, *see* Section VII.A hereof.

## X. CONFIRMATION OF THE PLAN

### A. Confirmation Hearing

Pursuant to sections 1128 and 1129 of the Bankruptcy Code, the Court has scheduled a hearing to consider confirmation of the Plan (the "***Confirmation Hearing***"). The Confirmation Hearing has been scheduled to be heard on **[●,] 2019** at **9:30 a.m.** (Prevailing Eastern Time) in Courtroom #3 of the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th floor, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time-to-time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

In addition, the Court has set the deadline to object to the confirmation of the Plan as **[●, 2019]** at **5:00 p.m.** (Prevailing Eastern Time) (the "***Objection Deadline***"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections and responses to the Plan, if any, must be served and filed as to be received on or before the Objection Deadline in the manner described below. For the avoidance of doubt, an objection to the Plan filed with the Court will not be considered a vote to reject the Plan.

### B. Objections To Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Court may order:

1) The Debtors and Attorneys to the Debtors:

Cloud Peak Energy Inc.
385 Interlocken Crescent, Suite 400
Broomfield, Colorado 80021
Attn: Bryan Pechersky

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Daniel J. DeFranceschi; John H. Knight; David T. Queroli
Tel: 302.651.7700
Email: defranceschi@rlf.com; knight@rlf.com; queroli@rlf.com

*– and –*

Vinson & Elkins LLP
666 Fifth Avenue
New York, New York 10103-0040
Attn: David S. Meyer, Jessica C. Peet, and Lauren R. Kanzer
Tel: (212) 237-0000
Email: dmeyer@velaw.com; jpeet@velaw.com; lkanzer@velaw.com

*– and –*

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Attn: Paul E. Heath
Tel: (214) 220-7700
Email: pheath@velaw.com

2) The United States Trustee:

Office of the U.S. Trustee for the District of Delaware
844 King Street
Suite 2207
Wilmington, DE 19801
Attn: Jane M. Leamy

3) The DIP Secured Parties and Prepetition Secured Noteholder Group:

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, Suite 1600
Wilmington, Delaware 19801
Attn: Curtis S. Miller; Paige N. Topper; Eric W. Moats
Tel: (302) 658-9200
Email: cmiller@mnat.com; ptopper@mnat.com; emoats@mnat.com

*– and –*

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn: Damian S. Schaible and Aryeh Ethan Folk
Tel: (212) 450-4000
Email: damian.schaible@davispolk.com; Aryeh.folk@davispolk.com

4) The Committee:

Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Attn: Carl N. Kunz, III; Eric J. Monzo; Brya M. Keilson;
Tel: (302) 888-6800
Email: ckunz@morrisjames.com; emonzo@morrisjames.com; bkeilson@morrisjames.com

*– and –*

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019-9601
Attn: Lorenzo Marinuzzi; Jennifer L. Marines; Todd M. Goren; Daniel J. Harris
Tel: (212) 468-8000
Email: lmarinuzzi@mofo.com; jmarines@mofo.com; tgoren@mofo.com; dharris@mofo.com

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE COURT.

## C. Requirements for Confirmation of the Plan

The requirements for Confirmation of the Plan pursuant section 1129(a) of the Bankruptcy Code include, without limitation, whether:

1) the Plan complies with the applicable provisions of the Bankruptcy Code;

2) the Debtors have complied with the applicable provisions of the Bankruptcy Code;

3) the Plan has been proposed in good faith and not by any means forbidden by law;

4) any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable;

5) the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the Holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained and the nature of any compensation for such insider;

6) with respect to each Class of Claims or Interests, each holder of an impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

7) except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

8) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

9) at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

10) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

11) all fees payable under section 1930 of title 28, as determined by the Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

At the Confirmation Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

## D. Best Interests Test/Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan

property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the Holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

Attached hereto as **Exhibit E** and incorporated herein by reference is the liquidation analysis prepared by the Debtors with the assistance of FTI. The Liquidation Analysis provides the Debtors analysis with respect to liquidations of Cloud Peak and its subsidiaries and affiliates. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial reduction in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than such Holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis is solely for the purpose of disclosing to Holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### E. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

As discussed above, the Plan provides for the payment in full of Other Priority Claims and Other Secured Claims, a Post-Effective Date Minimum Cash Amount, and mechanisms for the Administrative and Priority Claims Reserve Account to provide for distributions on account of, among other things, Administrative Claims, Cure Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims. Thus, the Debtors believe that, following consummation of the Plan, no liquidation or further reorganization will be necessary unless otherwise contemplated by the Plan.

### F. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[18]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

---

18 A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

**G. Additional Requirements for Nonconsensual Confirmation**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1. **No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.

2. **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

**A. Alternative Plan**

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

**B. Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7

liquidation would have on the recovery of Holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit E**.

As discussed herein, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

## XII. CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: October 4, 2019
Wilmington, Delaware

Cloud Peak Energy Inc.
on behalf of itself and all other Debtors

DocuSigned by:
Bryan Pechersky
E5E9C090CC544E3...

Bryan Pechersky
Executive Vice President, General Counsel and Corporate Secretary
385 Interlocken Crescent, Suite 400
Broomfield, Colorado 80021